## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

Monica Jordan                )
Louis Jordan,              )
                              )

          Plaintiffs,         )
                              )

          v.                  )     Civil Action Number: H02CV1465
                              )

Washington Mutual Bank, F.A.,   )
                              )

          Defendant.      )

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR, ALTERNATIVELY, FOR PARTIAL SUMMARY JUDGMENT

Comes now, the Defendant, Washington Mutual Bank, F.A. ("Defendant" or "Movant"), by and through the undersigned counsel, and herewith submits this Memorandum in Support of Defendant's Motion for Summary Judgment or, Alternatively, for Partial Summary Judgment, against the Plaintiffs, Monica Jordan and Louis Jordan ("Plaintiffs" or the "Jordans").

## I.  FACTUAL BACKGROUND

The Jordans have a mortgage loan with the Defendant. The loan was placed in November 2000 as a refinancing of previous purchase money financing on their home, which refinancing was accomplished for the purpose of improving on the net interest cost of financing by the Jordans and for the purpose of enabling them to pay off some of the considerable debt balances which existed at the time of the refinancing.

On or about March 9, 2001, via the internet, the Plaintiffs directed their bank, NetBank, an "internet" or "virtual" bank, to make the March 2001 payment on their mortgage loan in the amount of $1,793.46 to the Defendant from the Jordans account at NetBank. It is unclear

whether the NetBank payment was all electronic, or if it was a transaction that was initiated electronically over the internet but which was actually implemented by NetBank through a paper check payment from NetBank to the Defendant.  The NetBank payment was directed to WMHL at 75 North Fairway Drive, Vernon Hills, Illinois 60061-1845.  The Bank's monthly loan statements directed the Jordans to send their payment to Washington Mutual, P.O. Box 70308, Charlotte, N.C.  28272-0303.  Mrs. Jordan testified that the Illinois address was provided by NetBank. (Monica Jordan deposition at page 60, lines 1 to 22.)

The transfer which was made by NetBank to the Bank was not credited to the Jordan loan when it was received by the Bank.  The Jordans soon thereafter became aware that their loan payment was not credited, and they made contact with NetBank to track down their payment.  On or about, but not later than March 23, 2001, the Jordans confirmed that the NetBank payment had not been credited to their loan with the Bank.

The Bank, in the belief that it had not received the Jordans' March payment, reported to a national consumer reporting agency on or about April 1, 2001 that the Jordans had not made their March payment.  When the Bank received the Jordans' April payment, it credited that payment toward their presumably missed March payment.  This is consistent with procedures established in the loan documents and is customary practice.  Thereafter, for a period of time the Bank reported that the Jordans' payments were late and that they were in arrears on their loan.   The Plaintiffs and their attorneys corresponded directly with the Bank in order to get the problem corrected.  At no time did the Plaintiffs or their attorneys correspond with any of the national consumer reporting agencies with regard to the Jordans' loan.   There is no allegation or evidence

2

that the Movant made any credit disclosure to any third party, other than to consumer reporting agencies, concerning the Plaintiffs' credit.

The Plaintiffs allege, among other things, that the erroneous credit reporting precluded them from financing the purchase of a replacement house with acreage. Mrs. Jordan is the sole shareholder of Hummingbird Hill Farms, Inc., which primarily gives pony rides to children at birthday parties. Mrs. Jordan's intention was for Hummingbird Hill Farm, Inc. to become an equestrian business as a horseback riding stable[1].

The Jordans had begun looking for property that had the potential to serve as both a home and riding stable property prior to the credit reporting problem, which is the subject matter of this lawsuit. They attempted to purchase property in June 2000. These efforts were unsuccessful. The Jordan's first attempt at purchasing a property following the misplaced March 2001 Washington Mutual payment was an offer they purportedly made on an 8 acre parcel commonly known as 800 Bacon Hall Road located in Sparks, Baltimore County, Maryland. That attempt occurred in late May or early June 2001. However, even according to the testimony of Mrs Jordan, the proposed purchase contract for that property was not accepted by the seller. Indeed, according to Mrs. Jordan, the seller accepted another offer on the property presented at the same time as the Jordans' offer. The Jordans never submitted or completed a loan application pertaining to the Bacon Hall Road property. (Monica Jordan deposition, pages 100 to 105.) The record is clear that the reason for the Jordans not obtaining this property in June 2001 had nothing to do with the credit reporting problem which is the subject of this litigation.

---

[1]Hummingbird Hill Farm, Inc. is not a party in this litigation.

3

Thereafter, during the balance of 2001 and in the first half of 2002, the Plaintiffs made offers on three properties. None of these offers were accepted by any seller. At no time did the Plaintiffs ever make a loan application to any real estate lender for a loan on a specific property. There is no evidence that Plaintiffs' inability to persuade a seller to enter into a contract to sell a particular piece of real estate to them was the result of or, indeed, had anything to do with, the credit reporting problem that is the subject of this litigation.

## II.  STATEMENT OF THE CASE

The action was filed originally against Washington Mutual Bank, FA, and First Horizon Home Loan Corporation ("First Horizon"), the mortgage broker which originated the Jordans loan. The Complaint against the Movant alleges: (A) violation of the Fair Credit Reporting Act, 15 U.S.C. Section 1681, et. seq. ("FCRA") (Count I of the Complaint); (B) violation of the Electronic Fund Transfer Act, 15 U.S.C. Section 1693, et. seq., ("EFTA") (Count II); (C) defamation of credit (Count III); (D) negligent misrepresentation and negligence (Count IV); (E) fraudulent misrepresentation and gross negligence (Count V); (F) breach of fiduciary duty (Count VI); and (G) breach of implied covenant of good faith and fair dealing (Count VII).

Count VIII of the Complaint, at paragraph 46, also alleges that First Horizon violated Maryland law by prematurely raising Plaintiffs' interest rate on the loan. Count VIII goes on to allege that this was "... adopted and continued by... " Defendant. However, the ad damnum clause of the Complaint does not include Count VIII as to Defendant. The Court granted partial summary judgment in favor of First Horizon on Count VIII. Memorandum and Order dated the 30th day of July, 2002 at page 12. Thereafter, Plaintiffs and First Horizon entered into a

4

settlement agreement pertaining to the remaining claim against First Horizon under Count IX of the Complaint.  First Horizon is no longer a party to this suit.  Even if Count VIII is read as applying to and seeking relief against this Defendant,  Defendant believes that the Summary Judgment on Count VIII is appropriate as to Defendant Washington Mutual, as well.

With respect to Defendant, all of the causes of action, whether based on federal statutory claims or on state common law claims, arise from the same basic facts and contentions.  Plaintiffs allege that Defendant failed to properly credit the Jordan loan with a payment made in March 2001, that Defendant failed to correct this error, that as a result of this error Defendant erroneously reported the loan as delinquent to national consumer reporting agencies, and that Defendant failed to correct this erroneous reporting.

With respect to damages, the Plaintiffs' claim that the erroneous reporting and failure to correct the error has caused them immense harm in the nature of lost business and credit opportunities, and emotional distress.

### III.    APPLICABLE STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law."  FRCP 56(c).  In considering a motion for summary judgment, the court must view the evidence and all reasonable inferences that may be drawn from that evidence in the light most favorable to the nonmoving party.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1988) (citing *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 202 (1986).  A fact is material if, under the applicable substantive law, it is essential to the proper

disposition of the claim, and an issue is genuine if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. See, e.g., *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In meeting that standard, a movant who does not bear the ultimate burden of persuasion at trial need not negate the other party's claim, but must simply point out to the court that the other party lacks evidence on an essential element of its claim. *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. Once the movant has met this initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *accord Adler*, 144 F.3d at 671. The nonmoving party may not simply rest upon its allegations to satisfy its burden. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir.1999). Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671 (internal quotation omitted). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, it must be noted that summary judgment is no longer regarded as a "disfavored procedural shortcut." Instead, summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' " *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

6

These standards have been applied by federal courts in cases involving the Fair Credit Reporting Act. For example, see *Alkagi v. NationsCredit Financial Services*, 196 F. Supp.2d 1186 (D.C. Kansas 2002), in which the Court granted summary judgment under FCRA to a mortgage lender.

## IV.    ARGUMENT

A. Movant Is Entitled to Summary Judgment As to All Claims.

1.    Plaintiffs Are Not Entitled to Relief Under the Fair Credit Reporting Act.

The Fair Credit Reporting Act ("FRCA") controls the relationship between consumers, such as Plaintiffs [2], consumer reporting agencies [3], and furnishers of information to consumer reporting agencies [4], which includes Defendant.

As originally enacted in 1968, FCRA only governed the relationship between consumers and consumer reporting agencies. Under the original act, furnishers of information, such as Defendant, did not have any duties under FCRA. This presented consumers with a "Catch 22" in that the furnisher of information, who had no liability whatsoever under FCRA for its conduct, was effectively outside the reach of FCRA enforcement. At the same time, typically, in actions against reporting agencies, the reporting agencies claimed they had innocently relied on the furnisher's incorrect information on file. Consumer reporting agencies defended FCRA suits by

---

[2]    As defined by 15 U.S.C. § 1681a(c).

[3]    As defined by 15 U.S.C. § 1681a(f).

[4]    See 15 U.S.C. § 1681s-2(a)(2)(A).

blaming the furnisher of information, whose "empty chair" became the source of all ills.  In an effort to address this fundamental problem, in 1996 Congress enacted the Consumer Credit Reporting Reform Act ("1996 Act"), which added a new Section 1681s-2 to the FCRA.  The 1996 Act brought furnishers of information within the scope of FCRA in order to establish their responsibilities and afford complete relief to consumers.  Richard J. Rubin, <u>Fair Credit Reporting Act Amendments Provide New Duties on Furnishers of Information</u>, Corporate Law and Practice Course Handbook Series, Practicing Law Institute, Vol. 4, Issue 1, p. 203 (April 1999).

As in effect since 1996, under the current FCRA furnishers of information have three distinct duties.  The first is to provide accurate information.[5]  The second is to correct and update information.[6]  The third arises <u>only</u> upon receipt by the furnisher of information of a notice <u>from</u> a credit reporting agency that a consumer disputes information provided by a furnisher.  Under that circumstance, the furnisher has a duty to conduct an investigation with respect to the disputed information and to report those results back to the consumer reporting agency.[7]

      a.      No Relief Is Available to the Plaintiff under §1681s-2(a) of FCRA.

The Plaintiffs assert that, based on the allegations of the Complaint, Defendant has violated all aspects of Section 1681s-2 of FCRA.  Count I seeks damages based on those alleged violations.  While furnishers of information have a duty to provide accurate information under Section 1681s-2(a)(1), and to correct and update it under Section 1681s-2(a)(2), consumers do not have a private right of action against furnishers of information in the event of a furnisher's

---

[5]      15 U.S.C. § 1681 s-2(a)(1).

[6]      15 U.S.C. § 1681 s-2(a)(2).

[7]      15 U.S.C. § 1681 s-2(b).

failure to do so. Rather, if a violation of Section 1681s-2(a)(1) or (2) is alleged to have occurred, enforcement is exclusively by the government, through either the Federal Trade Commission or through the attorneys general of the several states.[8]

While FCRA provides specifically for claims for willful noncompliance[9] and negligent noncompliance [10], the applicability of those provisions is specifically excluded from Section 1681s-2(a).

§ 1681s-2(c) and (d) specifically state:

*(c) Limitation on liability*

*Sections 1681n and 1681o of this title do not apply to any failure to comply with subsection (a) of this section, except as provided in section 1681s(c)(1)(B) of this title.*

*(d) Limitation on enforcement*

*Subsection (a) of this section shall be enforced exclusively under section 1681s of this title by the Federal agencies and officials and the State officials identified in that section.*

§ 1681s(c)(1)(B) is entitled "*State action for violations.*" It permits the chief law enforcement office of a State or other officials or agencies designated by a State to bring action on behalf of the residents of the State. Section 1681s generally provides exclusively for Administrative Enforcement by the Federal Trade Commission and by other federal agencies. It also permits State action for violations.

---

[8]      15 U.S.C. § 1681 s-2(c) and (d).

[9]      15 U.S.C.  § 1681n.

[10]     15 U.S.C.  § 1681o.

Thus, FCRA specifically precludes any civil remedies against furnishers of information for either willful or negligent violations pertaining to a breach of the duty to provide accurate information or of the duty to correct and update. Federal courts have uniformly upheld this interpretation. *Hasvold v. First USA Bank, NA*, 194 F. Supp.2d 1228, 1233 (D.C. Wyoming 2002); *Aklagi*, supra at 1192.

        b.     No Relief Is Available to the Plaintiff under § 1681s-2(b) of FCRA.

Under the "third duty" established under FCRA, furnishers of information have a duty to conduct an investigation and report the results to consumer reporting agencies pursuant to 15 U.S.C. § 1681s-2(b). Aggrieved consumers do have a private right of action against furnishers for failure to conduct an investigation with respect to the disputed information <u>after receiving notice of a dispute from a consumer reporting agency</u>. If the notice provisions are satisfied and grounds for liability exist, the remedies available are those found in Sections 1681n and 1681o of the FCRA. As the Court stated in *Aklagi*, supra, 196 F. Supp.2d 1186 at 1193:

> The second component of § 1681s-2, found in subsection (b), does create a private cause of action by a consumer against a furnisher of credit information. *Nelson v. Chase Manhattan Mortgage Corp.*, 282 F.3d 1057, 1059-60 (9th Cir.2002). It requires a furnisher of credit information to conduct an investigation "[a]fter receiving *notice pursuant to section 1681i(a)(2)* of this title of a dispute" regarding the accuracy of information provided to a consumer reporting agency. § 1681s-2(b)(1) (emphasis added). Section 1681i(a)(2) requires a consumer reporting agency to provide a furnisher of credit information with prompt notice of a dispute from any consumer.
>
> Therefore, under the plain language of the statute, the duty of a furnisher of credit information to investigate a credit dispute is triggered only after the furnisher receives notice of the dispute *from*

*a consumer reporting agency,* not just the consumer. Indeed, courts have uniformly reached this conclusion. *See, e.g., Hasvold,* 194 F. Supp.2d at 1236 (reasoning that § 1681s-2(b) provides a private cause of action only if the furnisher received notice from a consumer reporting agency, as opposed to the plaintiff alone, that the credit information was disputed); *Scott v. Amex/Centurion S & T,* Nos. 3:01-CV-1594-H et al., 2001 WL 1645362, at *4 (N.D.Tex. Dec. 18, 2001) ("The duties created by subsection (b) arise ... only after the furnisher receives notice from a consumer reporting agency that a consumer is disputing credit information."); *Fino v. Key Bank,* No. Civ. A. 00-375E, 2001 WL 849700, at *5 (W.D.Pa. July 27, 2001) (reasoning that § 1681s-2(b) provides a private cause of action only if the furnisher received notice from a consumer reporting agency, as opposed to the plaintiff alone, that the credit information was disputed); *Jaramillo v. Experian Info. Solutions, Inc.,* 155 F. Supp.2d 356, 363 (E.D.Pa.2001) ("[T]o state a cause of action under 1681s- 2(b) requires a pleading that a consumer reporting agency notified a furnisher of a dispute...."); *Yelder v. Credit Bureau of Montgomery, L.L.C.,* 131 F. Supp.2d 1275, 1289 (M.D.Ala.2001) ("[A] furnisher of information has no duty under § 1681s-2(b) until a consumer reporting agency, and not a consumer, provides notice to the furnisher of information of a dispute."); *Dornhecker v. Ameritech Corp.,* 99 F. Supp.2d 918, 928-29 (N.D.Ill.2000) ("Section 1681s- 2(b) triggers a furnisher's duty to investigate allegedly erroneous information when that furnisher has received notice from a *consumer reporting agency* that the credit information is disputed." (emphasis in original)).

    The undisputed facts in the instant case are that neither the Plaintiffs nor anyone acting on their behalf never notified any consumer reporting agency of any dispute concerning Washington Mutual's reporting of derogatory information on their credit report. (Monica Jordan deposition at page 127 line 18 to page 128 line 22.) Having failed to do that, the Plaintiffs are not eligible for any remedies under § 1681s-2 of the Fair Credit Reporting Act, and Defendant is entitled to judgment as a matter of law as to Count I of the Complaint.

2.    <u>Plaintiffs Are Not Entitled To Relief Under Electronic Fund Transfer Act</u>.

Count II of the Complaint alleges a violation of the Electronic Fund Transfer Act ("EFTA") by Defendant.  There is no basis for a claim under EFTA for two reasons:  first, the Court lacks jurisdiction over the matter; and, second, EFTA does not apply to payments made on a loan.

By way of uncontested background, Plaintiffs' bank, NetBank, is an FDIC insured institution which does business "on-line" over the Internet.  It is a "virtual bank", having no branches.  NetBank's customers interact with it either over the Internet or by telephone.  In the instances in question, Plaintiff Monica Jordan went on the Internet and issued instructions to NetBank for it to make a loan payment for her.  Typically, and apparently in this case, NetBank then debits the customer's account and sends a payment to the payee.  Such payments may be made electronically (by wire, for example), or may be made by a paper check printed and mailed by NetBank.  In this case the parties do not know how the payment was actually delivered.  For the purposes of this Motion only, the Court should assume that the payment was made by NetBank in some manner and that it was received by Defendant.

FRCP 12(h)(3) states:  "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."  The EFTA, at 15 U.S.C. § 1693n(g) states:

> (g)  Jurisdiction of courts; time for maintenance of action.  Without regard to the amount in controversy, any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation.

12

a.    The Court Lacks Jurisdiction Over the EFTA Claim.

In this case, it is uncontested that the date of the occurrence of the alleged violation was on or about March 9, 2001, when the "electronic payment" was made. While the precise moment of the transaction may not be known, it is not contested that Plaintiffs knew that their loan had not been credited with the NetBank payment by no later than March 23, 2001, as a result of their communications with NetBank, their bank. ( Monica Jordan deposition transcript, page 53 line 19 through p. 57 line 2.)   This lawsuit was filed April 23, 2001, more than one year after Plaintiffs knew of the date of the occurrence of the alleged violation.  Thus, 15 U.S.C. § 1693m(g) specifically denies the Court jurisdiction over the EFTA claim.  See, *Houck v. Local Federal Savings and Loan*, 996 F.2d 311 (1993 10th Cir.), dismissing an EFTA claim for exceeding the one-year period.

b.    EFTA Governs Payments to Asset Accounts, Not on Debts.

The second reason for the Court granting summary judgment on Count II is that the EFTA, does not, as a matter of law,  govern money transfers for loan payments such as the case before the Court in this action.  The Act regulates electronic fund transfers between a consumer and a financial institution concerning the debiting or crediting of an account.  15 U.S.C. § 1693a(2) defines:

> *(2) the term "account" means a demand deposit, savings deposit, or other <u>asset</u> account (other than an occasional or incidental credit balance in an open end credit plan as defined in section 1602(I) of this title), as described in regulations of the Board, established primarily for personal, family, or household purposes, but such term does not include an account held by a financial institution pursuant to a bona fide trust agreement (emphasis added).*

13

A demand deposit means a checking account. A savings deposit is a savings account. The Board is defined as the Board of Governors of the Federal Reserve System. § 1693a(3). The Code of Federal Regulations, Title 12 (Banks and Banking), Volume 2 (Federal Reserve System), Part 205 (Electronic Fund Transfers (Regulation E)), describes other Asset Accounts in Section 205.2(b). In fact, under the regulations, a mortgage loan is an account for the payment of a debt and is not an asset account within the meaning of the Act. The Plaintiffs' loan with Washington Mutual is not an "asset account" within the meaning of the Statute. Therefore, the Defendant could not have violated the Federal Electronic Fund Transfer Act by failing to properly credit the Plaintiffs' loan.

Thus, Defendant is entitled to judgment as a matter of law as to Count II of the Complaint[11].

---

[11] Defendant is entitled to reasonable attorney's fees as a result of the prosecution of an action under Count II. In relevant part, EFTA provides:

> ATTORNEYS' FEES: 15 U.S.C. § 1693m(f) states:
> *(f) Action in bad faith or for harassment; attorney's fees*
> *On a finding by the court that an unsuccessful action under this*
> *section was brought in bad faith or for purposes of harassment, the*
> *court shall award to the defendant attorney's fees reasonable in*
> *relation to the work expended and costs.*

Regarding Count II, the Plaintiffs brought this action with the full knowledge that their cause of action violated the Statute of Limitations and jurisdiction of the Court on the Electronic Fund Transfer Act. In addition, they inferred that their loan is an account under the Act, which it is not. The Defendant has expended considerable monies defending this suit, including Count II. The filing of Count II is bad faith, per se, because the EFTA does not apply on its face. Defendant seeks its attorney's fees in conjunction with defending against Count II. Notwithstanding the foregoing, and reserving the right to seek an award of attorney's fees in the event this case proceeds beyond this Motion, Defendant is not now seeking an award of attorney's fees in connection with this Motion. If Summary Judgment is granted on the entire Complaint, Movant waives any award of attorneys' fees hereunder.

3.    <u>Plaintiffs' State Law Actions Are Preempted By The Fair Credit Reporting Act</u>.

Counts III through VII of the Complaint consist of state law claims for defamation of credit (Count III), negligent misrepresentation and negligence (Count IV), fraudulent misrepresentation and gross negligence (Count V), breach of fiduciary duty (Count VI) and breach of implied covenant of good faith and fair dealing (Count VII).

Each of these state common law causes of action address the same alleged acts and omissions which form the basis for the Fair Credit Reporting Act claims under Count I. Indeed, Counts III through VII are predicated on the same facts as Count I. The alleged wrongs in each instance are the failure to accurately report credit information and the failure to correct and update erroneously reported information.

In enacting FCRA, particularly evident after enacting the 1996 amendments, which is the applicable statute in all respects at all times relevant to this litigation, Congress, as part of its national scheme to regulate interstate commerce, financial institutions, consumer reporting agencies and furnishers of information to consumer reporting agencies, established a uniform framework by which all participants in the system operate under the same uniform rules. The Congressional findings and statement of purpose at the preamble to FCRA make it evident that the purpose of FCRA is to develop an elaborate process and mechanism for investigating and evaluating creditworthiness by consumers, and to adopt reasonable procedures for meeting the needs of commerce for consumer credit. By enacting FCRA, as amended, Congress sought to establish an administrative procedure, using the consumer reporting agencies in the first instance, to ensure the accuracy and timeliness of credit information. Congress implicitly recognized the

extraordinary burdens that could be placed on the courts if a judicial remedy was made available to every consumer for every dispute about any entry of information on a credit report, without first affording the administrative process established in FCRA to resolve the matter. Thus, certain consumer protections may only be vindicated by either the Federal Trade Commission or by state law enforcement officers. As to the last element of protection afforded to consumers, under 15 U.S.C. § 1681s-2(b), a private remedy may only be pursued after the consumer has complied with the notice procedures established under the Act. This means that the consumer must first communicate with the consumer reporting agency.

In fact, Congress also recognized the need for uniformity, consistency and predictability in the operation of consumer credit reporting when it enacted the preemption provisions found at 15 U.S.C. § 1681t(b). This provision, entitled *"Relation to State laws"* states in material part:

> *(b) General exceptions*
>
> *No requirement or prohibition may be imposed under the laws of any State -*
>
> *(1) with respect to any subject matter regulated under –*
>
> *(F) section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies...*

Thus, many U.S. District Courts have ruled that as a matter of law, the Federal Fair Credit Reporting Act preempts all state laws which are inconsistent therewith, or which present inconsistent remedies to those afforded in the Fair Credit Reporting Act. The Court in *Hasvold, supra.*, held:

> The Court does recognize that there is not complete agreement and unanimity in judicial discussions regarding the nature of the FCRA

preemption with few discussions specifically addressing preemption of state law actions against furnishers of information. [FN1] However, a useful discussion and consideration of arguments similar to those advanced by plaintiff here is offered by the district court in *Jaramillo v. Experian Information Solutions, Inc.,* 155 F. Supp.2d 356, (E.D. Pa.2001) (reconsideration granted June 20, 2001).

FN1. See e.g., *Yelder v. Credit Bureau of Montgomery, L.L.C.,* 131 F. Supp.2d 1275, 1284 (N.D. Ala.2001); *Carney v. Experian Information Solutions, Inc.,* 57 F. Supp.2d 496, 503 (W.D. Tenn.1999) ["Because duties, responsibilities, and liabilities of furnisher of information upon receipt of notice from a consumer are regulated under § 1681s-2(a) & (c) of the FCRA, there is preemption of plaintiff's state law claim under the [Tennessee Credit Protection Act.] See 15 U.S.C. § 1681t(b)(1)(F)."]; *Dornhecker v. Ameritech Corp.,* 99 F. Supp.2d 918, 924-26, 930-32 (N.D. Ill.2000) [finding private remedy for individual consumers against a furnisher of information under § 1681s-2(b) and that state law common law claims, such as negligence, defamation or invasion of private not preempted by Section 1681t(b)(1)(F) of the FCRA]; *Elliott v. TRW, Inc.,* 889 F. Supp. 960 (N.D. Tex.1995) (the same; predates 1996 amendments to FCRA).

In *Jaramillo v. Experian Information Solutions, Inc.,* the court considered plaintiff's arguments that Section 1681t should be read in conjunction with section 1681h(e), which provides only a qualified immunity for credit reporting agencies, users, and furnishers, from suit in defamation, invasion of privacy, or negligence unless false information was furnished with malice of willful intent to injure such consumer. The plaintiff there had argued that because Congress did not amend the language of § 1681h when FCRA was amended in 1996 to address furnishers of information in the act, her claims of willful and intentional failure to investigate information disputed by the consumer should stand. That court disagreed, and stated:

While Congress did not specifically provide in the 1997[sic] amendments that section 1681t supercedes 1681h, it is clear from the face of section 1681t(b)(1)(F) that Congress wanted to eliminate all state causes of action "relating to the responsibilities of persons who furnish information to consumer reporting

agencies." [footnote omitted] Any other interpretation would fly in the face of the plain meaning of the statute.

The plain language of section 1681t(b)(1)(F) clearly eliminated all state causes of action against furnishers of information, not just ones that stem from statutes that relate specifically to credit reporting. To allow causes of action under state statutes that do not specifically refer to credit reporting, but to bar those that do, would defy the Congressional rationale for the elimination of state causes of action. *Jaramillo v. Experian Information Solutions, Inc.*, 155 F. Supp.2d at 361-362 (some citations and footnotes omitted).

The Court finds that federal law under the FCRA preempts plaintiff's claims against the defendant relating to it as a furnisher of information. The Court finds that the defendant's motion to dismiss should be granted for failure to state a claim.
Since the common law remedies sought in the above-noted Counts are based on requirements that are inconsistent with the Fair Credit Reporting Act, Plaintiffs may not, as a matter of law, avail themselves of such common law remedies.

Accordingly, grounded as they are on the same facts which would, if cognizable, warrant relief under Count I of the Complaint, summary judgment should also be granted as to Counts III through VII of the Complaint in this action because any actions based on state laws are preempted by the Fair Credit Reporting Act[12]. To allow such state law actions to be maintained

---

[12] Defendant is entitled to reasonable attorney's fees as a result of the prosecution of an action under Count I. In relevant part, FCRA provides:

ATTORNEYS' FEES: § 1681n(c) and § 1681o(b) state:
> (c) Attorneys' fees
> Upon a finding by the court that an unsuccessful pleading, motion, or other paper filed in connection with an action under this section was filed in bad faith or for purposes of harassment, the court shall award to the prevailing party attorney's fees reasonable in relation to the work expended in responding to the pleading, motion, or other paper.

Plaintiffs' Complaint alleges violations of the Fair Credit Reporting Act even though it is well established law that (1) there is no private cause of action under a portion of the FCRA that

18

fundamentally jeopardizes the evident objective set forth by Congress that the regulation of credit reporting as an essential part of the national system of consumer finance be governed by the procedures established by Congress in FCRA.

      B.     In the Event the Court Denies Summary Judgment as to Some or All Aspects of Counts III Through VII of the Complaint, Movant Is Entitled to Partial Summary Judgment as to Certain Aspects of All Counts of the Complaint.

      1.     Movant Is Entitled to Partial Summary Judgment Because Plaintiffs Cannot Demonstrate Any Connection Between Defendant's Alleged Acts and Omissions and Plaintiffs Alleged Economic Loss.

Plaintiffs detailed their alleged damages in their Answer No. 12 to the Interrogatories propounded by Defendant. See, Exhibit B attached. While it is Defendant's position that, ultimately, it will be established that Plaintiffs have suffered no legally cognizable damage in this case, for the purpose of this aspect of Defendant's motion, seeking partial summary judgment, Movant does not seek partial summary judgment as to subparts A (emotional distress), B

---

the Plaintiff alleges the Defendant violated; and (2) the Plaintiffs never complied with the notice procedures of the FCRA as to the other part. By filing suit in spite of the plain meaning of the statute, Plaintiffs have engaged in bad faith litigation, which merits an award of attorneys' fees. Notwithstanding the foregoing, and reserving the right to seek an award of attorney's fees in the event this case proceeds beyond this Motion, Defendant is not now seeking an award of attorney's fees in connection with this Motion. If Summary Judgment is granted on the entire Complaint, Movant waives any award of attorneys' fees hereunder.

(medical expenses), D (lost credit opportunities[13])and G (loss of consortium) of Plaintiffs'

Answer No. 12 to the Interrogatories.  However, for the reasons hereinafter set forth, Movant

contends it is entitled to summary judgment as to the balance of Plaintiffs' alleged damages as to

subparts C (lost profits), D (lost credit opportunities, in part as to Hummingbird Hill Farm, Inc.),

E (lost opportunities to purchase real estate), F (increased cost to purchase real property), H

(punitive damages), I (reasonable attorneys' fees), and J (costs and fees) of Plaintiffs' Answer No

12 to the Interrogatories.

     a.     There is No Causal Connection Between the Alleged Negligent Acts of Defendant and Any Alleged Injury Suffered by Plaintiffs.

     The Plaintiffs allege in Paragraphs 17 and 18 of the Complaint that they need a larger

property to accommodate Mrs. Jordan's growing pony farm business. In Paragraph 18, the

Complaint alleges that "The plaintiffs have located several farm properties suitable for Mrs.

Jordan's expanding business, and they have executed several contracts for the purchase of those

properties.  However, they have been denied financing to purchase any of those properties

because of their deleterious credit record as wrongfully reported by Washington Mutual Bank to

the national credit reporting agencies."  Plaintiffs allege in Paragraph 21 of the Complaint that,

among other damages, they have lost and continue to lose considerable potential income.  They

seek damages for lost profits, lost opportunities to purchase property and increased cost to

---

[13] Except that Defendant does seek partial summary judgment of "lost credit opportunities" as to Hummingbird Hill Farm, Inc., for all of the reasons otherwise set forth herein.

purchase real property.  These allegations of the Complaint are those which relate to subparts C, D, E and F of Plaintiffs' Answer No. 12 to the Interrogatories.

The material facts which pertain to this matter are very straightforward.  The Jordans have not, since March 2001, entered into a single real estate purchase contract for any real property.  Nor have they, since that time, completed and submitted a mortgage loan financing application.  Nor have they had a real estate mortgage loan financing application turned down.  It is, therefore, as a matter of law, impossible to assert, much less prevail in the assertion, that there is any connection between the alleged acts or omissions of Defendant and any of the matters complained of in subparts C, D, E and F of the Answer to Interrogatory 12.  Plaintiffs have the burden of demonstrating a causal connection between the alleged breach of duty and the harm alleged to have been suffered.  Indeed, in this case, as it relates to lost real estate and business opportunities, Plaintiffs have not, as of this date, suffered any cognizable damage at all - much less as a result of Defendant's acts or omissions.

(i)  The entire record of the case establishes that there are no facts which support the allegations that Plaintiffs have actually suffered any damage whatsoever in conjunction with their attempts to purchase a larger property.  Rather, the testimony of the Plaintiff and her real estate agent, and an affidavit by a mortgage banker they approached to explore a possible real estate loan establish that (a) the Plaintiffs never executed a single contract for the purchase of any property; and (b) that the Plaintiffs were never denied financing to purchase any property.  Because there are no facts to support their allegations, the Defendants are entitled to Summary Judgment as a matter of law on the issue of lost opportunity to purchase property.

21

(ii)  Sometime in May or June of 2001, Mrs. Jordan identified an eight (8) acre parcel on

800 Bacon Hall Road, Sparks (Baltimore County), Maryland.  The property had a large house

and a barn.  Mrs. Jordan testified that she submitted an offer to purchase the property, but that her

offer was rejected because the Seller received two offers the same day and accepted the other

offer.  She also testified that she did not know why the seller accepted the other offer.  (Monica

Jordan deposition at pages 100 to 105.)  Mrs. Jordan also testified that in order to operate a

riding stable in Baltimore County, she would need a minimum of thirty five (35) acres (Monica

Jordan deposition at page 106 line 16 to page 107 line 2).  She also testified that she would have

had to purchase additional acreage from the adjacent landowner in order to obtain the size parcel

that the law required, but that she never had any conversations with the adjacent landowner.

(Monica Jordan deposition at page 107 line 17 to page 109 line 5).  She also testified that she

would have had to obtain a special exception under Baltimore County zoning laws in order to use

any parcel as a Riding Stable.  (Monica Jordan deposition page 19, line 15 to page 20 line 2).

The Plaintiff failed to produce a single document supporting her claim that she even made

an offer to purchase the Baltimore County.  The Jordan's real estate agent, Bonnie Kahler,

remembered the property, but did not remember ever preparing or presenting an offer from the

Jordans to purchase it.  (Kahler deposition, page 62 lines 1-15)[14].

At the time of her alleged attempt to purchase the house in Baltimore County, the Jordans

approached a lender, Ed Naworol at Sun Trust Mortgage.  They authorized Mr. Naworol to pull a

---

[14]In fact, the Bacon Hall property never sold to anybody.  The Plaintiffs could still
purchase the property now for the same price that they could have purchased it for in 2001, had
they made an offer acceptable to the seller.  And, today's interest rates make the property more
affordable now than it would have been in 2001.

22

credit report so that he could begin the financing process.   It was through that credit report that the Jordans first learned that Washington Mutual had reported derogatory credit information about them.  The Jordan's purchase offer was rejected by the seller, so they never pursued financing.  (Monica Jordan deposition at page 99 lines 11 - 17, Naworol Affidavit attached as Exhibit D.)

The undisputed fact is that the Jordans never had a contract to purchase the Bacon Hall property, and they never made a formal loan application to finance it.  That means that there is no set of facts which support the Plaintiffs' claims that the credit reporting in any way prevented the Plaintiffs from purchasing or financing the farm.

Subsequently, the Jordan's real estate agent, Bonnie Kahler, prepared three land purchase offers on behalf of the Jordans.  None of them were ever accepted by any seller.  The Jordans never submitted a loan application on any of those parcels.  The Washington Mutual credit reporting had no bearing on any seller refusing to accept any of the Jordans' offers.

There being no evidence to support any of the Jordans' allegations regarding their inability to purchase or finance any real estate as a result of alleged acts of the Defendant, the Defendant is entitled to Summary Judgment as a matter of law.

(iii)   With respect to lost profits, since Plaintiffs can not demonstrate that they ever had any real property under contract on which they could have even operated a riding stable business, much less a profitable one, they cannot, as a matter of law, maintain a claim for lost profits

pertaining to such a business[15].   There is no causal connection between the alleged acts and

omissions of Defendant and the harms claimed[16].


   2.  The Plaintiffs' Damages for Lost Profits are Too Speculative to be Legally

Cognizable.

   The Plaintiffs' claims for damages are, to be charitable, highly suspect and speculative.

The Plaintiffs' most serious claim for alleged financial losses is that the derogatory credit report

precluded the Jordans from borrowing money which would have enabled them to purchase real

estate upon which Hummingbird Hill Farm, Inc. could establish an equestrian business[17].  The

---

[15]  Mrs. Jordan alleges that but for the negligent credit reporting of the Defendant, she
would have purchased land upon which Hummingbird Hill Farm, Inc. would have established
that business.  As noted above, these allegations have no foundation and, indeed, are contradicted
by the record which establishes that during the relevant time period there never has been any
contract for the purchase of any real property, there never has been any submission of a real
estate loan application, and there has never been a denial of such an application.  As her measure
of damages, she claims the net profits that she believes her new business might have made.  This
in spite of the fact that, other than her own belief that she could operate a profitable stable
business when she has never realized a profit in her horse related activities to this point, Plaintiffs
have no basis, expert or otherwise, to assert the lost profits.  (See, next section of this
memorandum discussing the speculativeness of these damages.)  Plaintiffs also seek as a part of
their damages, for the Defendant to pay for all their expenses associated with building the house
and barn facilities.  How the entire cost of the construction of these facilities, under any theory of
damage, could become the responsibility of Defendant is a mystery.

[16] Plaintiffs are not entitled to recover punitive damages or attorneys' fees and costs in
this case.  First, Plaintiff has failed to meet the statutory requirements under FCRA or EFTA
which would entitle them to such extraordinary relief.  Second, even in the common law context,
Plaintiffs have not demonstrated malice or bad faith that would, even arguably entitle them to
punitive damages.  Negligence, no matter how gross, is not sufficient to award punitive damages.
Absent a statutory right, there is no right to an award of attorneys' fees.

[17]  As stated above, Hummingbird Hill Farm, Inc. ("HHFI") is not a party to this
litigation, and it should be.  Indeed, Plaintiffs should not, as a matter of law, be entitled to
recover any damages (in their individual capacities) for the alleged lost opportunities and future

Plaintiffs now own 3 acres in Baltimore County. Mrs. Jordan's company's current business activity is primarily giving pony rides at birthday parties. Mrs. Jordan's business never once made a profit. In 2000, as a sole proprietor, Mrs. Jordan suffered a cash loss of $6,350[18]. In 2001, Hummingbird Hill Farm Inc.'s first year of operation, the corporate tax return reflects a cash loss of $10,873[19]. Its 2002 corporate tax return reflects a cash loss of $10,512[20].

Plaintiff's desire is to purchase a much larger parcel of land for her new equestrian business[21], on which they could have a much larger residence, a barn with horses and other riding facilities.

_____

lost profits for this separate corporate entity. Either the failure to name HHFI as a party is a glaring omission in pleading or it is a clever effort to circumvent the fact that Defendant has no duty to HHFI (if indeed it has a duty to anyone for lost opportunities and lost profits) and any damages suffered by HHFI are not recoverable. Furthermore, the alleged losses of HHFI are not "foreseeable" as to Defendant and are, consequently, not recoverable. Finally, the foregoing problems are not curable simply by amendment of the pleadings(which, at this point, would be prejudicial), since the absence of a duty by this Defendant to HHFI and the lack of foreseeability would still apply. Finally, all of the points made regarding the lack of any causal connection between the alleged acts and omissions of Defendant and the alleged damages suffered - and the extreme speculativeness of the damages - would still apply.

[18] 2000 tax loss of $23,386, add back depreciation and expense deduction of $17,036 = cash loss of $6,350 on gross receipts of $3,815. [Plaintiffs' income tax returns are available, but have not been attached.]

[19] 2001 tax loss of $18,286, add back in depreciation of $7,413 = cash loss of $10,873 on gross receipts of $12,178.

[20] 2001 tax loss of $21,427, add back depreciation of $10,915 = cash loss of $10,512 on gross receipts of $13,709.

[21] Mrs. Jordan does not even own a horse. She has five ponies. (Monica Jordan deposition page 200 line 7.)

25

The Plaintiffs would have the Court believe that a business which never once made a profit could suddenly become incredibly profitable, and have the Court award damages based on their belief.

The Bacon Hall Road intended farm purchase could fairly be summarized this way:

a.    The Plaintiffs testified that she prepared an offer to purchase a home, but presented no documentary proof of that.

b.    Mrs. Jordans testified that her offer was not accepted.

c.    She testified that the parcel was not suitable for her proposed Stable Riding business because it was only 8 acres, and that she required 35 acres.

d.    She testified that she would have had to purchase land from an adjacent property owner in order to get more acreage, but that she never spoke with the adjacent owner to even determine if he was willing to sell the Jordans some of his land.

e.    She testified that she would have had to obtain a zoning special exception in order to legally operate her proposed business.

The Plaintiff's theory is that IF her offer had been accepted, and IF she had obtained additional adjacent land, and IF she had obtained a zoning special exception, and IF she had applied for a loan to purchase the parcel, and IF that loan had been approved, and IF the Jordans had constructed the house and horse-related facilities at a cost they could have afforded, and IF she had opened up an equestrian business, then that new business would have been extremely profitable.  The Plaintiffs claim that none of these events occurred solely because Washington Mutual reported their March 2001 payment as having been made late.  That allegation is absurd

26

and completely unsupported by the record, and is unsupportable. Any claim of damage resulting therefrom is speculative as a matter of law.

Maryland law on speculative damages states that lost profits of an unestablished or new business cannot be recovered. In *St. Paul at Chase Corp. V. Manufacturer Life Insurance Co.*, 262 MD. 192 at 244, 278 12 (1971), *cert. denied,* 404 U.S. 858 (1971), the Court held:

> Alleged Loss of Profits.
> In *Lawson v. Price*, 45 Md. 123, 139, appellee brought an action against appellant for obstructing the mill race leading to his distillery. It was held that lost profits could be recovered as an element of damage because they could be ascertained with reasonable certainty. In doing so the Court cited, with approval, Sedgewick on Damages, 89, as follows:
> 'It may now be assumed to be the general rule that in actions of tort, where the amount of profits of which the injured party is deprived, as a legitimate result of the trespass, can be shown with reasonable certainty, such profits constitute to that extent a safe measure of damages. In these cases, the rule adopted with reference to certain breaches of contract which makes the offending party liable for the loss of profits, so far only as he foresaw, or should have foreseen that particular consequence of his act, does not apply. He who commits a trespass must be held to contemplate all the damages which may legitimately follow from his illegal act, whether he might have foreseen it or not; and so far as it is plainly traceable, he should make compensation for it. To this extent, the recovery of a sum equal to the profits lost, while fairly within the principle of compensation, is also within the limits which exclude remote consequences, from the scale in which the wrong is weighed.
> In *Winslow Elevator (& Machine) Co. v. Hoffman*, 107 Md. 621, 640-(641), the owner of a building (recently constructed) had brought suit against the elevator contractor for, among other things, loss of rents from the building allegedly attributable to the defective elevator. The Court held as follows:
> In *Wolcott v. Mount*, 36 N.J.L. (262,) 269, the Court said: 'It must not be supposed that, under the principle of *Hadley v. Baxendale*, mere speculative profits, such as might be conjectured to have been the probable results of an adventure which was defeated by the breach of the contract sued on, the gains from

27

which are entirely conjectural, with respect to which no means exist of ascertaining, even approximately, the probable results, can, under any circumstances, be brought within the range of damages recoverable. The cardinal principle in relation to the damages to be compensated for on the breach of a contract, that the plaintiff must establish the quantum of his loss by evidence from which the jury will be able to estimate the extent of his injury, will exclude all such elements of injury as incapable of being ascertained by the usual rules of evidence to a reasonable certainty.'

'When the claim of the plaintiffs for the recovery of lost rent is considered in the light of these rules it certainly must be denied. What rent they might have received from the building was not only dependent upon collateral engagements with persons who might rent the rooms, but upon many other considerations, such as location, desirability of rooms, the amount of rent asked, light and air, competition of other buildings, the number of tenants, the ability of the owners to keep the rooms occupied, and the general character of the management of the building. There are so many elements of uncertainty which enter into and affect the question that any estimate of loss could be little short of a guess. The special damages sued for in this case are so uncertain and incapable of reasonable ascertainment that they cannot be recovered.'

In *Evergreen Amusement Corp. v. Milstead*, 206 Md. 610, 618, (112 A.2d 901,) the operator of a new drive-in movie theatre, in a suit by a contractor, counterclaimed for alleged loss of profits attributable to the delay in the work. The Court of Appeals held that because the venture was new profits were too uncertain to form a basis for recovery, saying:

'* * * on the other hand, loss of profits from a business which had not gone into operation may not be recovered because they are merely speculative and incapable of being ascertained with the requisite degree of certainty. Restatement, Contracts, Sec. 331, states the law to be that damages are recoverable for profits prevented by breach of contract 'only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty.

See also: *M. & R (Contractors &) Builders v. Michael*, 215 Md. 340, 352, (138 A.2d 350,) where the Court of Appeals cited a number of cases in which plaintiffs were not allowed to recover collateral, estimated and probable profits claimed to have been lost.; *Abbott v. Gatch*, 13 Md. 314, 332-4; *Lanahan v. Heaver*, 79 Md. 413, 418-(423,) 29 A. 1036.

28

> Reference to the hypothetical question put to the witness Hoffman by Plaintiff's attorney (objection to which, incidentally, should have been sustained by the Court) is sufficient to demonstrate that the alleged loss of profits from this venture were completely speculative. Realization of profits from a new untried venture such as this depends on so many uncertainties that they cannot form a proper element of damage in a contract action, and I so hold.

> We adopt that opinion.

A subsequent case, *John D. Copanos & Sons, Inc. v. McDade Rigging and Steel Erection Company, Inc.* 43 MD.App. 204, 403 A.2d 402 (1979) at 206 stated:

> It seems well settled in this State that there may be a recovery for unrealized profits providing (1) the plaintiff shows that a breach by the defendant was the cause of the loss; (2) it is shown that defendant could have reasonably foreseen that a loss of profits would be a probable result of a breach; and (3) the lost profits are proved with reasonable certainty.

In *Copanos*, a pharmaceutical company established in 1963, and which had enjoyed steadily increasing profits on the manufacture and sale of pharmaceuticals in liquid, tablet and powder form, purchased a new capsule machine. The machine was damaged by the Defendant, who was hired to move it from the second floor to the first floor. It took 52 days for the Plaintiff to obtain a replacement machine, during which time contracts for the sale of encapsulated drugs were cancelled as the company was not able to manufacture them. The Defendant was aware that the company was in the business of manufacturing drugs, the Plaintiff had contracts for sale and the sales price of the drugs could be established in detail. The Court ruled that the lost profits were recoverable because the use of a new machine did not constitute a new business. Thus, even the *Copanos* court acknowledges the difference between an existing and a new business or line of business for the purpose of determining whether a claim of damage is cognizable.

29

The Jordans cannot meet any of the three prongs described in the *Copanos* case. The erroneous credit reporting did not result in a single seller not accepting their offers; the Defendant could not reasonably be expected to have foreseen that the reporting of a late payment would prevent the Jordans from financing their new business and the lost profits are illusory, at best. Mrs. Jordan's current business, the giving of pony rides at childrens' birthday parties, never generated any profit whatsoever. The Jordans cannot demonstrate with any reasonable degree of certainty that their new riding stable business would have ever generated a profit in any amount at any time.

Thus, Defendant is entitled to Summary Judgment as a matter of law with respect to any alleged lost profits in the proposed new business because Maryland law would deem them speculative and unrecoverable.

## V. <u>CONCLUSION</u>

Based on the foregoing, Defendant submits that it is entitled to summary judgment as to the entire Complaint for the reasons set forth in Section IV (A) above. Alternatively, to the extent taht the Court denies all or any portion of the motion based on the grounds contaiend in Section IV(A) above, Defendant seeks partial summary judgment for the reasons set forth in Section IV(B) above.

WHEREFORE, Defendant prays that the Motion be granted in accordance with the proposed Order attached.

30

Respectfully submitted,

L. Mark Winston
5301 Wisconsin Avenue, N.W.
Suite 740
Washington, D.C. 20015
Telephone: (202)-537-5500
Facsimile: (202)-537-5505
E-mail: LMW@Glazersiegel.com
Federal bar. No. 5657

Of Counsel:

Kenneth A. Vogel
5301 Wisconsin Avenue, N.W.
Suite 740
Washington, D.C. 20015
E-mail: KAVogel@aol.com