## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| Monica Jordan | ) | |
| Louis Jordan | ) | |
| Plaintiff(s) | ) | |
| | ) | |
| v. | ) | **Civil Action Number: H02CV1465** |
| | ) | |
| Washington Mutual Bank, FA, | ) | |
| | ) | |
| Defendant | ) | |

---

### LIST OF EXHIBITS

A      Monica Jordan deposition transcript (condensed)

B      Jordan Answer to Defendant's Interrogatory #12

C      Kahler deposition, page 62

D      Naworol Affidavit

# EXHIBIT

# A

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MARYLAND

3      - - - - - - - - - - - - - - x

4   MONICA JORDAN and            :      CONDENSED

5   LOUIS JORDAN,                :

6          Plaintiffs,           :

7          Vs.                   : CIVIL ACTION

8   WASHINGTON MUTUAL BANK,      : No. H02CV1465

9   F.A.,                        :

10         Defendant.            :

11     - - - - - - - - - - - - - x

12            Thursday, February 27, 2003

13                 Washington, D.C.

14   Deposition of:  MONICA JORDAN,

15   the Witness, called for examination by counsel

16   for the Defendant, pursuant to notice, commencing

17   at 10:00 a.m., at the law offices of GLAZER &

18   SIEGEL, PLLC, 5301 Wisconsin Avenue, N.W., Suite

19   740, Washington, D.C., before Curtis R. Cloward,

20   CSR, a Notary Public in and for the District of

21   Columbia, when were present on behalf of the

22   respective parties:

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 2

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:
HOWARD J. NEEDLE, ESQ.
1321 Harden Lane
Baltimore, Maryland 21208
(410) 484-8701

ON BEHALF OF THE DEFENDANT:
L. MARK WINSTON, ESQ.
KENNETH A. VOGEL, ESQ.
GLAZER & SIEGEL, PLLC
5301 Wisconsin Avenue, Suite 740
Washington, DC 20015
(202) 537-5500

ALSO PRESENT: Louis Jordan

- oOo -

Page 4

9    Letter dated August 14, 2001 ...... 113
DEPOSITION EXHIBITS (CONTINUED):
10    Fax transmittal dated March 10, .. 116
2002

11    Letter dated August 27, 2001 ...... 119

12    Letter dated October 12, 2001 ..... 124

13    Answers to Interrogatories ........ 129

14    Short Listing .................... 171

15    Short Listing .................... 185

16    Short Listing .................... 206

- oOo -

Page 3

I N D E X
DEPOSITION OF MONICA JORDAN
2/27/03

EXAMINATION BY
                PAGE
Mr. Winston ........................... 5


INDEX OF DEPOSITION EXHIBITS
NUMBER    DESCRIPTION        PAGE
1    Notice of Deposition ............... 6
2    Résumé ........................... 10
3    Summons and Complaint ............. 27
4    E-Mail dated 3/23/01 .............. 53
4A    BATES stamped pages 32 and 32 ...... 65
4B    Handwritten notes ................ 67
5    Letter dated April 3, 2001 ........ 73
6    Letter dated June 14, 2001 ........ 73
7    Letter dated June 29, 2001 ........ 90
8    Letter dated July 10, 2001 ........ 110

Page 5

P R O C E E D I N G S
Whereupon
    MONICA JORDAN,
was called as a witness and, after having been
first duly sworn by the Notary Public, was
examined and testified, as follows:
    EXAMINATION ON BEHALF OF THE DEFENDANT
    BY MR. WINSTON:
    Q.  Mrs. Jordan, good morning.
    A.  Hi.
    Q.  Please state your full name.
    A.  Including middle name, Monica Karen
Jordan.
    Q.  And your residence address?
    A.  11805 Ivy Mill Road, Reisterstown,
Maryland 21136.
    Q.  And is your business address the same
as your residence address?
    A.  Yes, it is.
    Q.  When were you born?
    A.  November 21st, 1966.
    (Whereupon there was a discussion held

MGB REPORTING, INC.
(301) 983-9315 or (800) 245-2528

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 6

1   off the record).
2                   (Notice of Deposition
3                   marked for
4                   identification as DJ
5                   Exhibit No. 1).
6       BY MR. WINSTON:
7       Q.   I have handed you what's been marked
8   Defendant Jordan Exhibit Number 1 for the purpose
9   of identification at this deposition.
10              Would you take a look at it, please?
11      A.   Um-hum.
12      Q.   Do you recognize it?
13      A.   Yes.  Isn't this the same one I've
14  received prior?
15      Q.   For this deposition?
16      A.   Right.
17      Q.   Are you the Monica Jordan who is
18  listed as the Plaintiff in the caption?
19      A.   Yes, I am.
20      Q.   Is it correct that you participated at
21  the preparation of the answers to interrogatories
22  that have been served in this case?

Page 7

1       A.   Yes.
2       Q.   And also in the response that
3   Plaintiffs made to your requests for production
4   of documents?
5       A.   Yes.
6       Q.   Have you reviewed the attachment to
7   Exhibit 1, which contains document
8   specifications?
9       A.   Has it changed any from what I
10  received previously?
11      Q.   You should have received this
12  previously.
13      A.   Yes.  Looks the same to me.  I have it
14  right here, if you want me to look at it.
15      Q.   Are there any documents which are
16  responsive to the document specification that's
17  attached to the notice of deposition that is a
18  part of Exhibit 1 that you have not produced
19  prior to this deposition?
20      A.   Let's see.
21      Q.   Take a minute to satisfy yourself how
22  you can answer that.

Page 8

1       A.   Number 11, concerning the medical
2   records, I don't know that we've been able to
3   supply those yet, because we haven't received
4   them from the insurance company.
5       Q.   But is it correct that it would be
6   your intention to supply them when they become
7   available?
8       A.   Yes.  Yes.
9       Q.   I guess I should actually ask your
10  counsel that question.
11              Mrs. Jordan, are there any documents
12  in your possession or under your control bearing
13  on any aspect of this case which you haven't
14  produced because they weren't listed on either
15  the first request for production that was sent to
16  you or the documents specification that's
17  attached to this notice of deposition?
18      A.   I don't think so.
19      MR. NEEDLE:  Do you understand the
20  question?
21      THE WITNESS:  Can you be a little more
22  specific?

Page 9

1       MR. WINSTON:  Let me try to ask it
2   again.
3       BY MR. WINSTON:
4       Q.   What I'm trying to determine is
5   whether there are any documents --
6       A.   Um-hum.
7       Q.   -- that you have --
8       A.   Okay.
9       Q.   -- or that are under your control or
10  that you have control over that somebody else may
11  have, that you have but were not listed in a
12  previous request for production that I've given
13  to you that are relevant to this case.
14      A.   Again, I don't think so.  I think
15  we've given you pretty much everything that we
16  have.  I mean, when it came to like the real
17  estate documents that I supplied to you, I gave
18  you a small sampling of those -- of those
19  listings that I have, just because they are so
20  numerous, but they represent materially what
21  we've been through.
22      Q.   When you're referring to those

3 (Pages 6 to 9)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 10

1  listings, you're referring to the short listing
2  forms from MIRS?
3      A.  Yes.  Yes.
4      Q.  Any other documents that you might not
5  have provided?
6      A.  No.
7              (Résumé marked for
8              identification as DJ
9              Exhibit No. 2).
10         BY MR. WINSTON:
11     Q.  I've handed you what's marked as
12  Exhibit 2 for the purpose of this deposition, and
13  ask if you can identify it.
14     A.  This is my résumé.
15     Q.  So the answer is yes?
16     A.  Yes.
17     Q.  Does the résumé accurately reflect
18  your background, employment experience,
19  educational background, and other matters that
20  are reflected in the résumé?
21     A.  To the extent that everything that's
22  pertinent, yes.  There's some independent work

Page 11

1  that I did that has no bearing.
2      Q.  And, in other words, information
3  that's not on the résumé --
4      A.  Is not pertinent.
5      Q.  -- is not on the résumé?
6      A.  Right.
7      Q.  I notice, Mrs. Jordan, that you had
8  training, the third page of the résumé refers to
9  training that you had with CitiCorp?
10     A.  Um-hum.
11     Q.  Could you describe the nature of that
12  training?
13     A.  Most of which was in-house training.
14  A lot of the work that I did I started at the
15  bottom and worked my way up through -- through
16  on-the-job training.  A lot of these courses
17  that are listed were recommended courses for my
18  career development program.
19     Q.  These were separate training courses
20  as opposed to a single course that you took at
21  one point in time?
22     A.  Correct.

Page 12

1      Q.  I note that you were employed by
2  Municipal Savings and Loan Association and two
3  entities of the Citi group; is that correct?
4      A.  That's correct.
5      Q.  During your employment with any of
6  those financial institutions, did you have
7  occasion to be involved with the business of
8  customers of the institution, of any of the
9  institutions?
10     A.  Yes.
11     Q.  In what ways did you become so
12  involved?
13     A.  Well, with Municipal I dealt with
14  customers on a daily basis via either teller or
15  customer service representative.  Of course,
16  being a bank teller, you are the front line of
17  the bank, so you deal with the customers' issues
18  constantly.  With CitiCorp I started out as a
19  reconciliation clerk, so there was a customer
20  service 800 number through which the customer
21  would call, and then that 800 number would refer
22  those requests to me.

Page 13

1      Q.  What were the nature of those
2  communications with customers for the Citi group
3  that you just referred to?
4      A.  Generally they were just address
5  changes or if somebody couldn't find a bank
6  check, you know, to pull copies of bank checks to
7  reconcile, you know.  If somebody had a
8  discrepancy in their account, we would try to
9  find out where that was.  Process check reorders,
10  it was numerous, you know, basic customer service
11  things.
12     Q.  During your employment with these
13  financial institutions, did you have occasion to
14  become familiar with credit analysis for
15  customers?
16     A.  Yes.
17     Q.  What was the nature of your knowledge
18  about that?
19     A.  Through the course of my training and
20  career development, a position became available
21  in the credit card servicing division of CitiCorp
22  which I moved into, and we helped the data

4 (Pages 10 to 13)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 14

1   processing unit in reconciling credit card
2   transactions, keeping track of the business
3   structure associated with that, i.e., systems
4   development, data processing, things of that
5   nature, training human resources are all
6   different groups within that organization, and we
7   were responsible for the budgets of those groups.
8       Q.   Did you become aware while, again
9   while employed by one of these financial
10  institutions, did you become aware of how credit
11  reports were used in evaluating whether
12  applicants for credit were qualified?
13      A.   No.  We never dealt with credit
14  `apps'.
15      Q.   Did you ever deal with customers and
16  their credit issues?
17      A.   No.
18      Q.   Did you have a role in reporting the
19  reporting on credit?
20      A.   No.  We dealt with budgetary items.
21      Q.   Did you ever have experience in
22  evaluating credit?

Page 15

1       A.   No.
2       Q.   Did you ever have experience in
3   underwriting loans?
4       A.   No.
5       Q.   Or --
6       A.   Again, I dealt with the financial
7   analyses of the divisions within the organization
8   themselves.  I didn't when I moved into CitiCorp,
9   I dealt with the internal structure of the bank,
10  not customers any longer.
11      Q.   Did you have any experience with debt
12  collection?
13      A.   No.
14      Q.   I also note in your résumé that you
15  have training in real estate principles and
16  practice?
17          (Whereupon there was a discussion held
18  off the record between Mr. Winston and
19  Mr. Vogel.)
20          BY MR. WINSTON:
21      Q.   I'm going to suspend on that question.
22  Just a point of clarification.

Page 16

1       A.   Okay.
2       Q.   The responses that you just gave --
3       A.   Okay.
4       Q.   -- were in response to my questions
5   about your time as an employee of CitiCorp?
6       A.   Right.
7       Q.   Do the same responses apply with
8   respect to Municipal Savings and Loan?
9       A.   No.  As a customer representative
10  where we dealt strictly with bank accounts,
11  savings or CDs, checking, IRAs, things of that
12  nature, we did not deal with Visa loan
13  applications.  That went through the loan
14  servicing department.
15      Q.   And you were not involved in credit
16  reporting --
17      A.   No.
18      Q.   -- there?
19      A.   No.
20      Q.   In debt collection?
21      A.   No.
22      Q.   Again, Mrs. Jordan, I note from your

Page 17

1   résumé that you had training in real estate
2   principles and practices; is that correct?
3       A.   Yes.
4       Q.   Please describe the nature and content
5   of that training.
6       A.   I went through the training course
7   required of all real estate agents to obtain
8   their real estate license in order to buy, you
9   know, in order to transact real estate
10  transactions.  I did graduate on the first time
11  that I took that course.  I, in fact, did apply
12  with Coldwell Banker after I completed that
13  course.  I was granted a position, but within a
14  couple of weeks thereafter, I decided that that
15  was not something that I wanted to pursue at that
16  particular moment.
17      Q.   Have you ever been a licensed real
18  estate agent or broker?
19      A.   Yes.
20      Q.   And that license, I take it from your
21  résumé, is there but inactive?
22      A.   Correct.

5 (Pages 14 to 17)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 18

1    Q.    Did you ever actively engage in real
2  estate sales?
3    A.    No. Not on the behalf of someone
4  else. I did, however, sell my own home.
5    Q.    When you sold your own home, were you
6  involved as an agent as well as a seller?
7    A.    It was a for-sale-by-owner
8  transaction.
9    Q.    Mrs. Jordan, are you familiar with
10  land use issues and the impact that they can have
11  on real estate transactions?
12    A.    Yes.
13    Q.    Could you describe the nature of your
14  familiarity with those issues?
15    A.    In the state of Maryland there's a lot
16  of impact studies being associated with how
17  agriculture impacts waterways and things of that
18  nature. In which case, we have zoning issues
19  which you either have to acquire a special permit
20  to transact businesses of certain nature, or they
21  are not allowed at all in certain areas.
22        When there's a conservancy issue, the

Page 19

1  state is interested in conserving the nature, you
2  know, they are concerned with overdevelopment of
3  particular areas and among, for instance, if a
4  developer goes in and develops a piece of
5  property, he's required to conserve a piece of
6  that property as a natural resource. So, for an
7  example, if a developer buys a hundred acres,
8  he's required to keep, for example, 40 acres of
9  it in woods, and he can develop the rest of it in
10  order to meet the impact associated with
11  developing that property.
12    Q.    Have you ever been involved yourself
13  in a situation which zoning or other land-use
14  matters were an issue?
15    A.    In Baltimore County with regard to a
16  riding stable such as my own that I hoped to
17  build, it is required that a special exception be
18  obtained in wherever -- wherever zoning will
19  allow a special exception is still required
20  regardless; however, in Carroll County there is
21  no requirement for such.
22    Q.    So, a special exception is required in

Page 20

1  Baltimore County?
2    A.    Correct.
3    Q.    But not in Carroll County?
4    A.    Correct. There's also differences
5  with regard to the actual zoning issues
6  themselves with regard to equine -- equines being
7  on certain parcels of land. In Baltimore County
8  you are required to have one grazing acre per
9  horse or 1,000 pounds of animal is how that
10  works.
11        Now, grazing acre does not mean that it
12  can't be wooded area. It just means it can't be
13  a driveway. In Carroll County, provided the land
14  is agricultural, and you own a minimum of three
15  acres, they have no requirement on how many
16  animals you can have. In Howard County you have
17  to have a minimum of two acres per animal.
18    Q.    Is there a specific exception required
19  in Howard County?
20    A.    No.
21    Q.    So, to be clear about this, unless the
22  property you were acquiring already had a special

Page 21

1  exception in Baltimore County, any property that
2  you would acquire would require that an operator
3  of a horse farm would have to obtain a special
4  exception; is that correct?
5    A.    Not necessarily horse farm, but what
6  the county determines a riding stable because
7  breeding operations are exempt from that special
8  exception. Personal ownership is exempt from
9  that special exception.
10    Q.    What do you mean by personal
11  ownership?
12    A.    If I were -- if I owned, let's say,
13  eight horses, and they were all my own and I was
14  showing them or breeding them or just raising
15  them or just had them, no, you do not need a
16  special exception.
17        What Baltimore County determines as a
18  riding stable is if you're doing it for
19  commercial purposes. You're boarding horses,
20  leasing horses, lessons programs, things of that
21  nature.
22        (Whereupon there was a discussion held

6 (Pages 18 to 21)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 22

1  off the record between Mr. Winston and
2  Mr. Vogel).
3        BY MR. WINSTON:
4        Q.   Mrs. Jordan, I want to make sure the
5  record is clear on this. Let's take the
6  jurisdictions one at a time.
7        A.   Okay.
8        Q.   Carroll County?
9        A.   Okay.
10       Q.   Is it your testimony that the zoning
11  laws of Carroll County do not require that any
12  special exception be obtained before a riding
13  stable may be operated?
14       A.   That is correct.
15       Q.   I believe you testified that there was
16  a minimum --
17       A.   Three acre.
18       Q.   -- acre size of the parcel. Beyond
19  that, it's your understanding that there is no
20  additional special exception requirement?
21       A.   That's correct.
22       Q.   Are there other governmental

Page 23

1  requirements in Carroll County of which you are
2  aware that require some governmental approval?
3        A.   Yes. In the state of Maryland as a
4  whole, if you own any horse bodies for commercial
5  purposes, and you gross a certain minimum a year,
6  I believe it's $2,500, but I can't be exactly
7  sure on that, you must have a nutrient management
8  plan in place.
9        Q.   Are there any other local law
10  licensing activities that take place?
11       A.   No.
12       Q.   Any state licenses that must be
13  obtained?
14       A.   Other than sales and use, you know,
15  you have to have, of course, you have to be
16  licensed as a business to run the business, and I
17  already am, so that is not an issue for me.
18       Q.   In Howard County --
19       A.   Um-hum.
20       Q.   -- there is a two-acre minimum lot
21  size requirement to have a riding stable?
22       A.   No, I'm sorry. There is a minimum two

Page 24

1  grazing acre per horse body requirement so, for
2  instance, if you own eight horses, you must have
3  16 grazing acres allotted for those eight horses.
4        Q.   And it is your testimony that there
5  are no special exceptions, zoning requirements
6  that must be met in Howard County other than
7  those minimum grazing acre tests that must be
8  met?
9        A.   Correct.
10       Q.   Are there any other local licenses
11  that would have to be obtained in order to be
12  able to operate a riding stable?
13       A.   You have to obtain a -- stable
14  license from the state of Maryland, which comes
15  in and periodically checks your stable to make
16  sure that you are maintaining the minimum
17  requirement for care.
18       Q.   Are there any bonding requirements
19  with respect to be the operation of a riding
20  stable --
21       A.   That's not -- sorry.
22       Q.   -- or other facility of the kind that

Page 25

1  you were planning on operating?
2        A.   That's left up to the individual
3  owners themselves. I do carry liability
4  insurance on my own business.
5        Q.   What about financial security bonds?
6  In the event that you board horses at your
7  facility, are there any financial requirements
8  imposed on you?
9        A.   No. No.
10       Q.   In Baltimore County what is the zoning
11  classification, the name of the classification
12  that is required to be obtained in order to be
13  able to use the land for riding stable as a
14  matter of right? In other words, when you make
15  an application for a special exception --
16       A.   Right.
17       Q.   -- is the result of that that they
18  change the zone to a different zone?
19       A.   No. They do not.
20       Q.   Is that special exception something
21  that can be obtained in any zone?
22       A.   It can be obtained in any zone in

7 (Pages 22 to 25)

c575b5c0-5458-11d7-b797-0003b3005cf9

1  Baltimore County except those specifically
2  mandated by the county, most of which are
3  industrial zoned areas.  I mean, you can't put a
4  riding stable in an industrial zone or a
5  residential -- I take that back.  It can be a
6  residential zone provided it's an agricultural
7  residential zone.  For instance, RC2 has a
8  minimum acreage requirement in that zone, but a
9  special exception still needs to be obtained in
10  an RC2 zone.
11      Q.  So, is it your testimony that in a
12  residential zone, the only theoretical
13  restriction is the size of the lot that is
14  required to otherwise meet lot size requirements?
15      A.  No.  I'm sorry, through the special
16  exception process, you have to go through the
17  county zoning board, and they open it up to the
18  residents of that area to be able to put -- have
19  input on that business opening up.  Which is
20  obviously a major concern of mine, because I'm
21  not going into a development and going to try and
22  build a horse farm in the middle of all these

1  people's homes.  They'd have a problem with
2  traffic, so location has been a paramount concern
3  of mine.  Then, of course we have to deal with
4  the zoning issues.  Obvious -- for obvious
5  reasons it would behoove me to go to Carroll
6  County versus Baltimore County, because Baltimore
7  County in requiring that specific exception also
8  is going to cost me a fair amount more than it
9  would in Carroll County.
10             (Summons and Complaint
11             marked for
12             identification as DJ
13             Exhibit No. 3).
14      BY MR. WINSTON:
15      Q.  I hand you what's been marked as DJ-3
16  for the purpose of this deposition and ask
17  whether you can identify it.
18      A.  No.  I haven't seen this document
19  before.
20          Have I seen this?
21      Q.  Is this the complaint?
22      A.  Keep going.

1      Q.  In the lawsuit that's filed?
2      A.  Oh, okay, yes.  Okay.  Yes.  Okay.
3  Now I know I recognize it, yes.
4      Q.  So you have seen this document?
5      A.  Yes, sir.
6      MR. NEEDLE:  Objection.  When you
7  refer to document, it's many pages long, and I
8  think her response is that she's seen the
9  complaint and the request for jury trial.  I'm
10  not sure what her response is with respect to the
11  other papers on top of that.
12      MR. WINSTON:  The only document I'm
13  interested in for this purpose is the complaint.
14  I just attached the others for the sake of
15  completeness.
16      THE WITNESS:  Oh, okay.
17      BY MR. WINSTON:
18      Q.  I'm simply asking if you've seen the
19  complaint and the jury demand.
20      A.  Yes.  I have seen the complaint and
21  the jury demand.
22      Q.  All right.  Directing your attention

1  to paragraph 6 of the complaint.
2      A.  Yes.
3      Q.  Are you still the owners of the
4  property that's identified in paragraph 6?
5      A.  Yes, in -- yes, but my grandparents
6  are also deeded on this piece of property, which
7  is not disclosed.
8      Q.  So, who are the owners of the property
9  who hold title to this property?
10      A.  Louis and Monica Jordan and John and
11  Margaret Myers.
12      Q.  And John and Margaret Myers are your
13  grandparents?
14      A.  My grandparents, my maternal
15  grandparents.
16      Q.  What was the purchase price of the
17  property?  First of all, when did you buy it?
18      A.  Well, it was bought as a piece of
19  land, and we built the house that's on it, so it
20  was two separate transactions that was covered by
21  a construction PERM loan.  That loan was in the
22  amount of 259,000, but that was not the purchase

c575b5c0-5458-11d7-b797-0003b3005cf9

1  price. We put 120,000 plus down on it.
2      Q.   Do you recall what the total price of
3  the acquisition of the land and the construction
4  of the house on that property was?
5      A.   I believe the land was 90,000, and the
6  house was 225.
7          MR. NEEDLE:  You can't confer with
8  anybody else.
9          THE WITNESS:  Oh, I'm sorry.
10         If memory serves me correctly, it was
11  225,000 for the house.
12  BY MR. WINSTON:
13     Q.   And am I correct that it was your
14  testimony that you had a construction permanent
15  loan of $229,000, and that you also invested
16  approximately $120,000 in equity?
17     A.   No.  The 120,000 that we put down also
18  covered the settlement as well.  I mean, there
19  was -- I don't remember the exact breakdown of
20  that number, I just know the number as a total
21  figure.
22     Q.   How much of the $120,000, or the cash

1  portion of the purchase, did you and Mr. Jordan
2  contribute?
3      A.   Minimally.
4      Q.   Who contributed the balance?
5      A.   My grandparents.
6      Q.   What is the amount that they
7  contributed?
8      A.   Dollar for dollar, I can't tell you.
9  I know that we only contributed probably around
10  $30,000.  It's been almost eight years now, I
11  don't remember.  I have the documents at home
12  that I might be able to pull that information
13  from, but --
14     Q.   Okay, what portion of that property is
15  owned by your grandparents?
16     A.   It is deeded as a 50/50 split there,
17  but balance upon their death goes to my husband
18  and myself.
19     Q.   Do you know how the deed reflects
20  ownership?
21     A.   It's deeded -- I believe my husband
22  and I are joint tenants and my grandparents are

1  joint tenants, owned by tenants of entireties or
2  something of that nature, but I don't recall the
3  exact wording.  I have the deed at home.  If
4  anything were to happen to my husband or myself,
5  our 50 percent was supposed to go to our eldest
6  son.
7      Q.   Do you have a written agreement with
8  your grandparents regarding the ownership of this
9  property and the sharing of expenses for the
10  operation of the property?
11     A.   Other than the deed on the split of
12  the house, no.  When we took the initial
13  mortgage, my grandparents paid half the mortgage
14  at the very outset, but my grandfather has since
15  retired since that time, and my husband and I
16  refinanced the house so that we can take over the
17  entire mortgage and they not be burdened with a
18  mortgage payment.
19     Q.   When the property was purchased and a
20  home built and the financing that you have just
21  described was put in place, do you know whether
22  your grandparents treated any portion of the cash

1  that they contributed toward the purchase as a
2  gift for federal gift tax purposes?
3      A.   No.  They did not, because my
4  husband's and my intention is to repay them that
5  money.
6      Q.   Is there a promissory note that
7  evidences the debt that you're just described?
8      A.   No, there's not.  It's a family
9  matter.
10     Q.   When you refinanced this property, by
11  the placement of the loan that is now in place,
12  were there any cash proceeds at the time of that
13  refinancing?
14     A.   There was a cashout proceed to
15  consolidate some other debt that we had so that
16  we could take on the entire payment.
17     Q.   Do you recall how much that was?
18     A.   Off the top of my head, no, but I have
19  records of it at home.
20         MR. WINSTON:  I'd like to know that,
21  Mr. Needle.
22         MR. NEEDLE:  You think what?

c575b5c0-5458-11d7-b797-0003b3005cf9

1       MR. WINSTON: I'd like to know that.
2  I'd like to have a copy of that.
3       THE WITNESS: I'm sorry, it should be
4  on the settlement statement which we provided to
5  you already. Because the 'refi' will lay out --
6  the mortgage document, the settlement sheet
7  should tell you exactly how much went to the
8  other lenders, because they paid them directly.
9       BY MR. WINSTON:
10      Q.   So the creditors are reflected on the
11  real estate settlement statement for the
12  refinancing?
13      A.   Yes, they are.
14      Q.   Did any of the proceeds of that
15  refinancing go to your grandparents?
16      A.   No. It did not.
17      Q.   Were there any proceeds left after the
18  refinancing after you paid off these other
19  creditors to which you've just referred?
20      A.   No. It was strictly for consolidation
21  purposes. We did not cash out on the home.
22      Q.   Do you still intend to repay your

1  grandparents that loan?
2       A.   Yes, I do. Which, I'm sorry, which is
3  one of the reasons why we have retained the
4  equity position that we have in the home
5  currently. Because there is still the equity
6  position in the house to cover what they put into
7  the house in case that something, in case an
8  estate issue were to arise that we would need to
9  repay that.
10      Q.   What do you believe the house is worth
11  today?
12      A.   About 500,000.
13      MR. NEEDLE: Let me just, for
14  clarification purposes, are you including the
15  land as well in that estimate?
16      THE WITNESS: Well, I'm basing that
17  estimate on what I have seen go on the market
18  recently. And I know that a home nearby to me
19  just went on the market for $569,000 of similar
20  nature. So I know that our home is worth in that
21  same price range.
22      BY MR. WINSTON:

1       Q.   How much land did the other house have
2  around it?
3       A.   Five acres.
4       Q.   How much land do you have around
5  yours?
6       A.   Three and a third.
7       Q.   Directing your attention to the time
8  of June of 2001.
9       A.   Okay.
10      Q.   What was -- what was your property,
11  including house and land, in your view, worth at
12  that time?
13      A.   About 475. Now, I'm not a real estate
14  appraiser, but, you know, that's within, you
15  know, that's well within what it would have been
16  marketed for.
17      Q.   Well, at the time of the refinancing
18  of this property, November 22nd, 2000 --
19      A.   Um-hum, um-hum.
20      Q.   -- do you know whether an appraisal
21  was done --
22      A.   Yes, there was.

1       Q.   -- in connection with that
2  refinancing?
3       Did you see that appraisal?
4       A.   No. I did not.
5       Q.   Do you know what the amount of the
6  appraisal was?
7       A.   If memory serves me correctly, it was
8  428,000.
9       Q.   Do you know when you made your first
10  payment on the Washington Mutual Bank loan that's
11  the subject of this lawsuit?
12      MR. NEEDLE: Objection, and for
13  clarification purposes, because the first
14  payment, I don't believe, was made to Washington
15  Mutual, so you might want to clarify that.
16      BY MR. WINSTON:
17      Q.   It's really the same question, when
18  was the -- you placed a financing on November
19  22nd, 2000; is that correct?
20      A.   Correct.
21      Q.   Do you know when the first payment on
22  that loan was made?

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 38

1    A.   It was a January 1st payment, the
2  January payment was made to First Horizon Home
3  Loan. The February 1st payment was then made to
4  Washington Mutual.
5    Q.   Did there come a time between January
6  and February that you received a notice that the
7  loan had been transferred?
8    A.   I got a letter from First Horizon
9  stating that the loan had been transferred. I
10 don't recall seeing a letter from Washington
11 Mutual.
12   Q.   Did there subsequently come a time
13 when you received a notice from Washington Mutual
14 that a payment was due?
15   A.   I got the February 1st statement.
16   Q.   And that would have been the first
17 statement?
18   A.   First payment.
19   Q.   That you had from Washington Mutual?
20   A.   Yes.
21   Q.   And the first contact that you had
22 with them?

Page 39

1    A.   I believe so.
2    Q.   How did you customarily make payments
3  on this loan between -- well, how did you make
4  the January payment?
5    A.   The January payment was made by check.
6    Q.   And how was the February, how was the
7  February payment made?
8    A.   By check.
9    Q.   And we all know how the March payment
10 was made.
11   A.   Yes.
12   Q.   Which we'll go into in a minute.
13   A.   Yes.
14   Q.   After the March payment how were
15 payments made on this loan?
16   A.   By check.
17   Q.   Have you made any other electronic
18 fund transfer payment on this loan other than the
19 March 2001 payment --
20   A.   Washington Mutual?
21   Q.   -- on this loan?
22   A.   No. I wouldn't want it to be lost

Page 40

1  again.
2    Q.   Directing your attention to March of
3  2001, did there come a time when you made a
4  payment by a means other than check?
5    A.   Washington Mutual or to any other
6  creditor?
7    Q.   March of 2001, your March payment.
8    A.   My March payment was made to
9  Washington Mutual by electronic funds transfer.
10   Q.   Why did you change in the way that you
11 made the payment?
12   A.   I didn't receive a statement to mail
13 my payment in with the March payment when it was
14 due. I called Washington Mutual to find out how
15 I could get the funds to them and make sure that
16 it was received on time.
17       Well, actually I called to find out why
18 I didn't get a March statement, first of all, and
19 then I asked the young lady if there was any way
20 to get a statement in time for me to mail my
21 payment in. And she told me she didn't think so.
22 So, after that conversation, I think I just told

Page 41

1  her that I would make it electronically via my
2  bank, because I am in the regular habit of making
3  electronic bill payments for several other
4  creditors.
5    Q.   After the March 2001 payment, did you
6  continue to make payments on this loan?
7    A.   Yes.
8    Q.   Have all of your subsequent payments
9  been made in timely fashion?
10   A.   There was one that was late.
11   Q.   Do you remember --
12   A.   And I made a late payment on it.
13   Q.   Do you remember when that was?
14   A.   Not without referring to my
15 documentation.
16   Q.   Why was it late?
17   A.   I don't recall, to be honest.
18   Q.   Were you short of money during that
19 period?
20   A.   It's possible, but I doubt it. I do
21 recall. I'm sorry, I do recall. Yes. I was
22 waiting for a funds transfer from an investment

11 (Pages 38 to 41)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 42

1  account, and yes, that's why it was late, because
2  the funds transfer did not happen in a timely
3  fashion. So I was waiting for that money to come
4  in to make the payment.
5      Q.  What investment account was that?
6      A.  It's an investment account that we
7  contribute to on a monthly basis, and I decided
8  to cash out a portion of it because of the market
9  conditions.
10      Q.  Is this a private personal investment
11  security account?
12      A.  It's with a brokerage firm.
13      Q.  Does it own stocks in other
14  securities?
15      A.  Yes. It's a mutual fund.
16      Q.  A mutual fund.
17          How much money did you have invested
18  in that account?
19      A.  I don't know. At that particular
20  time?
21      Q.  Yes.
22      A.  I don't know without looking at my

Page 43

1  records.
2      Q.  Do you still have that account?
3      A.  Yes.
4      Q.  Do you know what amount is invested in
5  it at this time?
6      A.  Roughly $2,000.
7      Q.  Do you recall what the maximum value
8  of that investment account was?
9      A.  No, I don't, without checking my
10  records.
11      Q.  I'm now going to ask you some
12  questions about the process that you used in
13  making the March payment by electronic transfer.
14      A.  Um-hum.
15      Q.  But, for context, let me first ask
16  you, what computer software do you use to do your
17  bookkeeping?
18      A.  Quicken.
19      Q.  Do you use the Quicken software to
20  make -- to directly communicate with your bank
21  when making electronic transfers?
22      A.  No, I don't.

Page 44

1      Q.  How do you communicate with your bank
2  to make electronic transfers?
3      A.  I have to log onto the bank's web side
4  directly.
5      Q.  What bank is that?
6      A.  NetBank.
7      Q.  Who is Sponsor Care?
8      A.  I don't know.
9      Q.  Do you know what CheckFree is?
10      A.  It's a check servicing company who
11  guarantees funds, I believe, I'm not real -- I'm
12  not real sure what role they play. I know that
13  they keep track of people who are habitual
14  delinquents on writing checks.
15          MR. WINSTON: I'm not going to mark
16  this. I'm just going to give it to the witness.
17          BY MR. WINSTON:
18      Q.  I'm going to hand you three pages,
19  Ms. Jordan, two pages, which are from the initial
20  document production that you made that was in the
21  notebook.
22      A.  Okay.

Page 45

1      Q.  And these are pages 32 and 33, and I
2  just ask you to look at them, and see if when you
3  look at them, your recollection is refreshed as
4  to what CheckFree or Sponsor Care is?
5      A.  Oh, okay. I didn't recognize Sponsor
6  Care, it's a subtitle. I'm not -- I just
7  recognize the title of CheckFree, I have seen it
8  on other web sites before. But obviously, from
9  looking at this, CheckFree is the clearinghouse,
10  if you will, for NetBank.
11      Q.  What is that piece of paper that I've
12  just given you, the first page, do you know?
13      A.  It's my understanding, because I
14  received this document from NetBank directly --
15      Q.  How did you receive it?
16      A.  By fax.
17          It's my understanding that this is
18  their receipt, if you will, for electronic
19  transfers.
20      Q.  From whom -- this is NetBank's
21  receipt?
22      A.  Yes.

12 (Pages 42 to 45)

c575b5c0-5458-11d7-b797-0003b3005cf9

1      Q.    From whom did they receive that
2    receipt?
3      A.    I do not know.
4      Q.    All right. I want the record to
5    reflect that the BATES stamp page numbers are 32
6    and 33. For the purpose of, for identification,
7    is that satisfactory to you, Mr. Needle?
8          MR. NEEDLE:  Sure.
9          MR. WINSTON:  So we don't have to mark
10   it as another exhibit, but we'll all know what it
11   was.
12         BY MR. WINSTON:
13     Q.    Do you generally pay bills through
14   NetBank?
15     A.    Yes, I do.
16     Q.    And you have throughout the period
17   from March 1st forward?
18     A.    Yes.
19     Q.    For how long prior to March 1st did
20   you make payments through NetBank?
21     A.    I believe for as long as I've had the
22   on-line account. And I don't know without

1    conferring with my records how long that's been,
2    but I have used NetBank consistently to pay
3    bills.
4      Q.    I'd like you to describe in as much
5    detail as you can, from the time you decided to
6    start using the NetBank facility, what kind of
7    information you had to provide to NetBank about
8    the payees of transfers from NetBank on your
9    behalf, how did that process work?
10     A.    NetBank had an alphabetical directory
11   of payees who were enrolled in their bill payment
12   system, and all I needed to do was go to their
13   alphabetical listing and click on the particular
14   one that they had listed. I chose.
15     Q.    This, excuse me, but this alphabetical
16   listing was then on line?
17     A.    Yes. Yes.
18     Q.    So you did this by computer over the
19   Internet?
20     A.    Yes.
21     Q.    Did you?
22         MR. NEEDLE:  Excuse me. You asked her

1    to explain in full detail, and I'm not sure she
2    finished her answer.
3          MR. WINSTON:  You're right. I
4    interrupted her.
5          THE WITNESS:  I identified Washington
6    Mutual by the WMHL, which was Washington Mutual
7    Bank, and the little insignia icon which is on
8    all Washington Mutual letterhead statements, I
9    think the little gold seal with the W in the
10   middle. That's what was on the web site, so I
11   clicked on that, and the only thing I needed to
12   provide NetBank in order to direct that payment
13   was my account number and an optional blurb if I
14   wanted to put anything in there.
15         BY MR. WINSTON:
16     Q.    When you clicked on the Washington
17   Mutual icon, were you able to see at that time
18   any of the information that NetBank had on
19   Washington Mutual?
20     A.    No.
21     Q.    So it was simply a line with the name
22   of the payee?

1      A.    Yes.
2      Q.    Did you know to where the funds would
3    be transferred when you clicked on an icon?
4      A.    No.
5      Q.    Taking you back to the letter that you
6    received from First Horizon, I believe you
7    testified in January of 2001; is that correct?
8      A.    The letter from First Horizon that I
9    received in December of 2000.
10     Q.    That's the letter informing you that
11   there was going to be a transfer of the loan?
12     A.    Yes.
13     Q.    And do you recall to what institution
14   the loan was going to be transferred?
15     A.    Washington Mutual home loans.
16     Q.    Now continue with your explanation of
17   the process of making electronic fund transfer
18   payments.
19     A.    The only information that I needed to
20   provide NetBank for processing the payment was
21   the account number to which the payment was to be
22   made and the amount to which to make a payment

13 (Pages 46 to 49)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 50

1  to. And in order to verify the information that
2  I'm giving them, the only thing I needed to
3  reenter was the account number, my mortgage
4  account number so they can verify that I input it
5  correctly.
6      Q.  The loan number?
7      A.  Yes.
8      Q.  What documentation -- now, this
9  question refers to all payments that you make by
10  electronic transfer, not simply the mortgage
11  payments.
12     A.  Okay.
13     Q.  What documentation do you receive
14  evidencing the electronic fund transfer after
15  it's made?
16     A.  None. My statement. On a monthly
17  basis.
18     Q.  Is there a list of those transfers
19  that you direct be made given to you before you
20  get your monthly bank statement?
21     A.  I'm not sure I understand what you're
22  asking.

Page 51

1      Q.  Let me try a different way.
2          Does NetBank have from you a list of
3  payees to whom payments are to be made on a
4  regular or periodic basis?
5      A.  Yeah. Under my log in I have a
6  personal page of payees, yes.
7      Q.  And does NetBank automatically make
8  payment to those payees on some periodic basis?
9      A.  Not unless I set it up that way,
10  otherwise I do it every month. I generally make
11  my transaction, I generally tell my transactions
12  when to go every month.
13     Q.  Are there any transactions that are on
14  an automatic pay?
15     A.  No.
16     Q.  When you push the button and say make
17  these transfers --
18     A.  Um-hum.
19     Q.  -- do you get a printout of those
20  transfers that you have directed to be made?
21     A.  Not unless I hit my browser's print
22  button.

Page 52

1      Q.  Do you do that?
2      A.  No.
3      Q.  What record do you have of having
4  requested electronic fund transfers from NetBank?
5      A.  My statements.
6      Q.  That's the only record that you have
7  of them?
8      A.  Yes. Or each  -- I'm sorry, NetBank
9  keeps a record of history payments for a certain
10  time period, I think six months, and I think I
11  may have provided you a list of those or most
12  recent so that you could see that I have used it
13  on a consistent basis.
14     Q.  NetBank maintains that record?
15     A.  Yes.
16     Q.  Do they automatically send it to you?
17     A.  No.
18     Q.  So you have to request it?
19     A.  I -- I -- I don't request it, I can
20  access it on line via my log-in number, and I can
21  print it off.
22     Q.  Are you the sole member of your family

Page 53

1  who has in any way communicated with NetBank by
2  computer?
3      A.  Yes. My husband wouldn't know how to
4  pay a bill.
5          MR. WINSTON: Make sure that's on the
6  record.
7          MR. NEEDLE: She couldn't wait to get
8  that out.
9          MR. WINSTON: That's why I wanted to
10  make sure it was on there.
11         MR. NEEDLE: Off the record.
12         (Whereupon there was a discussion held
13  off the record).
14              (E-Mail dated 3/23/01
15              marked for
16              identification as DJ
17              Exhibit No. 4).
18         BY MR. WINSTON:
19     Q.  I'm handing you what's been marked
20  DJ-4 and ask whether you can identify it.
21     A.  Yes. This is an E-mail that I
22  received from NetBank when I questioned them

14 (Pages 50 to 53)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 54

1    regarding my March payment.
2        Q.   Now, if you would, describe for the
3    record what you mean by the reference, when I
4    questioned them regarding the March payment?
5        A.   I received my April statement for my
6    mortgage account to make my April payment and
7    noticed that my March payment had not been
8    reflected as being recorded for March. And
9    through various avenues, one through Washington
10   Mutual and one through NetBank, I was trying to
11   find out where the payment went to, and I
12   questioned their customer service department.
13       Q.   I want to be clear about this.
14           When did you receive the April
15   statement?
16       A.   The April statement was dated March
17   the 14th, so it would have been a few days
18   thereafter. Within a week.
19       Q.   Can you tell, from looking at Exhibit
20   4, the date on which it was received by you?
21       A.   Yes.  There's a date and time stamp on
22   it.

Page 55

1        Q.   What does -- what does the line to
2    say?
3        A.   Line 2?
4        Q.   T-O.
5        A.   In the message -- oh, "to."
6        Q.   The reference to hyphen?
7        A.   29, excuse me, 29001 at service, dot
8    NetBank, dot com.
9        Q.   What does that mean?
10       A.   I think that's their customer service
11   designation, that at NetBank is their E-mail but
12   the 2900 I believe is their customer rep
13   designation.
14       Q.   To whom was this E-mail sent?
15       A.   It was sent to me.
16       Q.   Are you the "to" line?
17       A.   No.
18       Q.   How did you get this?
19       A.   This is a printout of the E-mail that
20   I sent NetBank.  Netbank is the 2901 -- 29001.
21   And this is the date and the time that I sent it,
22   and I printed this page off.

Page 56

1        Q.   So, the message --
2        A.   The message is from me.
3        Q.   From you to NetBank?
4        A.   No.  I'm sorry.  I take that back,
5    this is to me.
6        Q.   Yes.  And until this conversation,
7    that's what I thought.  Take your time,
8    Mrs. Jordan.
9        A.   Yes.  This is an E-mail to me.
10       Q.   Are you 29001?
11       A.   Well, it doesn't correspond with my
12   log in ID, but, within the bank's secure system
13   is the only way that they communicate with me.
14   They do not communicate to my general E-mail
15   account.  I have what's known as a bank mail
16   account, and any statements or notices or E-mails
17   they need to send me, they send directly to my
18   log in ID account, not to my general E-mail
19   account.  So, I have no way of identifying, you
20   know, what their 29001 represents, other than
21   that's what came through on the printout.
22       Q.   But it is your testimony that this was

Page 57

1    received on March 23rd, 2001, at 11:53 a.m.?
2        A.   Yes.
3        Q.   Can you tell, from looking at Exhibit
4    4, whether -- strike that.
5            Did you have any actual conversations
6    with any live human beings at NetBank between
7    March 1st and March 23rd, 2001?
8        A.   I may have, but I don't have any
9    records of that.
10       Q.   Do you have any recollection of having
11   had such a conversation?
12       A.   I may have called the 800 number, but
13   as -- it's much more difficult to get any service
14   via the phone than it is through E-mail.  It's
15   much faster, one of the nice things about their
16   bank mail system is when I send a bank mail, I
17   can direct it to a particular department; for
18   instance, wire transfers, if I were sending a
19   wire transfer, it goes to that particular
20   department.  Now, in this case I don't recall
21   which particular -- I mean, they have a standard
22   list of headings that you can direct, so it's a

15 (Pages 54 to 57)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 58

1  lot easier to get to the department I need via
2  the bank mail system, which is one of the reasons
3  why I chose NetBank as my bank, versus a local
4  lender or anybody else. I mean, they have --
5  their service tends to be a little better because
6  they are an on-line bank. They do not have a
7  retail store, if you will.
8      Q.   Does Exhibit 4 tell you the date on
9  which NetBank made the payment?
10     A.   It does not show the date the payment
11  was deducted from my checking account.
12     Q.   Does it tell you when it should have
13  been received?
14     A.   Yes. It should have been received
15  March the 13th.
16     Q.   Do you know the date on which your
17  account was in fact debited?
18     A.   March the 9th.
19     MR. WINSTON:  Do you want to take a
20  break now?
21     MR. NEEDLE:  Sure.
22     (Whereupon there was a short pause in

Page 59

1  the proceedings).
2      MR. WINSTON:  Back on the record.
3      BY MR. WINSTON:
4      Q.   I want to direct your attention again
5  to the pages that I handed you previously that
6  are BATES stamped 32 and 33 from your originally
7  informal but now formal document submission. Do
8  you have those in front of you?
9      A.   Yes, I do.
10     Q.   I want to direct your attention to the
11  box that appears in the upper left-hand corner.
12     A.   Okay.
13     Q.   Do you see that?
14     A.   Yes.
15     Q.   It has your name?
16     A.   Yes.
17     Q.   Would you look down on the fourth line
18  to where it says subscriber ID.
19     A.   Yes.
20     Q.   Is that your Social Security Number?
21     A.   Yes, it is.
22     Q.   Okay. Now what I'd like to do is

Page 60

1  direct your attention further down the page to
2  where it says, toward the bottom of the page in
3  bold letters, address specified by the
4  subscriber?
5      A.   Okay.
6      Q.   And you see an address underneath
7  that?
8      A.   Yes.
9      Q.   And that address is 75 North Fairway
10  Drive, Vernon Hills, Illinois, USA, 60061-1845;
11  is that correct?
12     A.   Correct.
13     Q.   Did you input that information?
14     A.   No. I did not.
15     Q.   Do you have any idea why it appears as
16  though you did, because it describes it having
17  been submitted by the subscriber?
18     A.   I can't -- I don't know for sure,
19  other than the fact that that's, when I pick WMHL
20  mortgage, that it's a prefill.
21     Q.   Prefill meaning it was already there?
22     A.   By NetBank.

Page 61

1      Q.   By NetBank?
2      Do you know when you first received
3  this piece of paper? Can you tell from looking
4  at this when you would have first received it?
5      A.   No, I can't.
6      Q.   I note at the bottom there is what
7  appears to be some sort of a footer, and at the
8  end of that footer are the numbers 7, slash, 23,
9  slash, 01?
10     A.   Okay.
11     Q.   Does that refresh your recollection as
12  to when you might have received this?
13     A.   I know that I received this
14  documentation after I obtained counsel Matthew
15  Azrael, because he was the only one who was able
16  to move somebody to get me real documentation.
17  But as to the specific date, without referring to
18  a letter of some sort, I cannot tell you.
19     Q.   But it is your testimony that your
20  receipt of this document would have been after
21  you retained Mr. Azrael?
22     A.   That's correct.

16 (Pages 58 to 61)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 62

1  (Whereupon there was a discussion held
2  off the record between Mr. Winston and
3  Mr. Vogel).
4  BY MR. WINSTON:
5  Q.  Do you have in your possession the
6  letter from First Horizon notifying you of the
7  transfer?
8  A.  No, I don't.
9  Q.  Do you have in your possession the
10  first statement that you received from Washington
11  Mutual regarding this loan?
12  A.  Can I refer to my book?
13  Q.  Of course.
14  A.  Well, it's not in the book.  I may
15  have it in a different file at home, but I can't
16  be sure if I do or do not.
17  MR. NEEDLE:  Off the record.
18  (Whereupon there was a discussion held
19  off the record).
20  MR. WINSTON:  Back on.
21  THE WITNESS:  I'm not in the habit of
22  keeping old documentation.  I mean, typically

Page 63

1  when I pay my bills, unless they are for my
2  business, I write a check and throw the stub
3  away, you know.  I'm not a pack rat by nature, I
4  don't keep a lot of paper around that tends to
5  just clutter things, you know, and I had no
6  reason to keep it.  If I have it, it will be -- I
7  don't know why.
8  BY MR. WINSTON:
9  Q.  I want to follow up on one thing you
10  said earlier, which is that you received, I
11  believe, you testified that you received the
12  April statement in March?
13  A.  Correct.
14  Q.  Mid March?
15  A.  (Nodding head up and down, inaudible
16  response).
17  Q.  And it was the information that was on
18  that statement that alerted you to an issue?
19  A.  Correct.
20  Q.  Please repeat when you believe you
21  received that statement.  Did you say it was sent
22  on the date of the 13th of March?

Page 64

1  A.  I actually received two on consecutive
2  days, because somebody at Washington Mutual coded
3  it to send a supplemental statement because I had
4  called in to get a statement.  So they sent me
5  one that was dated the 13th of March, and then
6  they sent me another one that was dated the 14th
7  of March.  But the 14th of March one would have
8  been for the April 1st payment, because I believe
9  the 13th of March statement only had the payment
10  amount due for the March payment, and I think the
11  April statement had the amount due for March and
12  April.
13  Q.  I want to be clear on this.
14  Is it your testimony that you had
15  received that statement to which you've just been
16  referring, prior to the time when you received
17  the document that's been marked Exhibit 4, on
18  March 23rd?
19  A.  Okay, I believe so.  In fact, I think
20  it was the statement itself which jogged me to
21  make some inquiries, and that's why this is dated
22  after.  I -- I do periodically go on line, you

Page 65

1  know, and check my accounts, whether they be
2  credit cards, car loans, mortgage loans, you
3  know, I may have checked the mortgage on line
4  prior to the statement coming in, but without
5  referring to the documentation I don't know that.
6  But it was all within the same time
7  period.
8  MR. WINSTON:  I'm going to reverse
9  myself and ask that you mark as Exhibit 4A the
10  documents that were previously referred to as
11  paged 32 and 33 BATES stamped.
12  (BATES stamped pages 32
13  and 32 marked for
14  identification as DJ
15  Exhibit No. 4A).
16  BY MR. WINSTON:
17  Q.  All right, did there come a time, at
18  long last we'll reach this part of the story, did
19  there come a point in time when you made contact
20  with a Washington Mutual representative about the
21  status of the transfer of funds to Washington
22  Mutual?

17 (Pages 62 to 65)

Page 66

1      A.    On several occasions.
2      Q.    When was the first such occasion that
3   you made personal contact?
4      A.    I don't recall a specific date.
5      Q.    Did you have a conversation with a
6   person at Washington Mutual prior to March 23rd,
7   2001?
8            Don't look at anything, please.  Can
9   you see if you recall from your own recollection?
10     A.    Subsequent to me calling in about the
11  statement?
12     Q.    Yes.
13     A.    Okay.  I may have called in to find
14  out where the money was directed to.  I may have
15  called in to find out why it hadn't been posted
16  to my account yet.
17     Q.    Did you receive a call from anyone at
18  Washington Mutual during this period, that is,
19  between the time that you made the wire transfer,
20  rather the electronic transfer and the time that
21  you got the March 23rd memo?
22     A.    Someone from Washington Mutual's

Page 67

1   collections department did call me, but I do not
2   recall the specific date without looking at the
3   calendar.  I believe it was a Monday, and it was
4   like the last week of the month, and notified
5   them that I had -- that I was already aware that
6   the payment was missing, and that I was working
7   on clarifying where it went to.
8            MR. WINSTON:  Please mark this as 4B.
9            (Handwritten notes
10                 marked for
11                 identification as DJ
12                 Exhibit No. 4B).
13     BY MR. WINSTON:
14     Q.    This is a document BATES stamped 003,
15  from the book that you submitted?
16     A.    Yes.
17     Q.    Please look at the top of that piece
18  of paper.
19     A.    Um-hum.
20     Q.    First of all, is this a piece of paper
21  that you produced?
22     A.    Yes, I wrote.

Page 68

1      Q.    This is your handwriting?
2      A.    I wrote this personally, yes.
3      Q.    Take a look, please, at the top half.
4            MR. NEEDLE:  Off the record a second.
5            (Whereupon there was a discussion held
6   off the record).
7            MR. WINSTON:  Back on.
8            BY MR. WINSTON:
9      Q.    You're familiar with this piece of
10  paper?
11     A.    Yes, I am.
12     Q.    Directing your attention to the second
13  sentence of the top entry, can you explain what
14  that means?  First of all, would you read it for
15  the record.
16     A.    Got a call from Michael, in
17  quotations -- I believe that was his name, I'm
18  not exactly sure what his name was, I was trying
19  to work from memory, and I believe his name was
20  Michael -- from Washington Mutual's collection's
21  department asking where our payment was, and I
22  informed him of everything that had transpired

Page 69

1   thus far.  He asked for a written authorization
2   to be faxed to (818) 775-2010 in the form of an
3   authorization number or a tracking ID number.
4      Q.    What did that mean to you?
5      A.    He was trying to find out where -- if
6   the funds had been transferred, and he asked me
7   to try to get something from my bank that would
8   show where the, you know, where the money went
9   to, or some sort of track, some way to track the
10  funds.
11           MR. NEEDLE:  I'm going to object
12  somewhat belatedly that you're asking her to
13  interpret his remarks and to read his mind.
14           MR. WINSTON:  All right.  Well, I'll
15  fix that right now.
16     BY MR. WINSTON:
17     Q.    First of all, with respect to this
18  document, do you know when it was written?
19     A.    No.  I do not.
20     Q.    Was it written on -- was the entry
21  that we've just read written on March 26?
22     A.    No.  It was not.  This entry was

18 (Pages 66 to 69)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 70

1  written as a reference page for our
2  documentation. I keep a notebook, a spiral bound
3  notebook next to my telephone, and I try to make
4  notes in to remind me to do things, and that this
5  excerpt actually comes from an envelope that I
6  wrote a cryptic message on when this person
7  called.
8      Q.  So do you know when this particular
9  piece of paper was actually written?
10     A.  The specific date this paper was
11 written, no.
12     Q.  Would it have been after the lawsuit
13 was filed in this case?
14     A.  It may have, but I do have the
15 envelope with the cryptic message on it that was
16 written that night.
17     Q.  Is that page 002 in the book?
18     A.  Yes.
19     Q.  And that document, it's your testimony
20 that that document was written contemporaneous
21 with the conversation?
22     A.  Yes.

Page 71

1      Q.  All right. The words that you have
2  just read are words that you have written,
3  correct?
4      A.  Yes.
5      Q.  And your having written them was your
6  effort to make a note of what you were told by
7  the person with whom you were speaking on the
8  phone; is that correct?
9      A.  My interpretation of it, yes.
10     Q.  Now, with respect to the sentence, the
11 second sentence of the 3-26 entry --
12     A.  Okay.
13     Q.  When it says he asked for --
14     A.  Um-hum.
15     Q.  Whom was he asking for something?
16     A.  He was asking from me.
17     Q.  All right. And after you hung up the
18 phone, with having gotten the message that's
19 reflected under 3-26, what did you do?
20     A.  It was in the evening, and business
21 was not being transpired. There was nothing that
22 I did that evening.

Page 72

1      Q.  Did there come a time when you made an
2  effort to do what he asked for on 3-26?
3      A.  The following morning, yes, 3-27.
4      Q.  Now, looking at the next entry on this
5  piece of paper, 4B.
6      A.  Um-hum.
7      Q.  That's your handwriting as well?
8      A.  Yes, sir.
9      Q.  Does that entry reflect what you did
10 as a result of the 3-26 conversation?
11     A.  In part. I did fax the information to
12 him as he asked.
13     Q.  What information did you fax to him?
14     A.  I don't recall, because I don't have a
15 copy of the fax page. I wrote it on a fax
16 transmittal page and sent it in, and after I
17 faxed it I pitched it. Deposited it in the
18 trash, sorry.
19     Q.  Do you have any recollection of what
20 was contained on that piece of paper that got
21 tossed?
22     A.  No, I don't. Like I said, I never

Page 73

1  expected it to be lost in the first place. I
2  didn't expect to have to go through all this to
3  have to try and find it.
4              (Letter dated April 3,
5              2001, marked for
6              identification as DJ
7              Exhibit No. 5).
8      BY MR. WINSTON:
9      Q.  Handing you what has been marked
10 Exhibit 5 for identification, DJ-5.
11         Can you identify it?
12     A.  It's a letter from Washington Mutual.
13     Q.  To you and Mr. Jordan?
14     A.  Correct.
15              (Letter dated June 14,
16              2001, marked for
17              identification as DJ
18              Exhibit No. 6).
19     BY MR. WINSTON:
20     Q.  Hand you what's been marked DJ-6, a
21 letter from WAMU to you dated 6-14-01. Do you
22 recognize it?

19 (Pages 70 to 73)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 74

1    A.    Yes.
2    Q.    Do you recall, Mrs. Jordan, when you
3  first received a notice from WAMU that your loan
4  was in arrears or that you were late in making
5  payments?
6    A.    With the April 1st statement.
7    Q.    So the initial statement that you
8  received in mid March, or that was sent out in
9  mid March, reflected the late payment of the
10  March payment?
11    A.    Reflected that it hadn't been received
12  and was in arrears, yes.
13    Q.    And is it fair to say that thereafter
14  you continued to receive notices from Washington
15  Mutual that the loan was in arrears?
16    A.    Yes, every month.
17    Q.    Now, were those noticed that you
18  received the notices that also constituted
19  statements of amounts owed, or were they in
20  addition to those statements?
21    A.    In addition to the statements we
22  received notices of intent to foreclose and late

Page 75

1  payment notices.
2    Q.    When did the -- when did you first
3  receive a notice of intent to foreclose, do you
4  recall?
5    A.    April of 2001.
6    Q.    Did there come a time when you and
7  your husband decided that you wanted to look for
8  a new home?
9    A.    Yes.
10    Q.    When was that?
11    A.    Well, we initially considered
12  additional acreage in March of 1999.
13    Q.    When you say additional acreage, does
14  that mean that you were considering buying
15  property adjoining the property that you now own?
16    A.    In March of '99 that I recollect.
17  There was a four-acre parcel adjacent to my own,
18  and another acre and a half adjacent to my own
19  that was available.
20    Q.    Did you seek to acquire them?
21    A.    We did.  We put a contract in on them.
22  My real estate agent should know better about

Page 76

1  this.  I don't remember the specifics concerning
2  the contract, but that parcel of land has since
3  been acquired by someone else.
4    Q.    Is it your testimony that -- well,
5  first of all, there are two different parcels?
6    A.    Yes.  But the owner -- it was the same
7  owner of both parcels, and the acre and a half
8  parcel is not something that he could have sold
9  independently because of zoning restrictions, and
10  it was only suited for raising horses because of
11  power lines and whatnot, and he was willing to,
12  because it is adjacent to my property, he was
13  willing to consider it as an an attachment to the
14  contract.
15    Q.    I don't understand what you just said.
16    A.    The only parcel that was actually for
17  sale was a four plus acre parcel.  The other
18  parcel of land was not a listing, if you will,
19  but --
20    Q.    It was -- what you're trying to say is
21  he was prepared to sell that with the four
22  acre --

Page 77

1    A.    Additional acreage.
2      MR. NEEDLE:  This is very confusing.
3  Why don't you start over?  Let him finish his
4  question.
5      THE WITNESS:  Okay.
6      BY MR. WINSTON:
7    Q.    There are two parcels.  There's a
8  four-acre far parcel and a one-and-a-half-acre
9  parcel.  Because of the nature of the
10  one-and-a-half acre parcel, it could not be sold
11  separately; is that correct?
12    A.    Yes.
13    Q.    And so, when the adjoining landowner
14  was going to sell the four-acre parcel, he was
15  also prepared to sell the one-and-a-half-acre
16  parcel with it?
17    A.    To me, yes.
18    Q.    To you?
19      What is the name of that adjoining
20  landowner?
21    A.    The original owner or the owner now?
22    Q.    The owner in 1999 who owned those two

20 (Pages 74 to 77)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 78

1  parcels.
2      A.   Charles Forbes.
3      Q.   And what was his address at that time?
4      A.   I don't know, he can be reached via
5  Reisterstown Lumber Company on Hanover Pike. I
6  don't know a personal address.
7      Q.   Does he still live on the property
8  that he owned at that time?
9      A.   He never lived on the property that he
10  owned at that time. He was the owner of our
11  current -- he owned a large parcel of ground
12  which he subdivided, which is one of the lots
13  that we currently own.
14      Q.   Has the four-acre parcel been sold?
15      A.   Yes.
16      Q.   And who is the current owner?
17      A.   I don't know his last name. He hasn't
18  built his house. He comes in periodically and
19  mows his grass, I know his name is Marty.
20      Q.   Did he acquire the one-and-a-half-acre
21  parcel?
22      A.   No. He did not.

Page 79

1      Q.   Who owns that?
2      A.   Nobody -- well, Charles Forbes does.
3      Q.   Now, going back to 1999, I believe you
4  testified that you were interested in acquiring
5  what I'll refer to as the Forbes four-acre
6  parcel; is that correct?
7      A.   Correct.
8      Q.   Did you seek to acquire it?
9      A.   At that time, yes.
10      Q.   Did you submit a contract?
11      A.   Yes.
12      Q.   Who were the prospective purchasers
13  who signed that contract?
14      A.   I believe they were all four parties
15  that are currently on the deed to the house.
16      Q.   Was that contract accepted?
17      A.   I don't recall, because I know that we
18  did some land use studies in relation to that
19  first, and we were -- at that time I was just
20  beginning to develop a business plan for the
21  business that I intend to own, so all of this is
22  prior to actually the business that I've

Page 80

1  developed now.
2      Q.   Well, let me take this apart piece by
3  piece.
4      A.   Okay.
5      Q.   You submitted a contract?
6      A.   (Nodding head up and down, inaudible
7  response).
8      Q.   Is that correct?
9      A.   Yes.
10      Q.   Do you recall what the price offered
11  on that contract was?
12      A.   No, I don't. I don't remember what
13  the price on that was. I know it was in the
14  general neighborhood of a hundred thousand.
15      Q.   Did the contract contain any
16  contingencies?
17      A.   I don't recall.
18      Q.   Did it contain a contingency to have
19  any of the property rezoned?
20      A.   No, it didn't.
21      Q.   Did it contain a contingency that
22  would have enabled you to obtain a special

Page 81

1  exception to operate a riding stable?
2      A.   I don't recall.
3      Q.   Did it contain a contingency for any
4  financing?
5      A.   Other than the standard financing
6  clause that's in a typical real estate
7  documentation, it may have, I don't remember.
8      Q.   Mrs. Jordan, in your response to
9  request for production of documents you submitted
10  contracts on three properties. You responded by
11  tendering to me copies of documents for three
12  pieces of real estate.
13      A.   Right.
14      Q.   That had a heading on those documents,
15  you know, improved land contract of sale, I
16  believe?
17      A.   Okay.
18      Q.   Do you recall whether the form of the
19  document that was submitted in 1999 on the Forbes
20  property was substantially the same as that form?
21      A.   I believe so.
22      Q.   Do you have a copy?

21 (Pages 78 to 81)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 82

1    A.   Of that contract?
2    Q.   Of that contract.
3    A.   No, I don't.
4    Q.   Again, for the sake of clarification,
5  was that contract accepted by Mr. Forbes?
6    A.   I want to say yes, but I can't be sure
7  because I know that it turned around and was
8  resold immediately after we were interested in
9  it.
10   Q.   You never acquired it?
11   A.   No.
12   Q.   Why did you not acquire it?
13   A.   I believe we were doing further
14  research on the viability of that piece of
15  property, and it just didn't work out.
16   Q.   Had you obtained financing to purchase
17  it?
18   A.   No.
19   Q.   Had you applied for financing to
20  purchase it?
21   A.   I may have tried to get a preapproval,
22  but I don't know that we actually submitted a

Page 83

1  loan application.
2    Q.   How much of the purchase price, if you
3  recall, were you going to finance, and how much
4  was going to be in the form of cash?
5    A.   I don't remember that.
6    Q.   What did you intend to do with that
7  ground if you had acquired it?
8    A.   When we first considered that piece of
9  property, we were trying to weigh the
10  disadvantages and disadvantages of either moving
11  or staying where we are.  And when we were
12  looking at that property, it comes down to a
13  matter of dollars and cents.  We wanted to see if
14  it was physically right to buy that piece of land
15  and move on from there, or whether, you know, or
16  whether it was not -- it didn't make fiscal sense
17  in order to buy that, stay for a while, we
18  weren't sure at that time, I mean, this was right
19  at the very start of when I was developing my
20  business plan, and there were a lot of gray areas
21  at that time.  And we hadn't made any firm
22  commitments whether we were staying or leaving.

Page 84

1    Q.   When you submitted the -- what was the
2  date, if you remember, even if it's just a month,
3  do you remember what month during 1999 you may
4  have submitted --
5    A.   Spring.
6    Q.   -- an offer?
7    A.   Spring.
8    Q.   The spring?
9    A.   Yeah, that's all, you know.
10   Q.   The first half of 1999?
11   A.   Yes.
12   Q.   And you don't recall whether the offer
13  was ever accepted?
14   A.   Like I said, I want to say I think he
15  did.
16   Q.   Why didn't it close?
17   A.   I don't recall.  I don't know if we
18  determined that it wasn't the right piece of
19  property after I consulted with the bank or not.
20   Q.   Had you been told that you would not
21  qualify for financing?
22   A.   I don't think so, not at that time.

Page 85

1    Q.   Is it possible that you had been told
2  at that time that you would not qualify for the
3  financing of the purchase of that land?
4    A.   I find it very hard to believe,
5  considering the equity position we were in at the
6  time.
7    Q.   Did there come a time that you decided
8  to look for a new home?
9    A.   Yes.
10   Q.   And when did you decide, first decide
11  that you wanted to look for a new home?
12   A.   Geez, late '99 or early 2000.
13   Q.   So, it's your testimony you decided to
14  look for a new home prior to refinancing this
15  property?
16   A.   Yes.
17   Q.   Now, directing your attention back to
18  the 1999 Forbes land matter --
19   A.   Okay.
20   Q.   -- for a moment.
21   A.   Yeah.
22   Q.   Did you, in connection with that

22 (Pages 82 to 85)

c575b5c0-5458-11d7-b797-0003b3005cf9

1  potential acquisition, talk to a lender about the
2  possibility of borrowing funds to purchase that
3  land?
4      A.   I think I may have reviewed a
5  preliminary business plan with Keith Wills at
6  Farm Credit, but I don't remember if he was
7  involved at that time or later.
8      Q.   Did you have occasion at that time to
9  talk to Mr. Naworol?
10     A.   Not at that time, no.
11     Q.   Did you talk to any other mortgage
12  lender other than Mr. Wills or Mr. Naworol as far
13  as you can recall, regarding the 1999 land
14  transaction?
15     A.   No.  No one else regarding that
16  transaction.
17     Q.   Did you file an application for
18  financing with respect to the 1999 land
19  transaction?
20     A.   Maybe.  As best I can recall.
21     Q.   Did you receive a prequalification
22  letter in connection with that transaction from

1  any mortgage lender?
2      A.   No.  At that time I don't believe we
3  were in need of a prequalification letter.
4      Q.   Did there come a time, Mrs. Jordan,
5  when you listed your current home for sale?
6      A.   No.
7      Q.   Have you ever listed it for sale?
8      A.   No.
9      Q.   Did there come a time when you made
10  contact with a Mr. Ed Naworol regarding the
11  possibility of obtaining financing from him to
12  purchase a new home?
13     A.   Yes.
14     Q.   How did you come to know of
15  Mr. Naworol?
16     A.   We attended a home building seminar.
17  When I say we, my husband, my grandfather, and
18  myself attended a home building seminar of which
19  Mr. Naworol was the chair, if you will, he
20  organized it, and we obtained his business card
21  at that time, and we were impressed with him.
22     Q.   How did you make contact with him?

1      A.   Phone.
2      Q.   Did there come a time when you
3  submitted any information to him?
4      A.   Yes.
5      Q.   How did you submit that information to
6  him?
7      A.   Uniform lending, the, you know,
8  disclosure form.
9      Q.   Was that done by hand and faxed or was
10  it done by Internet over the computer?
11     A.   I think it was done over the phone.
12         MR. WINSTON:  I'm just going to tender
13  this to the witness.
14         THE WITNESS:  Okay.
15         BY MR. WINSTON:
16     Q.   Would you describe that document,
17  please?
18     A.   It's a brief loan overview information
19  sheet.
20     Q.   Does that appear to be the form of
21  document that you might have sent to him at the
22  time when you supplied him with information?

1      A.   Yes.
2          MR. NEEDLE:  Objection.  I thought she
3  said she did it over the phone.
4          THE WITNESS:  I don't remember how we
5  did it.  That's -- I didn't say I may have done
6  it over the phone, because I didn't remember how
7  exactly it was taken.
8          MR. WINSTON:  I don't think that's
9  what she said actually, Mr. Needle.  I think, let
10  me go back and ask the same series of questions
11  again to be clear on this.
12         THE WITNESS:  Okay.
13         BY MR. WINSTON:
14     Q.   I asked you whether you submitted any
15  information to Mr. Naworol.
16     A.   Okay.
17     Q.   Did you?
18     A.   Yes.
19     Q.   And did you submit that information by
20  using the computer and submitting it over the
21  Internet?
22     A.   No.

23 (Pages 86 to 89)

c575b5c0-5458-11d7-b797-0003b3005cf9

1    Q.   Did you submit any written information
2  to him by fax similarly?
3    A.   Possibly. I don't recall exactly how
4  I gave him the information. I do -- I do
5  recognize this document (indicating) as a piece
6  of paper in a package of material that we picked
7  up at that seminar that I described earlier, and
8  it's possible that we filled this form out and
9  faxed it over, because I do have a fax machine.
10                 (Letter dated June 29,
11                 2001, marked for
12                 identification as DJ
13                 Exhibit No. 7).
14        BY MR. WINSTON:
15    Q.   I am handing you what's been marked
16  Exhibit 7.
17    A.   Okay.
18    Q.   It's a letter from Mr. Naworol to you,
19  dated June 29th, 2001; is that correct?
20    A.   Correct.
21    Q.   Actually to you and your husband.
22        Do you recognize this?

1    A.   Yes, I do.
2    Q.   Now, after having met Mr. Naworol, did
3  you have a conversation with him shortly after
4  having met him at this seminar?
5    A.   I don't remember when we attended the
6  seminar, so shortly after or in regards to what,
7  I --
8    Q.   Did you have a conversation with him
9  prior to June of 2001?
10    A.   Other than the seminar that we
11  attended.
12    Q.   Yes.
13    A.   No.
14    Q.   Do you remember the first time after
15  that seminar that you had a conversation with
16  him?
17    A.   The day that we wanted to obtain
18  financing.
19    Q.   Do you remember when that was, what
20  the date was?
21    A.   No, it was -- end of May, beginning of
22  June 2001.

1    Q.   Do you remember what the substance of
2  that conversation was?
3    A.   We had located a property that we
4  thought would be suitable for purchase, and we
5  were going to try and get financing for it.
6    Q.   What did he say to you?
7    A.   He needed a loan application.
8    Q.   And why did he need the loan
9  application?
10    A.   All lenders require a loan
11  application.
12    Q.   So did you complete a loan
13  application?
14    A.   Probably similar along the lines of
15  that document that you just showed me, yes.
16    Q.   Is it your testimony that the document
17  I just showed you is the only document that you
18  would have completed for him?
19    A.   No. I don't -- I don't recall exactly
20  what documents we filled out.
21    Q.   Did he take information from you over
22  the phone while telling you that he was

1  completing an application for you?
2    A.   Yes.
3    Q.   Did he obtain your authorization to
4  obtain a credit report?
5    A.   Yes.
6    Q.   And was that authorization in writing?
7    A.   I don't know.
8    Q.   Did you ever sign a complete mortgage
9  loan application document?  Other than the
10  document that I have previously shown you.
11        MR. NEEDLE: With Mr. Naworol?
12        MR. WINSTON: Mr. Naworol.
13        THE WITNESS: I don't know.
14        BY MR. WINSTON:
15    Q.   And did you have any other
16  conversations with Mr. Naworol between the time
17  that you initially told him you were interested
18  in applying for a loan and the time that you
19  received the letter which is Exhibit 7?
20    A.   Yes. We received a letter back from
21  him with copies of our credit reports, saying
22  that he needed us to call him with regard to the

24 (Pages 90 to 93)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 94

1  credit report. So I'm sure I returned his call
2  at that time. The gist of that conversation, I
3  don't know.
4      Q.  Let me ask you to read Exhibit 7.
5      A.  Okay.
6      Q.  To yourself.
7      A.  (Complies). Okay.
8      Q.  Is this the letter from Mr. Naworol to
9  which you just referred?
10     A.  No.
11         (Whereupon, the Witness handed a
12 document to counsel).
13         (Whereupon there was a discussion held
14 off the record).
15         MR. WINSTON: I would like, if
16 possible, to make a copy of this.
17         MR. NEEDLE: Sure. Make one for me
18 too, please.
19         THE WITNESS: I'm sorry.
20         MR. VOGEL: Is this the same one we
21 have?
22         THE WITNESS: Yes. The credit reports

Page 95

1  you have in all your documentation I believe I
2  provided you copies of my grandparents' with you.
3         BY MR. WINSTON:
4      Q.  Did you have conversations with a Miss
5  Lenahan at Mr. Naworol's office during this
6  period?
7      A.  I may have. I know I talked to an
8  assistant occasionally who answers his phone, but
9  I don't recall names.
10     Q.  Did you ever have any substantive
11 conversations with that person in which you
12 provided her information to deliver to
13 Mr. Naworol?
14     A.  No. I believe I -- with anything of
15 importance I spoke with him directly.
16     Q.  I'm a bit confused. The letter that
17 you've shown me today?
18     A.  Um-hum.
19     Q.  That I did not have before, the date
20 is June 9th 2001?
21     A.  Okay.
22     Q.  And it says, as requested, SunTrust

Page 96

1  Mortgage, Inc., has obtained a recent copy of
2  your credit history. We have enclosed a copy of
3  this report for you to review. And then it says
4  they'll be -- please give Nawarol a call. He'll
5  be happy to go over the report with you and
6  answer any questions you may have.
7      A.  Right.
8      Q.  And that's a letter signed by
9  Ms. Lenahan, correct?
10     A.  Yes.
11     Q.  Then let's look at Exhibit 7.
12     A.  Okay.
13     Q.  Exhibit 7 also says, please see credit
14 report dated 6-9-01, which is the date of this
15 letter (indicating).
16     A.  Um-hum.
17     Q.  And it then goes on to say, we'll need
18 documentation proving the difference to help
19 clean up credit and raise your scores. Please
20 call with any questions.
21         Did you have conversations with
22 Mr. Naworol between June 9th, and his sending

Page 97

1  this letter on June 29th, about your credit
2  report?
3      A.  Yes. Because I had to question the
4  derogatory information that was on the credit
5  report.
6      Q.  But he then sent the June 29th letter
7  to you?
8      A.  At the request of Matthew Azrael.
9      Q.  Your then counsel?
10     A.  My attorney, yes, so that we could
11 prove to Washington Mutual that we were being
12 denied credit because of derogatory information
13 in our credit report.
14         MR. WINSTON: Let me have one minute
15 while I get this.
16         MR. NEEDLE: Off the record.
17         (Whereupon there was a short pause in
18 the proceedings).
19         MR. WINSTON: Back on the record.
20         BY MR. WINSTON:
21     Q.  I want to be very clear about what
22 occurred between the 9th of June, the date of the

c575b5c0-5458-11d7-b797-0003b3005cf9

1  original letter, and the 29th of June.
2      A.   Okay.
3      Q.   With regard to conversations that you
4  had with Mr. Naworol?
5      A.   All right.
6      Q.   Do you recall how many conversations
7  you had with him?
8      A.   No.
9      Q.   Do you recall the substance of
10 conversations that you had with him during that
11 period?
12     A.   Not without speculating.
13     Q.   Did you call him after receiving
14 Ms. Lenahan's letter on June 9th?
15     A.   Yes.  And I say that because I just
16 know I would have, not because I recall a
17 conversation.
18     Q.   Did you go see Mr. Naworol at that
19 time?
20     A.   Not in person.
21     Q.   At any time between June 9 and June
22 29th did you go see Mr. Naworol?

1      A.   No.
2      Q.   After you received the letter on June
3  29th, did you supply Ms. Lenahan with any
4  additional information?
5      A.   No.
6      Q.   Did you ask Mr. Naworol to help you to
7  resolve this problem?
8      A.   No.  I did not.  Do you want me to
9  explain why?
10     Q.   Yes.  That would be good.
11     A.   Upon learning that the information in
12 our -- after learning about the things in our
13 credit report, the property in which we were
14 interested in buying and had submitted that loan
15 application on had already been put under
16 contract to someone else, so it wasn't necessary
17 to pursue it any further.
18     Q.   All right.  What was the property that
19 you got interested in that caused you to seek
20 financing from Mr. Naworol?
21     A.   Do you want me to describe it?
22     Q.   Please.

1      A.   Well, it had a large home, with inlaw
2  quarters, it had a barn, several acres, eight
3  plus, I believe, but it was bordering on a very
4  large farm that we could have obtained additional
5  acreage.
6      Q.   What was the address?
7      A.   800 Bacon, just like in bacon, Hall
8  Road.
9      Q.   And what jurisdiction?  Which county?
10     A.   Baltimore County.  It was in Sparks.
11     Q.   Was it operating as a riding stable?
12     A.   No.
13     Q.   Did it have the variance required --
14     A.   No.
15     Q.   -- to enable it to be a riding stable?
16     A.   No.  Not in place.
17     Q.   What was the purchase, the asking
18 price of that property?
19     A.   $525,000, give or take 5,000.  I don't
20 remember.  It was 529 or 525.
21     Q.   Do you know the name of the owner?
22     A.   John somebody.

1      Q.   When did you first identify the
2  availability of that property?
3      A.   On the Internet.
4      Q.   Do you remember when?
5      A.   Not unless I have it in my records.
6      Q.   Do you remember the length of time
7  that elapsed from the time that you identified
8  that property to the time that you went to
9  Mr. Naworol and asked him to take an application
10 for a loan?
11     A.   It wasn't any more than a few days.
12     Q.   And do you know how long after you
13 identified that property you learned that it had
14 been sold to another person?
15     A.   It was just a few more days after
16 that.
17     Q.   Do you know for what use the other
18 purchaser -- to what use the other purchaser has
19 placed that property?
20     A.   No.
21     Q.   Do you know whether they are using it
22 as a riding stable?

26 (Pages 98 to 101)

c575b5c0-5458-11d7-b797-0003b3005cf9

1    A.   I don't know.
2    Q.   In making an offer -- did you ever
3  submit a contract on that property?
4    A.   Yes.
5    Q.   And did that contract contain a
6  contingency for obtaining a variance to use the
7  property as a riding stable?
8    A.   I don't recall.  I don't know, off the
9  top of my head.
10    Q.   Did that contract contain a financing
11  contingency, other than the standard financing
12  clause that's in every contract?
13    A.   I don't recall.  I am inclined to say
14  no.  I can't -- I can't be sure.
15    Q.   Do you recall whether the contract
16  that you prepared contained even the standard
17  financing contingency?
18    A.   Yeah.  Every contract has a financing
19  contingency.  It's a standard clause in every
20  real estate contract.
21    Q.   I appreciate your opinion on that, but
22  the question I have is whether, in fact, you

1  recall whether this contract that you prepared
2  had such a contingency; whether or not it's in
3  every contract, we don't have to discuss that.
4  Do you recall whether that one had such a
5  contingency?
6    A.   Well, I'd have to say yeah.
7    Q.   And did you submit that contract?
8    A.   Yes.
9    Q.   And did the seller ever respond to
10  your offer?
11    A.   Yes.
12    Q.   And what was the response?
13    A.   He received two the same day, and he
14  accepted the other one.
15    Q.   And do you know why?
16    A.   No, I don't.  He's not required to
17  disclose that.
18    Q.   I didn't ask you that, I just asked
19  you whether you knew why.
20         Do you recall the price at which you
21  submitted your offer?
22         MR. NEEDLE:  Objection, asked and

1  answered.
2         You may answer it, though.
3         THE WITNESS:  I don't recall what we
4  offered.  I know what was asked; I do not recall
5  what we offered.
6         MR. WINSTON:  That's why I don't think
7  the question had already been asked and answered.
8         MR. NEEDLE:  I beg your pardon.
9         BY MR. WINSTON:
10    Q.   Do you know the price at which it, in
11  fact, sold?
12    A.   I do not.
13    Q.   So, to be clear, what we're talking
14  about here is a period of several days from the
15  time you identified the property at 800 Bacon
16  Hall Road, to the time that you went and
17  attempted with Mr. Naworol to begin pursuing
18  financing; is that correct?
19    A.   Within a few days, yeah, it would have
20  been a relatively short turnaround, you know.
21  Less than a week.
22    Q.   And then is it correct that you then

1  learned several days thereafter that the property
2  was under contract to another prospective
3  purchaser?
4    A.   Correct.
5    Q.   Can you tell me the approximate date
6  on which you learned that it had gone under
7  contract to the other prospective purchaser?
8    A.   I don't know.
9    Q.   Would it have been after June 9th,
10  2001?
11    A.   It could have.  I don't know.  All of
12  that happened within a very short period of time.
13  We tried, you know, properties are selling like
14  hotcakes, and if you didn't act quickly, you lost
15  it, and the specifics of the timing there are
16  unclear to me.
17    Q.   Hot?
18         MR. WINSTON:  I think we can break
19  now.
20         (Whereupon at 12:20 p.m. the
21  deposition was suspended, to reconvene at 1:15
22  p.m. this same day).

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 106

```
 1         AFTERNOON SESSION
 2              (1:25 p.m.)
 3   Whereupon
 4         MONICA JORDAN,
 5   the Witness on the stand at the time of recess,
 6   having been previously duly sworn, was further
 7   examined and testified as follows:
 8      EXAMINATION BY COUNSEL FOR DEFENDANT
 9              (RESUMED)
10      MR. WINSTON:  Back on the record.
11      BY MR. WINSTON:
12      Q.   Mrs. Jordan, I want to go back for a
13   moment and talk generally, ask you generally
14   about your criteria for your stable business.
15      A.   Okay.
16      Q.   As we are sitting here today, what
17   size property do you think you need for your
18   stable business?
19      A.   Depends on county to county.  For a
20   minimum requirement.
21      Q.   Let's take Baltimore County first.
22      A.   Well, according to my business plan, I
```

Page 107

```
 1   need to support 35 horse bodies, so I would need
 2   a minimum of 35 acres.
 3      Q.   What about in Howard County?
 4      A.   It would be a minimum of 70 acres.
 5      Q.   And what about in Carroll County?
 6      A.   Because Carroll has no minimum
 7   requirement, but based off of my own discipline
 8   of horses, it would still be in the neighborhood
 9   of 35 to four acres -- 35 to 40 acres as a
10   minimum requirement, because -- I don't know if
11   you're familiar with different disciplines of
12   riding, but I deal in what's known as combined
13   training, which is, if you've watched the
14   Olympics, you've seen three-day event, and it's a
15   combination of show jumping, dressage, and cross
16   country.
17      Q.   Directing your attention to the
18   property identified as 800 Bacon Hall Road.
19      A.   Yes.
20      Q.   If I recall correctly, it was your
21   testimony that the size of that property was
22   eight plus acres?
```

Page 108

```
 1      A.   Correct.
 2      Q.   When you were interested in that
 3   property?
 4      A.   Yes.
 5      Q.   Were you interested in it for the
 6   purpose of operating a stable as well as living
 7   on that property?
 8      A.   That's a twofold answer.  Yes, we were
 9   interested in living there and starting our
10   business there, provided that, like I said, it
11   bordered a 400-acre farm or was multiple hundred
12   acres, and it was our intention to be able to
13   acquire the additional acreage from the adjacent
14   landowner.
15      Q.   Did you intend to buy the entire farm?
16      A.   No.
17      Q.   Did you intend to buy a portion of it?
18      A.   Just the minimum that we would have
19   needed to enhance our own parcel.
20      Q.   Did you ever have any conversations
21   with the owner of the farm about the prospective
22   purchase?
```

Page 109

```
 1      A.   Not at that time, no.
 2      Q.   Did you ever have any conversations
 3   with that owner?
 4      A.   I have his phone number; I have never
 5   been able to reach him.
 6         (Whereupon there was a discussion held
 7   off the record between Mr. Winston and
 8   Mr. Vogel.)
 9      BY MR. WINSTON:
10      Q.   Do you recall, Mrs. Jordan, with
11   respect to that 800 Bacon Hall Road contract that
12   you submitted, do you recall whether that
13   contract was contingent upon your being able to
14   acquire property from the adjoining landowner?
15      A.   I don't recall if we put the
16   contingency in there or not.
17      Q.   When did you first learn that the
18   status of your loan with Washington Mutual had
19   been reported to a credit agency as being late?
20      A.   When I got the -- when I got a copy of
21   the credit report from SunTrust Bank.
22      Q.   That was attached to the June 9th
```

28 (Pages 106 to 109)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 110

1  letter from Mr. Naworol?
2      A.    Correct.
3      Q.    Did you have a discussion with
4  Mr. Naworol about the accuracy of that entry on
5  the report?
6      A.    I'm sure that I made -- I'm sure that
7  we did, because I'm inclined to believe that he
8  brought it to my attention at which I was
9  unaware, and I had to dispute it because I knew
10  of the prior issue with the payment being
11  missing.
12      Q.    Did there come a time when you
13  retained counsel to assist you in dealing with
14  the matter of your loan with WAMU?
15      A.    Yes.
16      Q.    And whom did you retain?
17      A.    Matthew Azrael.
18                (Letter dated July 10,
19                2001, marked for
20                identification as DJ
21                Exhibit No. 8).
22      BY MR. WINSTON:

Page 111

1      Q.    Do you recognize that document,
2  Exhibit 8?
3      A.    Yes.
4      Q.    Do you remember when you retained
5  Mr. Azrael?
6      A.    It would have been in June, I believe,
7  or shortly after my issue with SunTrust Bank,
8  Mr. Naworol.
9      Q.    Did Mr. Azrael communicate with anyone
10  on your behalf at Washington Mutual Bank?
11      A.    Yes.  Yeah, he spoke to a couple of
12  people.  We ultimately wound up with Ms. Colleen
13  Klebanoff.
14      Q.    And Exhibit 8 reflects correspondence
15  that he wrote to her?
16      A.    Yes.
17      Q.    Do you know if he wrote any -- if he
18  communicated with any other persons either at
19  Washington Mutual Bank or anyone else on your
20  behalf?
21      A.    Can I refer to my notes?
22      Q.    Yes.

Page 112

1      A.    I know that we spoke to a couple of
2  different people before we ultimately wound up
3  with Ms. Klebanoff, but I didn't write -- looks
4  like I didn't write their names down.
5      Q.    When you make reference to a couple of
6  different people, do you mean at Washington
7  Mutual Bank?
8      A.    Correct.
9      Q.    Do you know whether Mr. Azrael
10  corresponded with any credit agency?
11      A.    I don't think he did, but I can't be
12  sure.
13      Q.    I take it that you received a copy of
14  this letter as indicated on the CC entry at the
15  bottom of Exhibit 8, the second page of Exhibit
16  8?
17      A.    Yes.
18      Q.    Did you receive copies of any
19  correspondence that Mr. Azrael sent out on your
20  behalf?
21      A.    Besides this letter?
22      Q.    Yes.

Page 113

1      A.    If I have it, you do, in the exhibits
2  that we've given you already.
3      Q.    Do you have any reason to think that
4  you would not have received a piece of
5  correspondence that he would have sent out?
6      A.    No.  I have no reason to believe that
7  I wouldn't have gotten a copy.
8                (Letter dated August 14,
9                2001, marked for
10                identification as DJ
11                Exhibit No. 9).
12      BY MR. WINSTON:
13      Q.    I hand you what's been marked DJ-9.
14      A.    Um-hum.
15      Q.    What is that document?
16      A.    This is a denial of credit to my
17  business from Bank of America.
18      Q.    Signed by?
19      A.    Ed Kivior.
20      Q.    And dated?
21      A.    August 14th, 2001.
22      Q.    And you're familiar with this letter?

29 (Pages 110 to 113)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 114

1    A.   Yes.
2    Q.   Directing your attention to the second
3  paragraph of the letter, did you, in fact,
4  request a statement of the specific reasons why
5  your application was denied?
6    A.   No, I didn't, because when I talked to
7  Mr. Kivior on my own, I made notes of it in my
8  notebook which I have right here, which is in the
9  supplemental documents which we provided you,
10  that issue, debt issue was used.
11    Q.   I beg your pardon.  Say that again.
12    A.   When I talked to Mr. Kivior, I spoke
13  to him personally after receiving this issue, and
14  I just made note in my notebook, in my own
15  personal notebook that when we spoke, he
16  referenced the debt issue, and he said the
17  Experion credit agency was used to pull the
18  credit report.
19    Q.   Did you receive a copy of the credit
20  report that he used?
21    A.   No.  I did not.
22    Q.   Do you know whether there were any

Page 115

1  matters other than the debt issue, as you've
2  termed it, that might have contributed to the
3  denial of credit reflected in this letter?
4    A.   No.  Because if I refer to my own
5  credit reports, which I pull periodically, there
6  was nothing on there, other -- there was nothing
7  on there that I could have derived.
8    Q.   What I asked you first was whether you
9  first received a copy of the credit report that
10  Mr. Kivior relied on, and the answer is no?
11    A.   No.
12    Q.   So you don't know what that document
13  said?
14    A.   No.  I do not.
15    Q.   Do you know whose credit report was
16  pulled?  Was the credit report that was run
17  credit report for Hummingbird Farm, Inc.?
18    A.   It was pulled on my own personal
19  Social Security Number, because I am the sole
20  stockholder for the business.
21    Q.   Did he run a credit report on
22  Hummingbird Hill Farm, Inc.?

Page 116

1    A.   I don't know that.
2    (Whereupon there was a discussion held
3  off the record between Mr. Winston and
4  Mr. Vogel.)
5    BY MR. WINSTON:
6    Q.   There is a reference here made in the
7  first sentence of Exhibit 8 to an application for
8  credit.
9    A.   Um-hum.
10    Q.   Do you recall the nature and extent of
11  the credit for which you made application to
12  which he is responding?
13    A.   It was over the phone, it was a phone
14  conversation, it was a $20,000 debt consolidation
15  loan for my business, because when I started my
16  business, most businesses you have to rely on
17  your own personal credit or collateral to get
18  started, and I did that, and I wanted to take the
19  portion of the debt that belonged solely to the
20  business and put it in the business's name and so
21  I could get it off of my personal credit record.
22    (Fax transmittal dated

Page 117

1    March 10, 2002, marked
2    for identification as DJ
3    Exhibit No. 10).
4    BY MR. WINSTON:
5    Q.   With respect to DJ-9, going back to
6  the Exhibit 9, when you spoke with Mr. Kivior
7  about this loan, who was -- what entity or person
8  was going to be the borrower on the business
9  consolidation loan?
10    A.   Hummingbird Hill Farm, Incorporated.
11    Q.   Did you anticipate obtaining that loan
12  for Hummingbird Hill Farm, Inc., on the credit of
13  that entity?
14    A.   Hummingbird Hill Farm, Inc., and me
15  are the same entity.
16    Q.   Did you expect that you would need to
17  personally guarantee such a loan?
18    A.   I already do.  It wouldn't have
19  been -- it was simply a matter of converting it
20  from my name to the business, the corporate name.
21  I still hold these notes in my own personal name.
22    Q.   Let me ask the question again.

30 (Pages 114 to 117)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 118

1    Assuming the loan had been approved --
2    A.   Okay.
3    Q.   -- is it correct that the maker of the
4  note that evidenced the debt would have been
5  Hummingbird Hill Farm, Inc.?
6    A.   Yeah.
7    Q.   And is it also correct that you would
8  have personally guaranteed that loan?
9    A.   Yes.  It was simply a matter of -- one
10 of the reasons our credit scores are lower than
11 average is because we have a higher amount of
12 debt than the average person, but the only reason
13 for having a higher amount of, higher debt than
14 the average person is because I have businesses,
15 business loans in my own personal name in
16 addition to our own personal debt.  So whose name
17 it's in didn't make a whole hill of beans to me,
18 just a matter of a way to properly reflect whose
19 expenses these expenses were.
20   Q.   Directing your attention now to
21 Exhibit 10, could you describe, do you recognize
22 that document?

Page 119

1    A.   Yes, I do.
2    Q.   A two-page document?
3    A.   Yes.
4    Q.   Could you describe what it is?
5    Page 1 is a fax from a financial
6  service company that denied credit to us for the
7  purchase of a big screen T.V. and accouterments,
8  referencing a problem with our real estate
9  mortgage and if we were to have supplied them
10 with the documentation that proved that it was in
11 dispute, then they could have been -- they could
12 have re-processed our application.
13   Q.   Did you provide them with such
14 documentation?
15   A.   No.  I was embarrassed, and I didn't
16 want to go back.
17   Q.   The date of this was?
18   A.   March the 10th of 2002.
19   Q.   Did you subsequently purchase the big
20 screen T.V.?
21   A.   No.  I have not.
22   (Letter dated August 27,

Page 120

1    2001, marked for
2    identification as DJ
3    Exhibit No. 11).
4    BY MR. WINSTON:
5    Q.   I have handed you what's been marked
6  DJ-11, do you recognize that?
7    A.   Yes, I do.
8    Q.   Can you identify it?
9    A.   It's a denial of credit from Capital
10 One.
11   Q.   And signed by a Kathy Kauffman; is
12 that correct?
13   A.   Correct.
14   Q.   What is the date of that letter?
15   A.   August 27th of 2001.
16   Q.   And this letter goes addressed to
17 Mr. Louis Jordan?
18   A.   Correct.
19   Q.   Is that correct?
20   A.   Yes.
21   Q.   Did you see this letter when it was
22 received?

Page 121

1    A.   Yes.  I open all the mail in the
2  house.
3    Q.   Directing your attention to the second
4  paragraph of the letter, would you read the four
5  lines that are indented and capped.
6    A.   Excessive balance compared to high
7  credit on bank card accounts, presence of
8  delinquency, too many active accounts, and
9  excessive number of bank card accounts.
10   Q.   Going one at a time, taking the first
11 line.
12   A.   Okay.
13   Q.   Do you know what excessive balance
14 compared to high credit on bank card accounts
15 means?
16   A.   Yes, I do.
17   Q.   What does it mean?
18   A.   It means we keep a high balance on our
19 cards in compared to the national average.
20   Q.   And is that -- if you know, is that a
21 reason for problems in obtaining further --
22   A.   It can be, yes.

31 (Pages 118 to 121)

c575b5c0-5458-11d7-b797-0003b3005cf9

1    Q.    -- credit?
2         Read the second line, please.
3    A.    Presence of delinquency.
4    Q.    Do you know to what that refers?
5    A.    Could be one of only two things.
6    Q.    And what would they be?
7    A.    Either the delinquency on our mortgage
8    or a late payment on a credit card from six or
9    seven years ago.
10   Q.    Is the -- is that the second item that
11   was reflected on the credit report that
12   Mr. Naworol gave to you?
13   A.    That is correct.
14   Q.    Would you read the third line, please?
15   A.    Too many active accounts.
16   Q.    Do you know what that means?
17   A.    Yes, I do.
18   Q.    What do you know about that?  What
19   does that mean to you?
20   A.    We have more than the average number
21   of active accounts because of the business,
22   again, business accounts are held in my personal

1    name, so they're being reflected on my personal
2    credit report.
3    Q.    Would you read the fourth line,
4    please?
5    A.    Excessive number of bank card
6    accounts.
7    Q.    What does that mean?
8    A.    Same as too many active accounts.
9    Q.    When you received this letter from
10   Ms. Kauffman, what, if anything, did you or
11   Mr. Jordan do to follow up as a result of this
12   letter?
13   A.    I filed it.
14   Q.    Did you seek to obtain a copy of
15   the --
16   A.    It wasn't necessary.
17   Q.    Let me finish.
18   A.    Sorry.
19   Q.    Did you obtain a copy of your consumer
20   file after receiving this letter?
21   A.    No.  It wasn't necessary.  I was
22   already fairly familiar with what was already in

1    my credit report.
2    Q.    Did you make contact with a credit
3    agency after receiving this letter?
4    A.    No, I did not.
5         (Letter dated October
6         12, 2001, marked for
7         identification as DJ
8         Exhibit No. 12).
9    BY MR. WINSTON:
10   Q.    I've handed you what's been marked as
11   DJ-12.
12   A.    Yes.
13   Q.    Do you recognize that document?
14   A.    Yes, I do.
15   Q.    What is it?
16   A.    It's a letter explaining why our
17   unsecured credit loan was frozen by Bank of
18   America.
19   Q.    Ms. Jordan, before I go on, this
20   appears to me to be the first page of a letter
21   that may have had more than one page, because
22   there's no signature on this letter.

1    A.    No.
2    Q.    No?
3    A.    No.  It stands alone.
4    Q.    It was unsigned?
5    A.    Yes.  It was a form letter.  Computer
6    generated.
7    Q.    Ms. Jordan, did you sign a loan
8    agreement pertaining to unsecured credit line
9    00519302394185 that is referenced in this letter?
10   A.    Yes.
11   Q.    And do you know -- first of all, do
12   you have a copy of that loan agreement?
13   A.    I seriously doubt it since this was a
14   longstanding account.
15   Q.    Do you know whether that loan
16   agreement contains provisions which entitle the
17   lender to suspend your authority under that line
18   for particular reasons?
19   A.    Most likely, most accounts do.
20   Q.    And do you know what some of those
21   reasons might be?
22   A.    I'm sure it's disclosed somewhere, but

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 126

1 I don't have a copy of it, so I can't tell you.
2    Q.   Directing your attention to the second
3 paragraph of this letter, would you read the
4 three indented lines one at a time?
5    A.   Proportion of balance too high credit
6 on bank revolving/all revolving accounts.
7        Length of time (or unknown time) since
8 account delinquent.
9        And number of accounts with balances.
10   Q.   What was the existing account balance
11 on this unsecured line of credit, how much on it
12 had you drawn as of October 12th, 2001, do you
13 recall?
14   A.   I don't know without checking my
15 records. The total line was only $2,000, so it
16 wasn't a large amount.
17   Q.   After receiving this letter, what, if
18 anything, did you do?
19   A.   I got mad.
20   Q.   Did you make contact with anyone at
21 Bank of America consumer loan center in Richmond
22 to discuss this problem?

Page 127

1    A.   No. I contacted them telling them I
2 was closing all of my accounts with them.
3    Q.   Did --
4    A.   Because of this. I've been a
5 longstanding customer who always paid her bills,
6 and to be denied the access to my credit line,
7 particularly one that I use for my business, was
8 very annoying.
9    Q.   Do you know, looking at the second
10 line of the three lines that were indented in
11 caps, do you know to what delinquent account that
12 is referring?
13   A.   It could only refer to the Washington
14 Mutual.
15   Q.   Did you discuss with anyone at Bank of
16 America the particulars of any of the reasons
17 given here why you did not score well?
18   A.   It wasn't necessary, I knew why.
19   Q.   Did you make any contact at that point
20 with a credit agency?
21   A.   No. You know, it wasn't whether I
22 should have contacted the agency or not.

Page 128

1 Washington Mutual should have contacted them for
2 me, because they knew during all this time period
3 why this issue was arising.
4    Q.   During the period from March 15th,
5 2001, through today?
6    A.   Okay.
7    Q.   Have you had any correspondence with
8 any of the national credit reporting agencies?
9    A.   Other than accessing my own credit
10 file, no.
11   Q.   Have you asked anyone to do so, acting
12 on your behalf?
13   A.   Have I asked them directly?
14   Q.   Have you asked any person acting on
15 your behalf to make contact and have
16 correspondence with any national credit reporting
17 agency?
18   A.   Other than through my attorney or with
19 Washington Mutual themselves, no.
20   Q.   Have you asked an attorney to make
21 contact with a national credit reporting agency?
22   A.   No.

Page 129

1        (Answers to
2        Interrogatories marked
3        for identification as DJ
4        Exhibit No. 13).
5    BY MR. WINSTON:
6    Q.   I've handed you a copy of a document
7 marked DJ-13.
8    A.   Okay.
9    Q.   And these are your answers to
10 interrogatories in this case. I ask you to turn
11 to the last page, which I show as page 19, and I
12 ask if those are, if that page contains your
13 signature?
14   A.   Yes, it does.
15   Q.   Are these your answers to
16 interrogatories?
17   A.   Yes, they are.
18   Q.   Directing your attention to
19 interrogatory, your answer to interrogatory
20 number 3, please look at the entry that is under
21 the date or next to the date 8-14-01 on page 5
22 toward the top.

33 (Pages 126 to 129)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 130

1   A.   Um-hum.
2   Q.   And read that to yourself, please.
3   A.   (Complies).  Okay.
4   Q.   You state there that you attempted to
5   get a $20,000 business loan to restructure your
6   business debt; is that correct?
7   A.   That's correct.
8   Q.   To what business debt were you
9   referring?
10   A.   I have a couple of credit cards and an
11   unsecured credit line.
12   Q.   The unsecured credit line was the line
13   to which we were just referring in the Bank of
14   America letter.
15   A.   I'm sorry.  There's another one from
16   Household Finance.
17   Q.   What's the amount of that unsecured
18   credit line?
19   A.   In the neighborhood of $12,000.
20   Q.   Is that line still in place?
21   A.   Yes, it is.
22   Q.   And do you know what the current

Page 131

1   outstanding balance is on that line?
2   A.   I could tell you, close to 11,5.
3   Q.   You indicated that there were credit
4   cards for your business?
5   A.   Um-hum.
6   Q.   Could you identify specifically what
7   those credit cards were?
8   A.   They were credit that I needed to
9   purchase supplies in order to open my business.
10   Q.   How many of them are there?
11   A.   Two that are in the business's name.
12   Q.   And what are the -- what are the
13   institutions in whose name those accounts were
14   issued, those cards are issued?
15   A.   The one is by First USA Bank, and I
16   believe the other one is Universal Card, I think
17   is issued by CitiCorp.  That Universal Card is in
18   my husband's name as the first cardholder.
19   Q.   So we have a First USA Bank card?
20   A.   Yes.
21   Q.   And we have two unsecured credit
22   lines?

Page 132

1   A.   Correct.
2   Q.   Are there any -- plus the Universal
3   CitiCorp card, but you said that is in your
4   husband's name but not in the business?
5   A.   It's a joint account, his and mine,
6   but his is the primary name on the card.
7   Q.   And you use that card?
8   A.   Solely for business purposes.
9   Q.   Are there any other accounts that are
10   used that are either in the name of the business
11   or in your individual names that you use solely?
12   A.   I do have a credit card in the name of
13   the business with Capital One.
14   Q.   Any others?
15   A.   I have a term loan with Desert
16   Community Bank, which is the loan on my horse
17   trailer.  And I have a term loan with GMAC, which
18   is the noteholder for my truck.  That pulls the
19   horse trailer.
20   Q.   With respect to the loan with Desert
21   Community Bank for the horse trailer, how much is
22   that loan?

Page 133

1   A.   The current balance?
2   Q.   Yes.
3   A.   Roughly in the neighborhood of $9,500,
4   I think, give or take a couple hundred.
5   Q.   And with respect to the GMAC truck
6   loan, what is the current balance on that?  Let
7   me modify that question.
8   A.   I can tell you.
9   Q.   What was the original balance on that
10   loan?
11   A.   Well, I don't remember.  It should
12   have been around 33,000.
13   Q.   That was the original balance?
14   A.   Yes.  Well, they account for it
15   differently than I do, because it's being
16   purchased by a unique program on GMAC, which they
17   call a smart-buy option, which allows me to hold
18   the truck for three years, and I have a
19   guaranteed trade in at the end of the three
20   years.  Very similar to a lease, but the title is
21   held in my name, rather than not having clear
22   title to the vehicle.

34 (Pages 130 to 133)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 134

1    Q.   If you would look on the entry under
2  5-25-01.
3    A.   Um-hum.
4    Q.   Just about where you have been
5  looking.
6    A.   Right.
7    Q.   I note that the amount of the
8  financing was for $45,517.94.
9    A.   That was the original purchase price.
10  I took those amounts off of the truth in lending
11  or the receipt or whatever they marked off that
12  they gave me.
13    Q.   Is it --
14    A.   Because they account for it
15  differently than I --
16    Q.   Is it your testimony that $45,517.94
17  is not the correct amount of the actual debt that
18  you have on this GMAC financing?
19    A.   No.  That's how much they approved it
20  for.  I'm confused.
21    Q.   You have acquired a Chevy Suburban; is
22  that correct?

Page 135

1    A.   Yes.
2    Q.   On May 25th, 2001?
3    A.   Correct.
4    Q.   And that was financed through GMAC?
5    A.   Correct.
6    Q.   Do you recall what the cost -- was
7  that a purchase?
8    A.   Yes.
9    Q.   Do you recall what the cost of that
10  vehicle was when you bought it?
11    A.   Not without referring to a -- the
12  sticker, you know, the financing statement.  The
13  original -- when you say the cost, you've
14  purchased a vehicle before, what's on the sticker
15  is not what you actually agree to buy it for.
16  So, you know, what we agreed to purchase was not
17  what was on the original sticker.  It was in the
18  financing agreement with GMAC is this amount,
19  because I took this amount right off GMAC's form.
20    Q.   Is it correct that -- is it correct
21  that the amount of the financing that you
22  obtained when you acquired the Chevrolet Suburban

Page 136

1  was $45,517.94?
2    A.   Yes.
3    Q.   Do you recall what the term of that
4  financing was?
5    A.   It's a 36-month smart-buy option.
6    Q.   Do you know how much would be owed on
7  that $45,517.94 at the end of that 36 months that
8  you would have to pay in order to be able to
9  retire that debt?
10    A.   Yes.  It's roughly 27,000.
11    Q.   What was the original amount borrowed
12  from Desert Community Bank on the horse trailer?
13    A.   I don't recall.  It's 12,5 -- 12,500
14  as a good give or take number.
15    Q.   All right.  Now, I want to go back and
16  summarize, because I do not -- because I want to
17  understand accurately what the facts are here.
18    A.   Okay.
19    Q.   I want to go through again with you
20  the specific accounts that you had that were
21  relevant to your business.
22    A.   All right.

Page 137

1      MR. NEEDLE:  I'm going to object
2  you've already asked these questions, she's asked
3  and answered the questions.  I don't know that
4  there's any confusion that you need to clear up.
5  Why do you have to go through it again?
6      MR. WINSTON:  That's fine.  Let me ask
7  a different question then.
8      BY MR. WINSTON:
9    Q.   Other than the accounts that you have
10  just gone through with me, and that Mr. Needle
11  didn't want me to go through again --
12    A.   Are there any other accounts?
13    Q.   Are there any other accounts that are
14  business accounts?
15    A.   Can I refer to my computer?
16    Q.   Yes.
17    A.   We took care of that one, we took care
18  of that one, yeah, we took care of that one.  No.
19  We covered them all.
20    Q.   What was the date of the loan with the
21  Desert Community Bank, do you remember when you
22  were owed that money?

35 (Pages 134 to 137)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 138

1    A.   It was June 2000.
2    Q.   Do you have any accounts with First
3  USA Bank other than the one that you identified
4  as a credit card account for Hummingbird?
5    A.   Yes, I do.
6    Q.   How many others do you have with First
7  USA Bank?
8    A.   One more.
9    Q.   One more?
10       Similarly with Capital One do you have
11 any other credit card accounts other than the one
12 that you referred to for your business?
13   A.   No.
14   Q.   Now, with respect to the business
15 consolidation loan --
16   A.   Okay.
17   Q.   -- what debts did you want to pay off
18 if you were to obtain that financing?
19   A.   The Household Finance account.  The
20 Bank of America account, the Universal Card
21 account, and at that time that that financing was
22 in place that account was about 8,000.  So that

Page 139

1  would have been about right.
2    Q.   So that would have --
3    A.   It would have covered a majority of
4  it.
5    Q.   Would there have still been balances
6  on those accounts after having obtained the
7  $20,000?
8    A.   At that time, no.
9    Q.   How did you arrive at the $20,000
10 number?
11   A.   It was a good round number, and it
12 covered most of the expenses, and I didn't want
13 it to be too high, to incur a higher interest
14 rate.
15   Q.   What was the interest rate that was
16 quoted to you on that loan if you were to receive
17 it?
18   A.   I don't recall.
19   Q.   Do you know what the interest rate or
20 rates were on the credit that you were going to
21 be replacing, paying off?
22   A.   Yes.  The Household Finance is 24

Page 140

1  percent.  The Bank of America was 18 percent, the
2  AT&T -- or sorry, Universal Card, I know what it
3  is now, I don't know what it was then.
4    Q.   When you --
5    A.   It's one of those variable interest
6  rate things.
7    Q.   When you applied for the consolidation
8  loan, did you do a calculation of the difference
9  in interest that would be owed on the $20,000?
10   A.   Um-hum.
11   Q.   When compared with the interest that
12 was owed on the accounts that you would be paying
13 off?
14   A.   Yeah.  It was a fixed term.  It would
15 only have been a couple hundred, I think it was
16 400, it wasn't that much.  It was only a couple
17 hundred dollars, and the savings to me monthly
18 would have been around $300.
19   Q.   This is a commercial loan; is that
20 correct?
21   A.   For Hummingbird Hill.
22   Q.   The $20,000 consolidation loan was a

Page 141

1  commercial loan?
2    A.   I don't know how the bank recorded it.
3  As a small business owner, and because it was
4  under the -- under the $25,000 SBA cap, I was --
5  I think it was a small business SBA account that
6  they were -- that we were going for at that time.
7    Q.   Once again, the $20,000 business
8  consolidation loan?
9    A.   Yes.
10   Q.   Do you recall with what department in
11 the bank you were negotiating to obtain that
12 financing?
13   A.   I obtained the information to call off
14 of a Bank of America's Web site, and I don't
15 recall the specific 800 number or which
16 department it was.
17   Q.   Had you prior to this time, back to
18 the time that you were seeking the $20,000
19 business consolidation loan?
20   A.   Right.
21   Q.   Had you had occasion to obtain a
22 commercial loan?

36 (Pages 138 to 141)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 142

1    A.   No.
2    Q.   Between the time when you were trying
3  to obtain the business consolidation loan and
4  today, have you had occasion to obtain a
5  commercial loan?
6    A.   I haven't wanted to try.
7    Q.   And why is that?
8    A.   Because my credit report's still
9  being -- has still been impacted by Washington
10 Mutual, and until I was clear that this situation
11 was going to be resolved, I hesitated to obtain
12 any credit.
13   Q.   Are you aware of whether there are any
14 differences in the underwriting criteria for a
15 commercial loan when compared with a residential
16 mortgage loan?
17   A.   I know that they can be a little more
18 restrictive, because when you're trying to --
19 when you're a corporation, you don't have the
20 liability or the -- if my business were to go
21 defunct, they couldn't hold me personally
22 responsible for the business debt, if that makes

Page 143

1  any sense, because I am incorporated, so I
2  personally have to guarantee money.  It's very
3  technical, and I don't -- I don't claim to know
4  all the ins and outs.  I just know what the bank
5  tells me.
6    Q.   But it is your understanding that if
7  you were to obtain such a loan, you would be
8  required again to give a personal guarantee or
9  your personal signature to obtain it?
10   A.   My personal signature, yes, because I
11 am the stockholder for the corporation.
12   Q.   Directing your attention to
13 interrogatory, your answer to interrogatory
14 number 4, I ask you to read the introductory
15 portion, really the first sentence.
16   A.   Okay.  We were not aware of any
17 adverse information contained in our credit
18 report until such time that we went to get
19 preliminary financing to purchase real property
20 in June 2001.
21   Q.   Ms. Jordan, please explain what you
22 meant by the words preliminary financing.

Page 144

1    A.   We went to obtain an approval, you
2  know, more or less for a loan, we hadn't -- I
3  don't know that it was preliminary other than the
4  fact that it didn't go any further than the
5  application process, because the property itself
6  had already become unavailable to me before it
7  made any difference to go any further.
8    Q.   Is it fair to say that you had not
9  made a formal application for financing for the
10 800 Bacon Hall Road property?
11   A.   No.  I believe we were attempting to
12 get full financing, because that's when I gave
13 Mr. Naworol the authority to pull credit reports
14 together and go forth with this.
15       (Whereupon there was a discussion held
16 off the record between Mr. Winston and
17 Mr. Vogel).
18 BY MR. WINSTON:
19   Q.   With respect to the answer to this
20 sentence --
21   A.   Okay.
22   Q.   -- and with respect to the 800 Bacon

Page 145

1  Hall Road property, did you authorize Mr. Naworol
2  to obtain an appraisal of that property?
3    A.   No.  I did not.
4    Q.   Did you ever arrange to have an
5  appraisal performed?
6    A.   No.  It wasn't necessary to go that
7  far.
8    Q.   Had you requested that one be done
9  before you knew that the property had gone to
10 someone else?
11   A.   It wasn't -- no.  I hadn't requested
12 one to be done.
13   Q.   Why wasn't it necessary, let me ask
14 you that?
15   A.   Considering the market at that time,
16 it was well within line of other properties in
17 the area.  There was no reason to think that it
18 had been overpriced.
19   Q.   Directing your attention for your
20 answer to interrogatory 12, with respect to item,
21 or paragraph E, lost opportunities to purchase
22 real properties starting on page 14 and carrying

37 (Pages 142 to 145)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 146

1  over to page 15?
2      A.   Okay.
3      Q.   My question is whether you have
4  submitted any documents in response to our
5  requests for documents which relate to the 800
6  Bacon Hall Road property?
7      A.   No.  There's none available.  Other
8  than the mortgage, the credit reports available
9  from SunTrust.
10     Q.   That relate to it because they were
11 done contemporaneous with your interest?
12     A.   Right.  They can be substantiated
13 though my real estate agent who drew up those
14 documents.
15     Q.   And your real estate agent at that
16 time was?
17     A.   Was and is Bonnie Kahler, K-A-H-L-E-R.
18     Q.   Did you have discussions with
19 Ms. Kahler about the 800 Bacon Hall Road
20 property?
21     A.   Discussions in relation to?
22     Q.   Anything in relation to the property.

Page 147

1  Did you have discussions with Ms. Kahler?
2      A.   Yeah, I mean, I consult her
3  professional opinion all the time concerning, you
4  know, locations, prices, neighborhoods, things of
5  that nature.
6      Q.   Did she advise you as to what she
7  thought would be an appropriate price to offer on
8  that property?
9      A.   She's never directed me as far as a
10 price, she really lets me know if she thinks it's
11 over price or in line, but she doesn't tell me
12 what to offer.
13     Q.   Does she offer you advice on what an
14 appropriate offer might be?
15     A.   She's offered her opinion, yes.
16     Q.   And did she offer an opinion as to
17 what the appropriate price to offer was on the
18 800 Bacon Road property?
19     A.   If she did, I don't recall.
20     Q.   Did you discuss with her any of the
21 substantive provisions in the contract that you
22 submitted?

Page 148

1      A.   I'm sure I did, but --
2      Q.   Did you discuss with her the amount of
3  the deposit that you would make?
4      A.   Yeah, I'm -- she used to hold a check
5  for me on a continual basis in case we did find
6  something.
7      Q.   And that was true in June of 2001?
8      A.   Most likely.
9      Q.   Do you know the amount of the deposit
10 that --
11     A.   It varied from time to time.
12 Sometimes it was 500, sometimes a thousand.
13          MR. NEEDLE:  Let him finish.
14          MR. WINSTON:  Let me finish my
15 question.
16          THE WITNESS:  Sorry.
17          BY MR. WINSTON:
18     Q.   With respect to the Bacon Hall Road
19 property, when you submitted an offer, do you
20 recall the amount of the deposit that was
21 contained in that offer?
22     A.   No, I don't.

Page 149

1      Q.   Did you intend to continue to own your
2  own home after acquiring the Bacon Hall Road
3  property?
4      A.   No.
5          MR. NEEDLE:  You mean --
6          MR. WINSTON:  The current --
7          THE WITNESS:  The current residence?
8  No.
9          BY MR. WINSTON:
10     Q.   Again, just for the sake of clarity,
11 do you recall whether the offer on the Bacon Hall
12 Road home contained a home sale contingency?
13     A.   I'm sure it would have, but I can't be
14 sure.
15     Q.   Could you have obtained financing for
16 the acquisition of the Bacon Hall Road home
17 without having sold your current home?
18     A.   No.
19     Q.   Mrs. Jordan, I note that the Myerses
20 are co-borrowers with you on your current
21 residence.
22          Did you anticipate that they would be

38 (Pages 146 to 149)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 150

1  co-borrowers with you on the Bacon Hall Road
2  property?
3      A.  It was always anticipated that they
4  would be co-borrowers on any residence that we
5  would purchase in the future, because that
6  protects their financial interests.
7      Q.  Does it also enhance your ability to
8  borrow?
9      A.  Yes, it does.
10     Q.  Have you had conversations with any
11 mortgage banker or representative of any lender
12 with respect to the impact of the
13 nonparticipation of Mr. and Mrs. Myers in a loan
14 application that you might make?
15     A.  The only nonparticipation upon their
16 part would be any loan that I would get for the
17 business, not --
18     Q.  Did your understanding with the
19 Myerses involve them in any ownership position in
20 the business?
21     A.  No.
22     Q.  So they own -- they did not own any of

Page 151

1  your present business?
2      A.  No.  They did not.
3      Q.  And it was not contemplated that they
4  would own any of your new business?
5      A.  That's correct.
6      Q.  Were they going to be contributed any
7  additional equity to the purchase of any new real
8  estate acquisition that you would make?
9      MR. NEEDLE:  Objection, additional
10 equity over what?
11     MR. WINSTON:  Over the equity that has
12 already been contributed to the current home.
13     Let me go back and rephrase the
14 question.
15     BY MR. WINSTON:
16     Q.  Does your arrangement with Mr. and
17 Mrs. Myers contemplate that in addition to the
18 equity that they have already invested in your
19 current home, they would invest equity in any new
20 home acquisition?
21     A.  It was always a possibility, because
22 they were to benefit from a new acquisition the

Page 152

1  same as we.
2      Q.  And why is that, that they would
3  benefit from a new acquisition?
4      A.  Because they live with us.
5      Q.  Have your parents made any gifts to
6  you of cash as a part of an annual gift program?
7      A.  My parents?
8      Q.  Excuse me, your grandparents.
9      A.  My -- okay, have my grandparents given
10 us any --
11     Q.  Cash gifts as a part of an annual
12 gifting program?
13     A.  No.
14     Q.  Did Mr. Naworol, when he took
15 information from you, do you know whether he
16 received any information on Mr. and Mrs. Myers?
17     A.  Yes.  He took their information as
18 well.
19     Q.  And how was that information conveyed
20 to him?
21     A.  Because they were supposed to own the
22 deed to the new place the same as we hold the

Page 153

1  deed to our current residence.
2      Q.  I did not ask why, I asked how was the
3  information on the Myerses communicated to
4  Mr. Naworol?
5      A.  Through me.
6      Q.  In writing or orally?
7      A.  Orally.
8      Q.  And do you recall what information you
9  gave to Mr. Naworol about the Myerses?
10     A.  No.  I do not, other than he had to
11 have had Social Security Numbers in order to pull
12 their credit report.
13     Q.  So it's your understanding that
14 Mr. Naworol also pulled a credit report for
15 Mr. and Mrs. Myers?
16     A.  Yes, that's correct.
17     Q.  With respect to your desire to
18 purchase property, and this is a general
19 question -- what were your basic objectives in
20 June of 2001?
21     A.  Not to move far from where we are now.
22 To keep my kids in the same school that they are

39 (Pages 150 to 153)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 154

1  currently attending.  To acquire additional
2  acreage so that we could expand upon our business
3  and to have a larger home.  Or more room than the
4  one we currently have.
5      Q.   Did you have any other criteria that
6  governed the kind of property that you were
7  searching for other than the size of the
8  property?
9      A.   Well, yeah, there's lots of them.  I
10  mean, they go all the way down to bedroom sizes
11  and location, and pricing, and there were
12  numerous -- you've been at our home, you have
13  seen the style of home we live in.  It's a
14  relatively new home.  It has a lot of the modern
15  conveniences, solid surface countertops and the
16  whatnot.  I mean, my grandparents were not going
17  to accept moving back to an old farmhouse, so I
18  had to meet their wants and desires in a home the
19  same as I had to meet my husband's and I
20  requirements.  You know, I'm looking at it from
21  two angles; A, I have to look at it from a
22  business angle; and B, from a personal angle, and

Page 155

1  there just weren't very many that met all of the
2  above.
3      Q.   By the way, do you know what the time
4  is that you contemplated it would take to obtain
5  a special exception or whatever regulatory action
6  was required to be taken?
7      A.   Roughly I was given an estimate of
8  about three months.
9      Q.   And during that period, did that
10  period include an opportunity for the public to
11  be heard?
12      A.   Yes.
13      Q.   Did that period include any
14  opportunity that people had to appeal from a
15  decision from the authority that granted the
16  exception?
17      A.   I don't know that an appeals process
18  was available.
19      Q.   And you don't know whether or not it
20  was part of the 90 days?
21      A.   No.
22      Q.   How did the availability of water and

Page 156

1  sewer fit if it into the criteria that you had
2  for the purchase of property?
3      A.   Didn't have one.  I'm used to dealing
4  with well and septic now.  It was perfectly okay
5  for me in the future.
6      Q.   Did you determine before you began to
7  look for properties, did you determine the amount
8  of a mortgage loan for which you would qualify?
9      A.   For --
10      Q.   Let me rephrase the question.
11      A.   Yes, rephrase it.
12      Q.   Leaving to the side for a moment the
13  problem with the Washington Mutual handling of
14  the payment and the subject matter of this
15  lawsuit.
16      A.   Um-hum.
17      Q.   When you decided to look for a new
18  home, did you make a judgment how much you could
19  afford to spend?
20      A.   That varied with each individual
21  property.
22      Q.   Why is that?

Page 157

1      A.   Because each individual property
2  offered its own unique -- well, price, first of
3  all, but each property could support different
4  types of businesses in, different in relation
5  to -- not different type of businesses, different
6  types of activities in relation to my business,
7  so each property had to be evaluated on where it
8  is, what it had valuable, what it had to offer,
9  how I could use it, and how it fit into the
10  business plan and the model and the affordability
11  thereof, so each one, each business plan could
12  have supported a different financial aspect.
13      Q.   Let me ask you this.  When you were
14  going to buy land for your business?
15      A.   Okay.
16      Q.   And let's assume you were looking, and
17  I believe I'm correct, that you were looking for
18  a house and land; is that correct?
19      A.   Actually we did not limit our options
20  to house and land because --
21      Q.   Certainly --
22      MR. NEEDLE:  Wait a minute.  She

MGB REPORTING, INC.
(301) 983-9315 or (800) 245-2528

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 158

1  didn't answer the question fully.
2       MR. WINSTON: I'm sorry. I thought
3  she was finished.
4       THE WITNESS: When we first started
5  our search, we have investigated all avenues, I
6  mean, either land alone or house and land.
7  Because I was trying -- obviously a house and
8  land would have made things a little easier as
9  far as transitioning, we could move from one
10 house to another; whereas, if we were just to
11 purchase just land, we've got a transition period
12 while a home and barn is being built, so the
13 viability of house and land had a little more
14 advantage to that than just land, but when it
15 came to actually finding house and land suitable,
16 it became increasingly obvious that there just
17 wasn't much to choose from, so that's why the
18 viability of land only was more important than a
19 house and land.
20      BY MR. WINSTON:
21 Q.   When you acquired -- when you were
22 going to acquire the 800 Bacon Hall Road, when

Page 159

1  you were pursuing that opportunity --
2  A.   Right.
3  Q.   -- and you were looking to finance a
4  portion of that acquisition, were you going to
5  finance that with a residential mortgage loan?
6  A.   Yes, we were.
7  Q.   Were you contemplating any form of a
8  real estate loan that would be separate from a
9  residential mortgage loan?
10 A.   Possibly after we had obtained the
11 home, because some improvements would have had to
12 have been made.
13 Q.   But that would be a construction loan?
14 A.   Not necessarily. I mean, fencing
15 would have need -- had to have been purchased.
16 So, I mean, we either would have done it in our
17 personal name or in the business's name,
18 something in that nature, if there wasn't any
19 fencing, but my husband and I are not, we're not
20 beyond digging post holes. We did our own
21 property now, so renting the equipment and doing
22 it ourselves we've done that.

Page 160

1  Q.   Let me tell you what the purpose of my
2  question is so we can maybe, if we understand
3  each other, then it will make it a little easier.
4  A.   Okay.
5  Q.   You were either going to buy a house
6  in which you were going to and which you were
7  going to finance with a residential mortgage
8  loan?
9  A.   Right.
10 Q.   Or you were going to buy a house and
11 additional land of some size; is that correct?
12 A.   Only if it were with the house. I had
13 no intention of commuting to my job. Other than
14 maybe an ATV.
15 Q.   In the case of an acquisition of a
16 house with land --
17 A.   Okay.
18 Q.   -- is it correct that you would have
19 acquired that property with a residential
20 mortgage loan?
21 A.   Yes. Because it's easier to qualify
22 that way.

Page 161

1  Q.   Is it fair to say that you would have
2  not financed the purchase of the real estate by
3  the use of a real estate loan other than a
4  residential mortgage loan?
5  A.   By real estate you mean the home?
6  Q.   I mean the land and any improvements
7  on it.
8       MR. NEEDLE: Objection. I don't know
9  if you understand the question. I don't. Do you
10 understand the question?
11      THE WITNESS: If we're talking
12 specifically about the Bacon Hall Road house at
13 this point, that's correct.
14      MR. NEEDLE: What's correct?
15      THE WITNESS: Then, no, we would not
16 have needed a separate loan. If you're talking
17 specifically about the Bacon Hall Road; however,
18 if you're talking about purchasing land and the
19 building of a house, and any substructures that
20 would need to have been purchased, no, we
21 intended to qualify as a business entity.
22      BY MR. WINSTON:

41 (Pages 158 to 161)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 162

1    Q.   So the borrower for any land that
2   would loan that would have been placed to build a
3   house and your riding stable facilities, if you
4   had only bought land, would have been the
5   business?
6    A.   I don't think I'm real clear on this.
7    Q.   Let me try again.
8        Let's assume now that you're going to
9   buy land.
10    A.   Okay.
11    Q.   And there's no house on it, and there
12   are no other facilities on it?
13    A.   Okay.
14    Q.   How did you intend to finance the
15   acquisition of the land, the construction of the
16   home, and the construction of any barn and riding
17   stable facilities?
18    A.   That was not a preset -- that was not
19   preset or predetermined.  I was relying on the
20   advice from my bankers and my lawyer, estate
21   lawyer, to give me advice on how best to obtain
22   my objectives.

Page 163

1    Q.   Had you received any such advice?
2    A.   Yes, I have.  I've gotten a couple of
3   different perspectives on that.
4    Q.   And what were your plans at the time?
5    A.   Well, the bank suggested that it would
6   be easier to qualify for the loans in a
7   personal -- on a personal basis; however, they
8   still thought that because of the commercial
9   nature of it, that I should have been applying as
10   a commercial entity, and as far as the estate
11   issues were concerned, my estate lawyer was
12   working on and still is working on trying to
13   determine how best to set up an estate so that in
14   the case anything should happen to my husband and
15   I, we make sure that the -- that taxwise, our
16   kids are taken care of.  So, no, it has not been
17   predetermined on any particular piece of property
18   how it -- how financing would have been obtained.
19   I don't know, that's speculation at this point, I
20   can't tell you that.
21    Q.   At the time when you submitted the
22   contract, on the Basehores Road property --

Page 164

1    A.   Okay.
2    Q.   -- had you established, in your own
3   mind, the structure of the financing that you
4   wanted to obtain in order to be able to
5   consummate that transaction?
6    A.   I had planned on doing it on a
7   personal nature.
8    Q.   So that if I understand that
9   correctly, you were going to pursue a residential
10   mortgage loan?
11    A.   That's correct.
12    Q.   In the name of the four people who are
13   on your current loan; is that correct?
14    A.   Yes.  I believe that's correct.  The
15   contract for the Basehores Mill Road had just my
16   husband's and my name, but the title would have
17   still been held in the four names.
18    Q.   I'll come back to that point in a
19   minute.
20        In June of 2001 --
21    A.   Okay.
22    Q.   -- when you decided when you were

Page 165

1   looking for new property, how much cash did you
2   have in your bank accounts?
3    A.   Geez, I don't know.
4    Q.   Where do you bank?
5    A.   Where?
6    Q.   At that time where did you bank?
7    A.   NetBank and Bank of America, and we
8   had some investment accounts with National
9   Financial Services, and I don't know if we had
10   any with American Express at that time or not.
11    Q.   When you refer to investment accounts,
12   are you making reference to marketable
13   securities?
14    A.   Yes.
15    Q.   What was the value of those marketable
16   securities at that time?
17    A.   I have no idea.
18    Q.   Do you know what your total assets
19   were in June of 2001 that were available for you
20   and Mr. Jordan to use to make an equity
21   contribution to a new property acquisition?
22    A.   Beyond the equity in our current

42 (Pages 162 to 165)

MGB REPORTING, INC.
(301) 983-9315 or (800) 245-2528

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 166

1   residence at the time?
2       Q.   Correct.
3       A.   Without consulting my financial
4   records, no.
5       Q.   Do you have any such records with you
6   here today?
7       A.   I don't have bank statements in here,
8   do I? No. I'm afraid I don't.
9       Q.   Again, Mrs. Jordan, I want to step
10  back for a minute and ask you this question.
11      Did you have a sense when you embarked
12  on the effort to buy a new property, did you have
13  a sense of what combination of equity and debt
14  you could afford and support on the whole?
15  Whatever the structure was, whatever the mix of
16  financing and that you were going to use, did you
17  have a sense in your own mind at that time what
18  you could afford?
19      A.   I knew what I was willing to spend,
20  yes.
21      Q.   What was that?
22      A.   No more than $700,000.

Page 167

1       Q.   For any combination of an existing
2   facility or the purchase of something existing
3   that had to have more money put into it, $700,000
4   was the upper limit of what you were prepared to
5   spend?
6       A.   Yeah, was the maximum -- it was
7   roughly 700,000. I didn't want to overextend
8   myself to a point where we couldn't support the
9   business, you know, the house and the business.
10      Q.   And that $700,000 is a maximum level
11  that was for a combination of your residential
12  and business purposes; is that correct?
13      A.   Again, it was a comfort zone, but it
14  depended on the particular property and its
15  unique characteristics; for instance, location
16  plays a very big importance on curb appeal, if
17  you will, you know, or access. It depended on if
18  it had a premium location, it was definitely
19  worth going a little more for, you know, it was
20  worth going a little out of your comfort zone
21  for.
22      Q.   When you spoke with prospective

Page 168

1   lenders about borrowing money, that related to
2   your business as well as your residential
3   needs --
4       A.   Right.
5       Q.   -- did any of those lenders indicate a
6   willingness to lend on the strength of the
7   projections that you might have given them on
8   your business?
9       A.   Mid Atlantic Farm Credit and
10  Susquehanna Bank have worked with me extensively
11  me on that.
12      Q.   Have they issued you any conditional
13  commitments or commitments to make loans?
14      A.   You got preapproval letters from Keith
15  Wills, copies of preapproval letters on a couple
16  of properties, so I mean, yes, he has reviewed my
17  business plan, and yes, you know, he knows
18  we're -- he deals extensively with equine
19  businesses, so he --
20      Q.   Was any prospective lender with whom
21  you dealt prepared to make any loan that you and
22  your husband would not have had to personally

Page 169

1   guarantee?
2       A.   I never got that far.
3       Q.   Did you have, during the period from
4   April 2001 through today, do you have a financial
5   advisor whom you consult?
6       A.   Yes.
7       Q.   Who is that?
8       A.   Roger Dunn with American Express
9   Financial Services.
10      Q.   And when you have -- and what are the
11  nature of the things that Mr. Dunn does for you
12  or with you?
13      A.   He created our financial plan.
14      Q.   Have you ever sat down with a
15  financial advisor or business consultant and
16  said, here's what we want to accomplish as it
17  relates to our residence and as it relates to a
18  business that we would like to operate in
19  conjunction with our residence?
20      A.   Um-hum.
21      Q.   And has such a person ever helped you
22  walk through the structuring of how you could

43 (Pages 166 to 169)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 170

1  accomplish those objectives?
2      A.   His first duty was to see that we got
3  our debt in hand and pay down the debt first
4  before he wanted us -- to see us expand our
5  business.
6      Q.   When did that happen?
7      A.   Oh, geez, I don't know without looking
8  at the book. It's been a few years.
9      Q.   Do you know when you first started
10  talking with him about that?
11      A.   Not without looking at the book.
12      Q.   Is it before 1999?
13      A.   I don't think so.
14      Q.   Is it after March of 2001?
15      A.   I don't recall.
16      Q.   Do you know Mr. Dunn's address?
17      A.   Not off the top of my head, but I can
18  get it for you.
19      Q.   He's with American Express?
20      A.   Yes.
21      Q.   In Baltimore, Maryland?
22      A.   In Towson.

Page 171

1      Q.   Towson, Maryland?
2           With respect to the 800 Bacon Hall
3  Road property, did you have an agreement with
4  Mr. and Mrs. Myers regarding the allocation of
5  ownership of that property if it were to be
6  bought?
7      A.   Beyond verbal agreement, no.
8      Q.   Did you have a verbal agreement with
9  them?
10      A.   Yes.
11      Q.   And what was it?
12      A.   That it would be held, the title, the
13  same as what our current residence is.
14           (Short Listing marked
15            for identification as DJ
16            Exhibit No. 14).
17  BY MR. WINSTON:
18      Q.   Mrs. Jordan, I've handed you DJ-14,
19  which consists of a short listing form, which is
20  page number 225, for real property located on
21  Basehores, and perhaps you could help me
22  pronounce that name?

Page 172

1      A.   I think you're pronouncing it
2  correctly. We never did figure out how it was
3  correctly pronounced.
4      Q.   Good, not alone.
5           And an eight-page contract pertaining
6  to that property that carries the date of October
7  30th of 2001; is that correct?
8      A.   Yes.
9      Q.   And you can identify that contract?
10      A.   Yes.
11      Q.   I'd like you to turn to page numbered
12  233.
13      A.   (Complies).
14      Q.   And look at the signature block,
15  please.
16      A.   Yes.
17      Q.   Are those the signatures of you and
18  your husband?
19      A.   Yes, they are.
20      Q.   And the affidavit signature is
21  10-30-2001; is that correct?
22      A.   That's correct.

Page 173

1      Q.   Was this contract ever submitted to
2  the sellers?
3      A.   Yes, it was.
4      Q.   By whom?
5      A.   My real estate agent.
6      Q.   Ms. Kahler?
7      A.   Yes.
8      Q.   How were you going to use this
9  property, what were your plans?
10      A.   The same as they've always been, to
11  build a suitable home and to expand upon our
12  business.
13      Q.   What was the size of this property?
14      A.   25 acres, give or take a little.
15      Q.   And what kind of a business operation
16  did you plan to operate on this property?
17      A.   A riding stable. Boarding, leasing,
18  lessons, training, summer camp, day camp.
19      Q.   What -- in what jurisdiction, from a
20  county standpoint, was this property?
21      A.   Carroll County.
22      Q.   From looking at the short listing

44 (Pages 170 to 173)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 174

1  form, can you determine whether there was water
2  or sewer available for this site?
3       A.  No.
4          MR. NEEDLE:  Can't determine or there
5  wasn't any?
6          BY MR. WINSTON:
7       Q.  Can you determine whether or not there
8  was?
9       A.  It says there isn't on the short list.
10  It says none.
11      Q.  Do you in fact know what the actual
12  circumstances were with respect to the
13  availability of water?
14      A.  When it came to water, there was a
15  well driller just up the street who I questioned
16  at that time and said he was having no problem
17  hitting water sources.  He was drilling for a
18  minor subdivision.  So when it came to water, I
19  wasn't concerned about having to drill for water.
20      Q.  Was there, in fact, a well, though, on
21  site at the time?
22      A.  No.  No.  There was also a little

Page 175

1  stream that ran through, so there, you know,
2  obviously seemed to be a good source of water.
3  When it came to septic, we knew that there was no
4  septic perc that had been acquired, and that was
5  one of the things that we were requiring in the
6  contract.
7       Q.  As a contingency?
8       A.  Yes.  As one of the things that needed
9  to be done.
10      Q.  Did the proposed contract contain any
11  other contingencies other than a positive perc
12  test?
13      A.  If you let me consult my other book, I
14  can tell you.  You've gotten -- these are the
15  supplemental documents to this (indicating), and
16  I believe in the supplements has the full copy of
17  the contract that goes along with this
18  (indicating).
19          MR. WINSTON:  You mean I don't have?
20          MR. NEEDLE:  You do.  The supplemental
21  documents that were submitted.
22          THE WITNESS:  The supplemental

Page 176

1  documents.  The supplements, that book that I
2  sent you.
3          MR. NEEDLE:  A couple weeks ago.
4          MR. WINSTON:  Oh, oh, oh.
5          MR. NEEDLE:  That she sent while I was
6  away.
7          THE WITNESS:  Yeah.  Here's the whole
8  contract is in there.  There was a survey of the
9  property that needed to be done, a land use study
10  that needed to be done.
11          BY MR. WINSTON:
12      Q.  What was the nature of the land use
13  study?
14      A.  This contract of sale is contingent
15  upon a determination that the subject property
16  can be used for the purposes of residents and
17  equine-related activities.
18      Q.  Did you know, when you included that
19  contingency, that you would need to have any
20  regulatory approval?
21      A.  No.  I knew that I would not need to
22  have regulatory approval.

Page 177

1       Q.  And so why did you include that
2  contingency in the contract?
3       A.  Because this contingency allowed me to
4  make soil studies available for a nutrient
5  management plan going forth.
6       Q.  Did you in fact, perform any perc
7  tests?
8       A.  No.
9       Q.  Did you perform any soil tests?
10      A.  No.  We did not.
11      Q.  Did you do any other land use study?
12      A.  No, we didn't.  We never made it that
13  far.
14      Q.  Did you submit this contract?
15      A.  Yes, we did.
16      Q.  And how did the seller respond?
17      A.  He initially rejected it.  We
18  resubmitted it at a higher price, and let's see,
19  okay, there's a memorandum that we increased our
20  offer and --
21      Q.  From what to what?
22      A.  Re-offered -- the price, the contract

45 (Pages 174 to 177)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 178

1  price was 129,9; we initially offered him 125,
2  and we subsequently changed our offer to 130,
3  offering more than contract price.
4      Q.   More than listing price?
5      A.   More than listing price.
6           But he didn't want to wait with some
7  of the contingencies that we had in effect,
8  because one of them was the perc test, and the
9  particular location of the percing area required
10 is known as a wet weather perc, which can only be
11 done in certain times of the year, and this
12 contract was -- now we were talking November, and
13 the first perc test could not be taken until, I
14 want to say February the 1st. And he didn't want
15 to wait that long. And by the time we had gotten
16 around to January 1, I would have submitted a
17 subsequent contract, he'd already accepted a
18 contract on somebody else's offer.
19     Q.   This was during what time?
20     A.   January.
21     Q.   Of 2002?
22     A.   Yes.

Page 179

1      Q.   And this was submitted October 30th of
2  2001?
3      A.   Yeah.  And then the subsequent, you
4  know, the change in offer was November 4th of
5  2001.
6      Q.   Were you planning on financing the
7  purchase of this property?
8      A.   Yes, we were.
9      Q.   What was your plan for acquiring this
10 property and developing a home and riding
11 facility if you were to acquire it?
12     A.   I don't think I understand your
13 question.
14     Q.   This is raw land, correct?
15     A.   Yes. Yes.
16     Q.   I take it from your earlier answer
17 that the purpose of your purchase of this land
18 was to build a house?
19     A.   Right.
20     Q.   In which you would live?
21     A.   Right.
22     Q.   And also to build the horse-related

Page 180

1  facilities; is that correct?
2      A.   That's correct.
3      Q.   What was your plan for being able to
4  do that, being able to acquire this property,
5  construct the house and the horse facility, and
6  continue to have a place to live while you were
7  doing that?
8      A.   There was something called bridge
9  financing, where you use the equity in your
10 current residence as collateral down payment on
11 the future residence, which allows me time to
12 have the new residence constructed and the time
13 to put my current residence up for sale after a
14 certain length of time.
15     Q.   And who was going to -- with whom did
16 you speak about arranging?
17     A.   Keith Wills, the letters.
18     Q.   The Keith Wills' letter?
19     A.   (Nodding head up and down, inaudible
20 response).
21     Q.   Excuse me just a minute.
22          (Whereupon there was a discussion held

Page 181

1  off the record between Mr. Winston and
2  Mr. Vogel).
3          MR. NEEDLE:  Mark, is this a good time
4  for a break?
5          MR. WINSTON:  Happy to do that.
6          (Whereupon there was a short pause in
7  the proceedings).
8          MR. WINSTON:  Back on the record.
9          BY MR. WINSTON:
10     Q.   Mrs. Jordan, with respect to the
11 business loan, I believe that it was your
12 testimony that there was a $20,000 business
13 consolidation loan that you were pursuing and
14 that you were attempting to move into that credit
15 facility debt that was exclusively business
16 oriented, whether on a business account or a
17 personal account?
18     A.   Correct.
19     Q.   So that it would become the obligation
20 of your business and free up your credit?
21     A.   Free up, yes, improve my personal
22 credit, yes.

46 (Pages 178 to 181)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 182

1    Q.   Is it your understanding that had you
2  accomplished that, that the business loan that
3  you would have obtained would not have appeared
4  on your credit report as a obligation of your own
5  personal?
6    A.   I can't say yes or no, other than I
7  can tell you that I do have a credit card that's
8  solely in the corporate name and that does not
9  reflect on my personal credit report.
10    Q.   And is that a card for which you are
11  personally liable?
12    A.   Yes, it is.
13    Q.   Did you know, or what is your
14  understanding of the impact that the business
15  consolidation loan in the name of Hummingbird
16  Hill Farm would have on your personal financial
17  statement?
18    A.   I didn't follow your question, I'm
19  sorry.
20    Q.   If you obtained a loan in the name of
21  your corporation --
22    A.   Okay.

Page 183

1    Q.   -- that you personally guarantee.
2    A.   Okay.
3    Q.   And I believe you've testified that
4  you would have to personally guarantee it?
5    A.   Yes.
6    Q.   Do you know whether that personal
7  guarantee would have to be reflected on your
8  personal financial statement?
9    A.   What do you mean by financial
10  statement?  Oh, as far as --
11    Q.   I'm not now talking about a credit
12  report.
13    A.   Okay.
14    Q.   I'm talking about a personal financial
15  statement, a statement of your assets and
16  liabilities.
17    A.   Yes.  Yes.  Of course it would.
18    Q.   How would it be reflected on your
19  personal financial statement?
20    A.   As my business?  I'm afraid I don't --
21    Q.   With the liability, would the personal
22  guarantee --

Page 184

1    A.   Yes.
2    Q.   -- be reflected on your personal
3  financial statement, if you know?
4    A.   I haven't been in a position to have
5  to do that yet, so I'm not exactly sure how that
6  reporting is done.
7    Q.   In connection with the filing of your
8  income taxes
9    A.   Okay.
10    Q.   -- does a Hummingbird -- does
11  Hummingbird entity file a corporate return?
12    A.   Yes, it does.
13    Q.   Is it an S corporation?
14    A.   Yes, it is.
15    Q.   Does it include on that return a
16  financial statement of the corporation, if you
17  know?
18    A.   As of tax time, yes, it's done on an
19  annual basis, the same as my personal return,
20  yes.
21    Q.   Is it your understanding that
22  obtaining a business consolidation line of credit

Page 185

1  would have freed up personal credit to enable you
2  to borrow any additional funds in your own name?
3    A.   I don't know that it would have
4  allowed me to borrow anything more than what I
5  have now, but I know that it should have improved
6  my personal credit scores because of the number
7  of accounts that are open in my personal name,
8  yes.
9    Q.   Do you know whether the credit rating
10  on you personally would have -- the credit
11  reports would have reflected the $20,000 business
12  consolidation loan as a personal liability?
13    A.   Again, it -- I can't say whether it
14  would have or it wouldn't have.  I can only base
15  my determination off of past history, and it's my
16  understanding that when liability is held in the
17  corporate name, it would not be reflected on my
18  personal report.
19          (Short Listing marked
20          for identification as DJ
21          Exhibit No. 15).
22    BY MR. WINSTON:

1    Q.   I've handed you Exhibit DJ-15,
2    which -- and this is a name that I can actually
3    pronounce, which consists of a short listing page
4    from MRIS for Cape Horn Road in Westminster,
5    Maryland, together with an eight-page contract, I
6    think it's eight pages --
7        A.   Yes.   The entire contract was given to
8    you in the supplemental pages.
9    Q.   All right.
10       A.   That I mailed to you.
11   Q.   All right.
12       Can you identify this document?
13       A.   Yes, I can.
14   Q.   I would ask you to turn to the last
15   page of the document.
16       A.   (Complies).
17   Q.   Do any signatures appear thereon?
18       A.   No.   There are no signatures.
19   Q.   And why is that?
20       A.   I believe this is a copy of the
21   contract that I kept prior to being submitted to
22   my real estate agent.   I don't know that -- I

1    don't know if she has the signed copy or not, but
2    I would try and take copies of things.   I didn't
3    always make it because of time constraints, but
4    sometimes I would take copies, and I'd just have
5    them on file.
6        Q.   Is it your testimony that this
7    contract was signed by the prospective
8    purchasers?
9        A.   I can't say whether yes or no -- oh,
10   yeah, maybe I can.   No, I can't, sorry.
11   Q.   Do you have any supplements that may
12   have any signatures or initials on them --
13       A.   Let me look.
14   Q.   -- in the materials that you have?
15       A.   No, I'm sorry.   I can't locate them.
16   Q.   Was this proposal ever submitted to
17   the seller?
18       A.   It may have been.   Again, this is
19   another piece of property with which we were
20   dealing, and when we -- you have to
21   understand that when it came to land, we're in a
22   very competitive market, and I think this was one

1    of the properties that was sold either right
2    before or right after, you know, we submitted a
3    contract.   I can't -- I can't say for sure
4    whether there was ever a signed contract
5    submitted on this piece of property.   I can tell
6    you it was sold.
7        Q.   Can you tell from looking at the cover
8    sheet what the size of this property was?
9        A.   36.03 acres.
10       Q.   Can you tell how it was zoned?
11       A.   Other than looking at the current use,
12   no.   Current use was agricultural, which you
13   recall.
14       Q.   This is Carroll County?
15       A.   Correct.
16       Q.   Do you know whether this property had
17   any regulatory actions that would have been
18   required to be taken before it could have
19   operated as a horse riding or stable facility?
20       A.   There would have been no regulatory
21   action that would have needed to be taken,
22   because it was in Carroll County.

1        Q.   Can you tell from this document how
2    long this property had been on the market?
3        A.   Yeah.   849 days.
4        Q.   And do you know how long after you --
5    well, let me ask you this:   The date of this
6    contract is December 16th, 2001; is that correct?
7        A.   Correct.
8        Q.   Do you know how long after that date
9    this property sold?
10       A.   I don't.   My real estate agent can
11   tell you.
12       Q.   And can you tell from the short
13   listing page what the listing price was?
14       A.   $225,000.
15       Q.   And then what did you offer, or what
16   were you prepared to offer?
17       A.   190 was our original offer.
18       Q.   Did you modify that offer at any time?
19       A.   I can't say yes or no.
20       Q.   In fact, you don't even know if this
21   was actually submitted to the seller?
22       A.   Yeah.   I don't know that we got that

48 (Pages 186 to 189)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 190

1   far.
2       Q.   Does this contract propose any
3   contingencies?
4       A.   We wanted to have a wetlands
5   delineation obtained, which just verified that at
6   one time it was in a wetland.
7       Q.   How long would that take to
8   accomplish, do you know?
9       A.   30 days.  There was an appraisal of
10  the property that needed to be done.
11      Q.   How long was that contemplated to
12  take, do you know?
13      A.   Ten days.
14      Q.   Was there a financing contingency?
15      A.   Other than the standard clause in a
16  real estate contract, no.
17      Q.   Would that be paragraph 25 of this
18  document -- excuse me, paragraph 20?
19      A.   Yes.
20      Q.   What was the deposit that was set
21  forth in this contract, do you know?
22      A.   A $500 check.

Page 191

1       Q.   Had you been given any advice by your
2   real estate agent as to how practical it was to
3   present an offer on a property, on this property,
4   with a $500 deposit proposed?
5       A.   No.
6       Q.   You had no discussion with Ms. Kahler
7   about that at all?
8       A.   No.
9       Q.   Did she, in any contract that you may
10  have prepared or presented with her, have a
11  discussion with you about the appropriate amount
12  of a deposit to propose?
13      A.   No.
14      Q.   Did this contract contemplate the sale
15  of your house before there would be a closing
16  under this contract?
17      A.   I don't believe so.
18      Q.   What was your expectation with regard
19  to your ability to close on this property as it
20  relates to maintaining your current home?
21      A.   The same with the Basehores Mill Road,
22  to obtain a bridge loan on both.

Page 192

1       Q.   I want to direct your attention to
2   paragraph 13 of this contract.
3       A.   All right.  Okay.
4       Q.   And ask you to read that to yourself,
5   please.
6       A.   (Complies).  Okay.
7       Q.   Is it fair to say that paragraph 13
8   explicitly provides that, as written, the buyer
9   does not have a contingency on the sale of
10  another home?
11          MR. NEEDLE:  Objection.  It speaks for
12  itself.
13          BY MR. WINSTON:
14      Q.   Do you know how much of this purchase
15  price that you had proposed here that you would
16  have financed?
17      A.   That was questionable at the time,
18  because my grandparents were willing to give us
19  additional funds for it.
20      Q.   How much additional funds were they
21  willing to give?
22      A.   I don't remember.

Page 193

1       Q.   Were they prepared to fund the entire
2   purchase?
3       A.   It's possible.  They have that kind of
4   equity.
5       Q.   Did you have an agreement with them to
6   that effect?
7       A.   Not written.
8       Q.   Did you have an oral agreement with
9   them?
10      A.   It's only -- you have to understand
11  that my grandparents, they don't necessarily see
12  eye to eye with me when it comes to a particular
13  piece of property.  They want to be -- they also
14  want to be in a particular area that they are
15  familiar with.  So, you know, when it came to
16  locating property, I had to locate a piece of
17  property that was suitable for all parties
18  involved, not just me.  So they -- they would
19  have had -- in order for me to get to a contract
20  state, they would have had to have liked the
21  property, so I'm -- I'm sure that I would have
22  had some sort of verbal agreement from them.

49 (Pages 190 to 193)

c575b5c0-5458-11d7-b797-0003b3005cf9

1    Q.   Before even preparing this contract?

2    A.   Yes.

3    Q.   But you don't recall specifically what

4 that was?

5    A.   No.

6    Q.   I want to be sure I understand how you

7 believe the bridge loan concept would work.

8    A.   Okay.

9    Q.   In your opinion, what amount of equity

10 did you have in your current home in December of

11 2001?

12    A.   At least $100,000.

13    Q.   And to what use would you place that

14 equity as you sought to obtain bridge financing?

15    A.   I'm not --

16    Q.   How would you use that equity to

17 enable you to obtain bridge financing?

18    A.   As collateral for the new property.

19    MR. NEEDLE:  Make sure you understand

20 the question.

21    MR. WINSTON:  Off the record.

22    (Whereupon there was a discussion held

1 off the record).

2    MR. WINSTON:  Back on the record.

3    BY MR. WINSTON:

4    Q.   I'm going to go through the same thing

5 we just did off the record.

6    A.   Okay.

7    Q.   As I understand it, your plan with

8 regard to any property that you were going to

9 acquire that was land was that you were

10 going to retain your current home so you had a

11 place to live?

12    A.   Right.

13    MR. NEEDLE:  It didn't sound like a

14 question.

15    MR. WINSTON:  Okay.

16    BY MR. WINSTON:

17    Q.   You were going to obtain a bridge loan

18 or interim financing to enable you to acquire the

19 new property, the land, and construct

20 improvements thereon, which would include a home,

21 and horse-related facilities, am I correct?

22    A.   That's correct.  That was one of the

1 scenarios that we considered doing.  It never

2 came to that, because I never had to finalize any

3 of those arrangements, but we, you know, that was

4 one of the scenarios that we considered.

5    Q.   And the way that would work is you

6 would retain ownership of your current home,

7 there would be an appraisal done of your current

8 home, correct?

9    A.   Um-hum.

10    Q.   Whatever the amount of the value of

11 that home in excess of its debt would be pledged

12 to the lender on the bridge loan, correct?

13    A.   Correct.

14    Q.   The bridge loan, the bridge loan

15 lender would then make a loan to enable you to

16 acquire and build on the second property,

17 correct?

18    A.   Correct.

19    Q.   You'd own them both at the same time?

20    A.   If it is fiscally -- if we were able

21 to do so fiscally, yes.

22    Q.   How were you going to determine

1 whether you could fiscally be able to do so?

2    A.   That would have been done at the

3 application process.

4    Q.   And how would that have been

5 determined, if you know?

6    A.   I don't know.  I know that you go

7 through the same uniform residential application

8 for every mortgage application that you do for

9 anything else.

10    Q.   Did you expect to need to borrow more

11 on the bridge loan than the equity that you had

12 in your current home?

13    A.   No.  I don't understand -- the bridge

14 loan, it was not my understanding that you could

15 borrow on the bridge loan anymore than what you

16 currently have in equity.

17    Q.   Then how --

18    A.   The bridge loan was simply as a down

19 payment, not as a end transaction.

20    Q.   How did you intend, when you acquired

21 the second property, the new property, how did

22 you intend to fund the cost of constructing the

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 198

1  new home and the horse-related facilities?
2      A.   Again, we hadn't gotten that far yet.
3      Q.   That's not the point of my question,
4  the point of my question is now that you were
5  about ready to do it, the point of my question
6  is, when you were contemplating doing these
7  things, had you put in place a plan, a structure
8  for how to finance these transactions so that if
9  you ever came to a point in time where you had a
10  piece of property you wanted under contract, you
11  could in fact implement that plan and do what you
12  wanted to do?  That's the purpose of the
13  question.
14      MR. NEEDLE:  Do you understand?
15      THE WITNESS:  I think so.
16      That was one scenario that we used as
17  a model, as an option.  That was not the ending
18  scenario.  I mean, we considered selling and
19  moving into temporary residence, we considered
20  putting contracts contingent on the sale of our
21  current property and putting a mobile home while
22  the construction of the home went on.  These were

Page 199

1  several different options that we had available
2  to us, none of which had ever gelled into a solid
3  foundation.
4      BY MR. WINSTON:
5      Q.   Did you have as a scenario any
6  financing alternative to the bridge loan
7  alternative that you have described?
8      A.   There was never any solid financing,
9  because we never got any further than that.
10  There were no options to be explored, because we
11  didn't have any contracts on any property.
12      Q.   Right.  Did you have occasion to
13  present any contract to any prospective seller
14  that contained a home sale contingency?
15      A.   Other than the Bacon Hall Road home?
16      Q.   Correct.
17      A.   Not that I'm aware of.
18      Q.   And there was such a contingency on
19  the Bacon Hall Road?
20      A.   I can't say for sure, because I don't
21  have the contract.
22      Q.   Did you have conversations with your

Page 200

1  agent on the practicality of including a
2  provision in an offer to purchase property that
3  was contingent on the sale of your current home?
4      A.   Not when it came to land, because
5  the -- the viability of moving my household into
6  temporary living was not necessarily an option.
7  When you have eight people, five ponies, a dog,
8  you don't exactly move into a temporary
9  apartment.
10      Q.   With respect to the pursuing an
11  interest in a home, as a new purchase, did you
12  have a conversation with your agent about the
13  practicality of a home sale contingency in any
14  contract that you might propose?
15      A.   I may have.  Practicality.  I don't
16  recall.  I just know that from my frame of mind,
17  it did not make sense to put a contract in on a
18  piece of land contingent on the sale of my home,
19  because I had no home to move into if my house
20  were to sell, and I only had a piece of land.  So
21  we may have had this discussion, I know that I
22  have had this discussion with the banks, you

Page 201

1  know, as far as options, and that's why the bank
2  is actually the one who suggested the bridge loan
3  option.
4      Q.   But, again, the bridge loan option was
5  only for a loan that was in an amount equal to or
6  less than the equity in your current home; is
7  that correct?
8      A.   They would be using the bridge loan as
9  down payment collateral on a new purchase, not as
10  the payment of the loan.
11      Q.   Did you contemplate at the same time
12  that you were going to have a bridge loan, having
13  an additional loan on the new property to enable
14  you to construct?
15      A.   A construct loan, yes.  Because a
16  construct loan only charges interest during the
17  construction period.
18      Q.   How would that have been financed, how
19  would the credit and security have been set up
20  for that?
21      A.   I have never gotten that far.
22      Q.   In December of 2001 --

MGB REPORTING, INC.
(301) 983-9315 or (800) 245-2528

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 202

1    A.   Okay.
2    Q.   -- directing your attention to that
3  time period, do you know how much cash you had in
4  the bank accounts?
5    A.   No.
6    Q.   Do you know what the value of any
7  marketable securities were that you might own?
8    A.   Not without consulting records.
9    Q.   Do you have a sense of what your net
10 worth was on a personal financial statement by
11 your -- I mean you and your husband?
12   A.   Not without consulting my financial
13 records.
14   Q.   Are they here?
15   A.   No.
16   Q.   Do you know, have you ever seen a
17 personal --
18   A.   Other than my tax records, which you
19 have.
20   Q.   Have you ever had occasion to see the
21 personal financial statement of your
22 grandparents?

Page 203

1    A.   I have done their taxes for them every
2  year.
3    Q.   Do you know what their personal net
4  worth is?
5    A.   I know it's substantial, but I can't
6  give an exact dollar figure.
7    Q.   Is that because you don't know?
8    A.   Yes.  That's because I don't know an
9  exact dollar figure.
10   Q.   Do you know an approximate value of
11 their net worth?
12   A.   I can give you a figure, but I can't
13 guarantee that it's accurate.
14   Q.   I don't want you to guess, but I don't
15 need you to be specific to the dollar.
16   A.   I know it's multiple six figures.
17   Q.   Have you, with respect to the Cape
18 Horn Road property, had you ever gotten to a
19 point where you had done any planning for the
20 improvements that might be built on that
21 property?
22   A.   Beyond preliminary sketching, no.  We

Page 204

1  never got that far with the Cape Horn property.
2    Q.   Had you done any estimates of what it
3  would have cost to construct the improvements
4  that you wanted to build on the Cape Horn
5  property?
6    A.   With regard to the house, what?
7    Q.   Both.
8    A.   I'm still working on them with
9  builders now.
10   Q.   With respect to the Basehores Road
11 property, had you ever developed any plans for
12 what you would do on that property?
13   A.   The basis has always remained the
14 same, boarding, leasing, lessons, summer camp.
15   Q.   Let me reask the question.  I may have
16 misled you by my question.  I'm now focusing on
17 the physical improvements that would be built on
18 these properties.
19   A.   Okay.
20   Q.   Did you develop a plan that for the
21 kind of home that you would develop and the kind
22 of horse facilities that you would develop and

Page 205

1  get an estimate of what the cost was for doing
2  that?
3    A.   I had a good idea in mind.
4    Q.   You did personally?
5    A.   Yes.
6    Q.   Had you obtained any pricing from any
7  architect or contractor?  Basehores Road now, I'm
8  talking.
9    A.   I know that I had a couple of
10 estimates done on some barns, but I don't
11 remember for which particular property.  I mean,
12 a barn is a barn.  I can put a barn anywhere.
13   Q.   Could you have operated the horse
14 business in a manner consistent with the way you
15 have described it in your business plan on the
16 Basehores Road property?
17   A.   May I have a copy of it?
18   Q.   The business plan?
19   A.   Yeah.
20        (Whereupon counsel handed the Witness
21 the aforementioned document).
22        THE WITNESS:  The products and

52 (Pages 202 to 205)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 206

```
 1   services that are reflected on page 1, yes, I
 2   could have done those at Basehores Mill.
 3        BY MR. WINSTON:
 4        Q.   Is it of sufficient size to have
 5   accommodated the number of horses and other
 6   operations that are recited in the business plan?
 7        A.   Yes, it is.  It was level clear
 8   ground.
 9        Q.   And of sufficient size to accommodate
10   the number of horses that you were going to be --
11        A.   According to county regulations.
12        Q.   With respect to the Cape Horn
13   property, same question.
14        A.   Yes.
15        Q.   And?
16        A.   And the reason I can say that is we
17   had every intention of utilizing a grazing
18   program known as intensive rotational grazing
19   where you take smaller pastures and split it up
20   and split up your crops so that you're not
21   overgrazing your land.
22                 (Short Listing marked
```

Page 207

```
 1                 for identification as DJ
 2                 Exhibit No. 16).
 3        BY MR. WINSTON:
 4        Q.   This is No. 16.  This consists of a
 5   short listing form, one page, together with
 6   eight-page contract document.
 7        A.   This is the property my husband broke
 8   his toe on.
 9        Q.   And this is located on Cockeys Mill,
10   C-O-C-K-E-Y-S, separate word Mill, Road, and
11   that's in Reisterstown, Maryland?
12        A.   Correct.
13        Q.   What county is that?
14        A.   Baltimore.
15        Q.   Do you know whether this property was
16   at the time -- well, strike that.
17             What is the date of the contract
18   offer?
19        A.   April 12, 2002.
20        Q.   Do you know whether on the date of the
21   offer this property was eligible as a property on
22   which you could operate a riding stable?
```

Page 208

```
 1        A.   Yes, it was.
 2        Q.   It already had its zoning approval?
 3        A.   No.  It was in Baltimore County.  It
 4   required special exception approval.
 5        Q.   And it had already been approved?
 6        A.   No.  But it was on a road that had
 7   surrounding farmland.  I had talked to several of
 8   the neighbors already, so the likelihood of being
 9   granted a special exception was highly probable.
10        Q.   But it would have --
11        A.   Required a special exception.
12        Q.   -- required a special exception?
13        A.   That's correct.
14        Q.   With whatever the routine time period
15   was for that to be considered and granted?
16        A.   That's correct.
17        Q.   Do you know what that time period
18   typically is in Baltimore County?
19        A.   Roughly three months.
20        Q.   Can you tell from the short listing
21   page, the first page is size of this property?
22        A.   24.12 acres.
```

Page 209

```
 1        Q.   Do you know whether this property was
 2   one on which you could operate a business that
 3   would have been consistent with the assumption
 4   contained in your business plan?
 5        A.   Yes, it was, and the reason I can say
 6   that is because the property that surrounded this
 7   property was owned by BYE, which is land that I
 8   could have leased in excess of 11 acres.
 9        Q.   How do you know that?
10        A.   Because I talked to them.
11        Q.   Did you negotiate?
12        A.   It was $160 for a year lease, provided
13   I maintain the property.
14        Q.   For how much?
15        A.   11 acres.
16        Q.   $160 a year for 11 acres?
17        A.   Yeah.
18             MR. NEEDLE:  A year?
19             THE WITNESS:  A year.
20             BY MR. WINSTON:
21        Q.   Were you going to be under high
22   tension wires?
```

53 (Pages 206 to 209)

c575b5c0-5458-11d7-b797-0003b3005cf9

1    A.   Yes.  That area is under high tension
2   wires.  That's why it was the way it was.
3    Q.   Obviously you can identify the
4   attached Exhibit 16.  I'd like to ask you to look
5   at the lower right-hand corner of each of these
6   pages, and you'll note that there is a reference
7   to page blank of 18, and I want to walk through
8   this with you, because I'm confused.
9    A.   Well, in the supplemental pages that I
10  gave you, you have the entire contract, which is
11  pages 1 and 2.
12   Q.   And pages 1 and 2 are cover pages?
13   A.   Just cover pages.
14   Q.   Okay, that takes care of 1 and 2.
15  Now, let's proceed toward the end, to page 251,
16  which is 10 of 18?
17   A.   Right.
18   Q.   And then, 11 of 18 through 18 of 18,
19  are not there?
20   A.   They are provided to you in the
21  supplemental pages that I gave to you.  The
22  entire contract is in there.

1    Q.   I ask you to turn to page 10 of 18.
2    A.   Okay.
3    Q.   Which is 251, BATES stamped.
4    A.   Um-hum.
5    Q.   And ask you if you can identify the
6   signatures that appear.
7    A.   Yes, I can.
8    Q.   They are the signatures of the people
9   whose names are Louis Jordan, Monica Jordan,
10  Margaret Myers, and John L. Myers?
11   A.   Correct.
12   Q.   And you recognize all of those
13  signatures?
14   A.   Yes, I do.
15   Q.   Is there any signature from a
16  seller --
17   A.   No.
18   Q.   -- appearing on here?
19   A.   No.
20   Q.   Was this contract ever submitted to a
21  seller?
22   A.   Yes, it was.

1    Q.   Do you know when it was submitted?
2    A.   Based on the date of the contract, it
3   was probably submitted within a week of that
4   date, you know, the date is printed out, Bonnie
5   gives me the contract, I take it back to get all
6   the pertinent signatures, I have to get it back
7   to her, and then it has to be submitted to the
8   seller.
9    Q.   Sometime in mid April of 2002 is it
10  safe to say that was submitted?
11   A.   Yeah.  I would think that would be a
12  reasonable assumption.
13   Q.   And after it was submitted, what
14  happened to the contract?
15   A.   The initial offer was rejected.
16   Q.   And do you know why?
17   A.   No.  Seller did not make that
18  available.
19   Q.   Did you make any additional offer?
20   A.   I believe we did.
21   Q.   How did you modify this document in
22  your second offer?

1    A.   We increased our contract offer price.
2    Q.   Do you recall from what price to what
3   price?
4    A.   Not with any certainty.
5    Q.   Turn to the last page of the document,
6   that has been handed to you, please.
7    A.   (Complies).
8    Q.   Why is that 10 of 10?
9    A.   Those were contingencies in addition
10  to the original contract.
11   Q.   There was another ten pages?
12   A.   Yes.
13   Q.   Of contract documents?
14   A.   Yes, there are.  There is a cover page
15  with all of the contingencies.
16   MR. NEEDLE:  off the record.
17   (Whereupon there was a discussion held
18  off the record).
19   BY MR. WINSTON:
20   Q.   I want to focus on page 10 of 10.
21   A.   Okay.
22   Q.   I'd like you to read the first

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 214

1  sentence to yourself.
2      A.  (Complies).  Okay.
3      Q.  Am I correct that your contract was
4  contingent upon your making a written application
5  for financing within seven days of land use
6  suitability conditions being met or final
7  resolution of your litigation with, I take it,
8  WAMU?
9          MR. NEEDLE:  Objection.  It speaks for
10  itself.  I think you're reading from it.
11         BY MR. WINSTON:
12     Q.  Did you have a conversation with
13  Ms. Kahler about this financing addendum before
14  you attached it as a part of the contract that
15  you submitted?
16     A.  I don't recall.  I probably did, but
17  the specifics of that conversation, I don't
18  remember.
19     Q.  Do you remember whether Ms. Kahler
20  expressed any opinion about the effect that this
21  kind of a financing contingency would have on the
22  strength of your offer?

Page 215

1      A.  She probably said something to that
2  effect, but, I can't -- you know, what she had to
3  say about it, I don't know.
4      Q.  When you, I believe you said you
5  submitted a subsequent offer increasing the
6  price; is that correct?
7      A.  I think we did, yes.
8      Q.  Do you have any document --
9      A.  No, I don't.
10     Q.  -- that would support that?
11     A.  No, I don't.
12     Q.  But it's your testimony that there are
13  additional contingencies that are set forth in
14  pages 1 through 9 of the ten-page addendum?
15     A.  I'm sorry.  I do have -- I do have a
16  memorandum that increased the price to 288.  It's
17  in the supplemental information.
18     Q.  And the original offer was for
19  $285,000?
20     A.  Correct.
21     Q.  Do you recall whether the seller
22  countered this contract with another number?

Page 216

1      A.  He did not.
2      Q.  Why then did you go back to him with a
3  $288,000 offer?
4      A.  Because we just assumed that he may
5  want more money if that would sweeten the deal to
6  accept some of the other contingencies.
7      Q.  Did the memorandum that you were
8  looking at there indicate that all other
9  contingencies were to remain in effect?
10     A.  All other details and contingencies
11  included in the original offer are to remain in
12  effect in subsequent offer.
13         If you allow me to read further,
14  please let the seller or sellers's agent be aware
15  that any offer received from us will continue to
16  have all of these contingencies, with the
17  possible exception of the mortgage litigation
18  issue regardless of any monetary offer, and if
19  any of these contingencies are a deal breaker
20  issue, we would like to know now so we can
21  continue our search elsewhere.  I did not receive
22  any response to that.

Page 217

1      Q.  What was the deposit that was proposed
2  in this contract, paragraph 18?
3      A.  $1,000 check.
4      Q.  Did you have any discussion with your
5  agent about whether that was an appropriate
6  amount to offer as a deposit on a purchase of
7  this size?
8      A.  No.  I did, however, always make my
9  agent aware that should a contract be accepted,
10  we would be willing to put subsequent money down.
11     Q.  Had you, during a period prior to
12  submitting this offer on the Cockeys Mill Road
13  property, done any study of the feasibility of
14  using this property for the intended purposes?
15         MR. NEEDLE:  Objection.  I think asked
16  and answered.
17         You can answer.
18         MR. WINSTON:  I don't think so.
19         THE WITNESS:  We looked at this
20  property extensively.  In fact, it was one the
21  premier properties that we considered, because of
22  its high visibility to a major route, its close

55 (Pages 214 to 217)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 218

1 proximity to the golf course, the neighboring
2 golf course and the recreational ball fields,
3 owned by the recreation and parks -- Baltimore
4 County Recreation and Parks.
5    BY MR. WINSTON:
6    Q. Did you do any studies, did you
7 commission any engineers or --
8    A. It wasn't necessary to go into that
9 expense without having a contract.
10    Q. Did you have any financial plan at the
11 time that you presented this contract for how you
12 would acquire this property and construct a home
13 and build a horse farm or a horse facilities on
14 it?
15    A. There was no set-in-stone plan.
16    Q. Is it fair to say that the discussion
17 that we've had about the Basehores Road and the
18 Cape Horn property is applicable to the Cockeys
19 Mill property as it relates to how you would
20 acquire it?
21    A. I can't say for sure. Each one has
22 its own uniqueness, and each one I had a

Page 219

1 different business plan for. You know, again, it
2 gets back to the particular business, the
3 location, what it had to offer, what kind of
4 business could have been developed on that piece
5 of property; for instance, the one on Cockeys
6 Mill Road would have been highly used for
7 recreational purposes, for instance, the summer
8 camp, it's in the midst of a major growth area.
9 It depends on the location of the property.
10    Q. Mrs. Jordan, to the best of your
11 knowledge, has any physician prepared a report on
12 your medical condition in which the physician
13 expresses the opinion that you're suffering from
14 any psychological or emotional disorder?
15    A. How are you asking? If I'm seeing a
16 psychiatrist?
17    Q. No. That's not what I'm asking. I'm
18 asking if you are aware of whether a physician
19 has expressed that opinion in a report.
20    A. Not a report that I have.
21    Q. Are you aware of whether or not any
22 such report exists?

Page 220

1    A. It may be in my medical records, I
2 know that my doctor has put me on stress
3 medication.
4    Q. And this is Dr. Johnston?
5    A. Yes.
6    Q. What medications have you been on?
7    A. Zoloft.
8    Q. Is that a prescription?
9    A. Yes, it is.
10    Q. When was Zoloft first prescribed for
11 you?
12    A. April 2002.
13    Q. And do you remain under that
14 medication?
15    A. Yes, I do.
16    Q. Are you on any other forms of
17 medication?
18    A. Not prescribed from my doctor.
19 Occasionally I'll take one of my husband's stress
20 pills.
21    Q. What pills are those?
22    A. It's called Lorazepam.

Page 221

1    Q. Has any physician referred you to a
2 psychiatrist?
3    A. No.
4    Q. Has any physician referred you to a
5 psychologist for examination?
6    A. No.
7    Q. Has any physician or psychiatrist
8 expressed the opinion orally to you that you are
9 suffering from depression?
10    A. Not from depression.
11    Q. Has any physician expressed the
12 opinion that you are suffering from any other
13 psychological or emotional condition or disorder?
14    A. Anxiety.
15    Q. When was that opinion expressed to
16 you?
17    A. When I initially consulted a
18 physician.
19    Q. That would be in April of 2002?
20    A. April of 2002, yeah.
21    Q. Have you since April -- well, since
22 April 1 of 2001, have you had occasion to go to

56 (Pages 218 to 221)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 222

1  an emergency room?
2      A.   No.  I have not.
3      Q.   Have you been hospitalized?
4      A.   No.
5      Q.   What is the dosage of Zoloft that you
6  are on?
7      A.   50 milligrams.
8      Q.   How frequently?
9      A.   Every day.
10     Q.   What is the dosage of the other drug
11  that you mentioned that was your husband's pill
12  that you occasionally take?
13     A.   I don't know, I've only taken it once,
14  I brought one with me today.
15         UNIDENTIFIED SPEAKER:  I have the
16  whole bottle with me today.
17     MR. NEEDLE:  We can all take one.
18     MR. WINSTON:  Not me.
19     BY MR. WINSTON:
20     Q.   Directing your attention to your claim
21  of lost profits for the operation of your
22  prospective new horse farm business, or stable

Page 223

1  riding business, have you retained an accountant
2  or an economist or other professional to prepare
3  an economic feasibility study of that business?
4      A.   I have consulted with people, but I
5  haven't retained somebody who does the actual
6  documentation.
7      Q.   Who have you consulted with?
8      A.   Joe Feeney is my accountant, and Kevin
9  Thomas is a personal friend who used to be an
10  account auditor for Deloitte Touche.
11     Q.   And how have they provided advice to
12  you?  What kinds of advice have they provided?
13     A.   I consult with Joe on various aspects
14  of the business because he also does the taxes
15  for other horse businesses.  So he can tell me
16  whether my figures are on track, out of line, if
17  I'm challenging market rates, things of that
18  nature.
19     Q.   Has Mr. Feeney reviewed your financial
20  projections in the business plan?
21     A.   No.  He has not.
22     Q.   Has Mr. Thomas seen the financial

Page 224

1  projection in his your business plan?
2      A.   Not for quite some time.
3      Q.   Have the financial projections in your
4  business plan been reviewed by an accountant?
5      A.   They are being reviewed currently.
6      Q.   By whom?
7      A.   Donald Hall?
8      MR. NEEDLE:  I forget his first name.
9      THE WITNESS:  Mr. Hall with Hall and
10  Company Accountants.
11     BY MR. WINSTON:
12     Q.   Who prepared the projections of income
13  and expenses that are contained on your business
14  plan?
15     A.   I did.
16     Q.   In your business plan how does it
17  express you are going to finance the start-up
18  costs of the prospective business?
19     A.   It doesn't.  It doesn't address those
20  issues yet, because I haven't been able to
21  acquire a piece of property with which to base
22  real numbers upon.

Page 225

1      Q.   Does the business plan contemplate a
2  working capital loan?
3      A.   I believe it does, I can't say for
4  sure.  Let me refer to it.
5      Q.   Page 13.
6      A.   Okay.  Okay.  This was one option,
7  yes.
8      Q.   Does it contemplate financing of
9  acquisition, construction, and start-up costs?
10     A.   It does.
11     Q.   And what portion of those costs are to
12  be financed as assumed in the business plan?
13     A.   Again, there's no way to determine
14  with certainty what that number would be.
15     Q.   Let me have the plan, please.
16     A.   I can give you approximate numbers,
17  but I couldn't give you a real figure.
18     Q.   When was this document prepared
19  (indicating)?
20     A.   It's been a ongoing work in process
21  ever since I had the concept of building this
22  business.

MGB REPORTING, INC.
(301) 983-9315 or (800) 245-2528

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 226

1    Q.    When was this document first
2  generated?
3    A.    Oh, man.  In April of '99, maybe.
4    Q.    When was the document that you have
5  produced in response to our requests for
6  production of documents generated, the business
7  plan document?
8    A.    It's whatever the last business plan
9  model was less the particular criteria for
10  whatever land we were working on at that time.
11    Q.    You don't know when you actually
12  printed out, generated this document?
13    A.    There should be a date on it.
14       (Whereupon counsel handed the Witness
15  the aforementioned document).
16    THE WITNESS:  I mean, the date is not
17  necessarily the date it was made, but the date it
18  was printed, February 4th was the date it was
19  printed, because it does a prefill off of the
20  computer.
21    MR. NEEDLE:  February 4th of this
22  year, '03?

Page 227

1    THE WITNESS:  Um-hum.
2    BY MR. WINSTON:
3    Q.    Does your computer have a directory
4  that retains all prior drafts?
5    A.    No.  I just overwrite.
6    Q.    You write over every draft?
7    A.    Yeah.
8    Q.    In your files have you maintained hard
9  copies of the prior drafts?
10    A.    I have.  In fact, Keith Wills at Mid
11  Atlantic Farm Credit, if he has a old copy of the
12  business plan, he may have it in a file, some of
13  the lenders may have it in their old files, but I
14  don't necessarily have an old file.  I didn't
15  think it was necessary to retain.
16    Q.    So, is it your testimony that with
17  respect to those documents under your immediate
18  physical custody, that there are no earlier hard
19  copies of the business plan that was produced?
20    A.    No.  There are none.
21    Q.    Do you -- so it would be impossible
22  from either hard copies or from your computer or

Page 228

1  disks associated with your computer to identify
2  versions of this business plan that existed in
3  June of 2001?
4    A.    I know for sure that there's no way to
5  have one from then, because my computer crashed
6  spring of last year, and the hard disk had to be
7  completely erased and redone.
8    Q.    Too many copies of your business plan?
9    A.    Probably.
10    UNIDENTIFIED SPEAKER:  Too many bad
11  versions of Windows.
12    BY MR. WINSTON:
13    Q.    October 30, 2001, the same would be
14  true?
15    A.    Yeah, because it was -- it was spring
16  of last year, 2002, that I had to buy a new
17  computer.
18    Q.    April of?
19    A.    Roughly, I don't know the exact date,
20  I'd have to --
21    Q.    What I'm asking is whether there is,
22  either in some computer form, computer available

Page 229

1  form or in a hard form, a copy of the business
2  plan that relate to each of the properties?
3    A.    Right.
4    Q.    That we've been talking about?
5    A.    I can look on disks.  I seriously -- I
6  doubt it, that I kept it on a disk.  I usually
7  keep everything on a hard -- on the hard drive,
8  but I may have a backup disk somewhere that has
9  some information on it.
10    Q.    Is it fair to say that when you became
11  interested in a particular piece of real estate
12  and approached a lender in connection with a
13  piece of real estate, that you supplied that
14  lender with a copy of the then current version of
15  your business plan?
16    A.    The model that we would be working off
17  for that particular real estate property, yes,
18  which is one of the reasons why there's a time
19  lag in between some of these things, because once
20  we locate a piece of property, I had to build a
21  business model on that particular piece of
22  property.

58 (Pages 226 to 229)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 230

1    Q.   Ms. Jordan, are you familiar with the
2  different forms of preapproval letters that
3  lenders issue for prospective borrowers and
4  prospective purchasers of real estate?
5    A.   No, I'm not.
6    Q.   Now that we've worked through all
7  these various pieces of real estate, I want to
8  ask you a question that I asked you previously in
9  a different context, but this will, I think, help
10  you respond.
11    A.   Okay.
12    Q.   Is it -- in what form did you expect
13  to own the real property that you acquired?
14    A.   Is that the whole question?
15    Q.   Yes.
16    MR. NEEDLE:  Do you understand it?
17    THE WITNESS:  No.
18    BY MR. WINSTON:
19    Q.   Who was going to appear on the title
20  as owner of the real property?
21    A.   Well, my husband and myself, for sure,
22  probably my grandparents.

Page 231

1    Q.   And is it correct, from -- I am
2  assuming from your earlier answer that you and
3  your husband would be tenants by the entirety,
4  and you would be joint tenants with your
5  grandparents who, between the two of them, would
6  be tenants in the entirety?
7    A.   Correct.
8    Q.   And that's a joint tenancy between the
9  two couples, not a tenancy in common between the
10  two couples?
11    MR. NEEDLE:  Do you understand that?
12    THE WITNESS:  No.  I know that
13  there's -- I know there's, specifically there's a
14  specific legality of how that's worded, and I
15  don't remember which is which.
16    BY MR. WINSTON:
17    Q.   Do you have a personal recollection of
18  what the deed to your current home says?
19    A.   Do we have a copy of it?
20    Q.   If you don't, that's fine.
21    A.   I don't recall.
22    Q.   Okay.  Please go back to Exhibit 13.

Page 232

1    A.   It's been a long time since my real
2  estate class.
3    Okay.
4    Q.   Directing your attention to your
5  answer to interrogatory number 9, you've already
6  mentioned Mr. Thomas?
7    A.   Correct.
8    Q.   Does he perform any services for you
9  for a fee?
10    A.   No -- yeah.  I take him out to dinner.
11    Q.   What services does he provide to you?
12    A.   He's a personal friend.  He acts as a
13  consultant.  My husband and I considered
14  purchasing an established business, so he was one
15  of the first people that I had reviewed the books
16  of the established business, so he's familiar
17  with how that business was run, the expenses and
18  income associated with it.  So since that time,
19  you know, I've consulted with him on various
20  aspects of accounting.
21    Q.   What facts, what pertinent facts to
22  this litigation does he have personal knowledge

Page 233

1  of?
2    A.   He can't testify to anything except
3  for the fact that I've been searching for
4  property for a very long time and that he has
5  served as a -- answered some questions for me
6  concerning accounting legalities.
7    Q.   So what pertinent facts to which
8  litigation does Mr. Joe Feeney have?
9    A.   He's my accountant.  He sees my books.
10  He can answer to those.
11    Q.   Who is Karen Fulton?
12    A.   She is the owner of Full Moon Farm.
13    Q.   Is she a former employer?
14    A.   Former employer.
15    Q.   So what pertinent facts relevant to
16  this litigation does she have personal knowledge?
17    A.   Well, she can attest to the length of
18  time for which I've been pursuing property, and
19  she can also, as a horse business owner, she can
20  attest to the liquidity of the business, of it
21  being a viable income source.
22    Q.   How long has she been -- she's the

59 (Pages 230 to 233)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 234

```
 1   owner of the Full Moon Farm?
 2       A.   She and her husband.
 3       Q.   How long have they owned that farm, do
 4   you know?
 5       A.   Almost, around 10 years.
 6       Q.   Who is Kirsten Smith?
 7       A.   She is the owner of Epoch Farm, along
 8   with her husband.
 9       Q.   Have you ever worked for her?
10       A.   No.  I have not, I've taken my horse
11   for training from her.
12       Q.   And that's how you know her?
13       A.   Um-hum.
14       Q.   Of what pertinent facts is she aware
15   that are relevant to this litigation?
16       A.   She doesn't know anything about this,
17   other than I was involved in a lawsuit; however,
18   she can attest to real numbers as far as the
19   boarding and renting of a stable.
20       Q.   Who is Ken Holniker?
21       A.   He is a gentleman from whom we
22   anticipated purchasing an equestrian, established
```

Page 235

```
 1   equestrian business from, and for liability
 2   reasons we chose not to.
 3       Q.   Please explain what you mean by for
 4   liability reasons you chose not to.
 5       A.   There was some insurance issues that
 6   weren't real black and white, and upon -- I
 7   consulted with an attorney, and upon consulting
 8   with the attorney, he didn't recommend the
 9   purchase of the property.
10       Q.   Were you made aware of claims against
11   Horses, Inc., that existed at the time that you
12   were interested in purchasing it?
13       A.   No.  There were no claims against
14   them.  It was not a matter of claims being
15   against any party, it was just that with the
16   ingress, egress, and liability with some other
17   property owners surrounding that business,
18   we'd -- it didn't match what our future business
19   model, what we wanted it to be.
20       Q.   Had you actually placed a contract to
21   purchase that property?
22       A.   We consulted with Mr. Holniker on a
```

Page 236

```
 1   personal level, he was considering holding the
 2   note for us personally.  But, an actual contract
 3   on his property, I don't believe we ever got to
 4   an actual contract, it was a very informal
 5   discovery, if you will, with him, before we
 6   actually went into the depth of getting to a
 7   contract.
 8       Q.   Did you discuss price?
 9       A.   Yes, we did.
10       Q.   What was the price that was arrived
11   at?
12       A.   Oh, geez.  It was in the ballpark of
13   200,000.
14       Q.   Did the price or the possible price
15   play a role in determining whether or not you
16   were interested in pursuing that acquisition?
17       A.   No, it didn't.
18       Q.   Who is Janice Hayden?  Have I
19   pronounced that correctly?
20       A.   Hayden.
21       Q.   Hayden?
22       A.   She is the home plan, she's the
```

Page 237

```
 1   customer service rep for Classic Custom Homes
 2   with whom I'm working with to develop our home
 3   plans.
 4       Q.   And of what pertinent facts relevant
 5   to this litigation is she aware?
 6       A.   She is aware only that I am involved
 7   in litigation at the moment, and she can attest
 8   to how much or how little the house would cost
 9   when we're done with it.
10       Q.   Is her firm simply a builder?
11       A.   I don't know for sure.  I know that
12   she has an office at Long and Foster in Bel Air,
13   but in what capacity she serves with them, I did
14   not know.
15       Q.   Is Classic Customs Home an affiliate
16   of Long and Foster?
17       A.   I'm not sure.
18       Q.   Who is Todd Warren?
19       A.   He is my bank contact at Susquehanna
20   Bank with whom I have my business account.
21       MR. WINSTON:  Mr. Needle, is
22   Mr. Warren's address one of those addresses
```

60 (Pages 234 to 237)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 238

1   you've given me in the letter?
2           MR. NEEDLE: It is.
3           MR. VOGEL: Mrs. Jordan answers yes
4   with a shake of the head.
5           BY MR. WINSTON:
6       Q.   Mr. Stehlik --
7       A.   Is my father.
8       Q.   And of what pertinent facts relevant
9   to this litigation is he aware?
10      A.   Only that I've talked to him in
11  passing. He doesn't have any real -- he knows
12  that I'm involved, he knows -- I don't know
13  what -- he doesn't know anything other than I've
14  been searching for property for ages.
15      Q.   How about Susan Stehlik?
16      A.   That's his wife, same response.
17      Q.   I take it your mother is deceased?
18      A.   No. My mother lives in Virginia.
19      Q.   Excuse me, but that is your -- Susan
20  Stehlik is your stepmother, and your mother lives
21  in Virginia, and John and Margaret Myers are your
22  mother's parents; is that correct?

Page 239

1       A.   Correct.
2       Q.   Of what pertinent facts is John Myers
3   aware?
4       A.   He lives with me every day --
5       Q.   Probably more facts than he wants to
6   be aware of.
7       A.   Yes, much more.
8       Q.   Does he know from start to finish
9   everything that's gone on in this matter?
10      A.   My grandfather is in failing health.
11  I try not to discuss it in front of him, because
12  it upsets him.
13      Q.   How about your grandmother?
14      A.   She knows everything.
15      Q.   How is her health?
16      A.   She's fine. She's hanging in there.
17      Q.   How old are the Myerses?
18      A.   My grandfather is 83; my grandmother
19  is 81.
20          MR. NEEDLE: Off the record.
21          (Whereupon there was a discussion held
22  off the record).

Page 240

1           MR. WINSTON: Back on the record.
2           BY MR. WINSTON:
3       Q.   Who is Tim Gilbert?
4       A.   He is the farrier who sees my ponies
5   every six weeks to trim their feet.
6       Q.   That is the function of a farrier?
7       A.   That is the function of a farrier, and
8   put shoes on, if required.
9       Q.   So is what some of us refer to a
10  blacksmith?
11      A.   That's correct.
12      Q.   Is a farrier?
13      A.   Correct. Tim is aware of only that I
14  pay my bills on time, and he knows I've been
15  searching for property and obviously spent an
16  hour with him every six weeks, so we catch up.
17  And same goes for Mr. Rash, who is my hay
18  supplier.
19      Q.   I take it that a farrier is a -- is a
20  kind of independent contractor, he goes around
21  providing services to a large number of people
22  like yourself?

Page 241

1       A.   Yes, he does.
2       Q.   And only a large business would have
3   its own farriers on staff?
4       A.   Generally, yes.
5       Q.   Typically?
6       A.   Generally. Anybody can study to be a
7   farrier. It's not that hard, I can trim my own
8   pony's feet if I wanted to.
9       Q.   Your ponies wouldn't want me to trim
10  their feet, I can tell you that.
11      A.   I just don't have the time.
12      Q.   Before finishing, I'd like to take a
13  few-minute break, and then we'll come back.
14          (Whereupon there was a short pause in
15  the proceedings).
16          MR. WINSTON: Back on the record.
17          BY MR. WINSTON:
18      Q.   I'd like to go back to Exhibit 9,
19  which is the answers to interrogatories.
20          MR. NEEDLE: 13 is the answers to
21  interrogatories.
22          MR. WINSTON: Excuse me, 13.

61 (Pages 238 to 241)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 242

BY MR. WINSTON:

Q.   So we're going back to question 9.

A.   Okay.

Q.   Have you discussed with Ms. Fulton, has Ms. Fulton showed you any of her financial statements?

A.   No.  I haven't asked her for them.

Q.   Have you discussed with her any of the techniques that she uses to budget for operating expenses of her --

A.   No.  My business model was based off of a different business that I considered, the business from Mr. Holniker.  I did have his financial statements to peruse, and some of my numbers were based off of his business model.

Q.   By the way, Mr. Holniker's business, is that the business as to which you have the assistance of Mr. Thomas?

A.   That's correct.

Q.   Now, with respect again to Ms. Fulton, have you had occasion to show Ms. Fulton any of the business plan materials for your business?

Page 243

A.   No, it wasn't -- because she's still a potential competitor, I didn't feel that supplying that information would be wise.

Q.   Have you gone to any operator of a stable or horse farm and shown them your business plan?

A.   No.  Other than my accountant who does the taxes for other stables.

Q.   Has your -- that answer has now created an ambiguity in relation to an earlier answer that I want to clear up so the record is clear on it.

A.   Okay.

Q.   Has your accountant reviewed your financial projections in the business plan?

A.   No.  He has not seen the finished product of the business plan.  I have only discussed orally with him certain aspects of what could be charged, what is a viable alternative, things of that nature.  Things to expect as far as real expenses and things of that.

Q.   On what have you relied for the

Page 244

assumptions that you've made, if any, about appropriate levels of expenses to charge that you will incur, to operate this business?

A.   Personal knowledge, for one, investigating into other businesses for two, I have used material that comes from the Maryland Cooperative Extension Services, in fact, data sheets that they put out.

Q.   What other businesses, with what other businesses have you consulted with respect to your calculation of the cost of operating your prospective business?

A.   I don't talk to other businesses, I consulted with the records that I had for Mr. Holniker's business as one of the references from which I pulled.

Q.   Do you still have those records?

A.   I think so.

MR. WINSTON:  Mr. Needle, I'd like to have those if they are available.

MR. NEEDLE:  I've already made a note. I knew you would.

Page 245

THE WITNESS:  I hesitate on that on one particular -- I mean, that was given to me as privileged information from him, because they do contain his tax records.  I would have to consult with him first before I were to turn those over.

BY MR. WINSTON:

Q.   Well, I would be happy to agree to treat them as confidential, but --

A.   Okay.

Q.   But I would --

A.   I just don't want to get into any trouble.

Q.   I don't need his tax returns, per se, I'm not interested in his personal tax situation, I'm interested in knowing the information on which you relied to the extent you may have.

A.   His accountant gave me their balance sheets, income expense statements, things of that nature.

MR. WINSTON:  Let me just say this:  I would like that material, and I'm addressing that request to Mr. Needle, and to whatever extent we

62 (Pages 242 to 245)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 246

1  need to work out whatever we needed to work out,
2  you have to determine in the first instance what
3  the issues are, and then I'll respond to --
4      MR. NEEDLE:  I happen to know that
5  Mr. Holniker is an attorney as well, which
6  probably complicates it even more.  We'll see
7  what we can do.  I think if we can get the income
8  and expense statements, that's the most important
9  part.
10     BY MR. WINSTON:
11     Q.   Again, I'm interested in knowing the
12 information on which you relied, to the extent
13 that you may have, for the preparation of your
14 business plan?
15     A.   I don't know that I've given you all
16 of the material that I've -- from which I've
17 pulled my numbers from, but, you know, again,
18 they go back to personal research.  I've called
19 various farm organizations on the phone to find
20 out what they are charging for boarding, that you
21 can see from my business plan, that I had to do
22 some investigative work on my competitors to find

Page 247

1  out what is being offered, what's being charged,
2  things of that nature, so I had to do some
3  calling.  The Maryland Cooperative Extension
4  Service puts out fact sheets that are very
5  helpful as far as things associated with income
6  and expenses, associated with horse businesses,
7  as well as fact sheets on soil management and
8  grazing management and things of that nature, so
9  I've used them extensively.  Personal knowledge
10 of my accountant for which he does the taxes of
11 other riding stables as far as what's a real
12 number to what to realistically expect as far as
13 income and expenses, things of that nature.  So
14 these are all --
15     Q.   Has he expressed an opinion in writing
16 on the reasonableness of any assumptions that
17 you've used in your business plan?
18     A.   No.  Because he hasn't actually seen a
19 finished business plan.
20     Q.   Do you pay yourself a salary now in
21 your current business?
22     A.   No.

Page 248

1      Q.   Do you pay -- do you compensate anyone
2  else?  Are there other workers in your current
3  business?
4      A.   Occasionally, yes.
5      Q.   Are there any other full-time
6  employees?
7      A.   No employees.  Which means I have no
8  employee headaches.
9      Q.   Have you discussed with any other
10 operator of facilities similar to the one you
11 want to have the kind of reserves that you need
12 to maintain for repair and maintenance of your
13 facilities?
14     A.   No.  I have not.
15     Q.   Have you discussed amounts with them
16 that you should have in an operating budget for
17 repair and maintenance?
18     A.   No.  But most of the farms with which
19 I have been in contact with are all older farms.
20 I'm talking about a new facility that should need
21 minimal repair and maintenance from the getgo.
22     Q.   Do you happen to have operating

Page 249

1  equipment on the farm?
2      A.   Yes, we do.
3      Q.   Do you provide a budget item for
4  repair and maintenance of that equipment?
5      A.   I believe so.  It may be under a
6  different heading.  It may be under automobile or
7  something of that nature.
8      Q.   Have you found the relevant entry?
9      A.   Sorry.  I didn't realize.
10     Q.   She got engrossed in her own business
11 plan?
12     MR. NEEDLE:  I believe.
13     THE REPORTER:  "Question: Do you
14     provide a budget item for repair
15     and maintenance of that
16     equipment?"
17     THE WITNESS:  That line is yes, it's
18 either in auto other, or it could be under loan
19 re payments.
20     BY MR. WINSTON:
21     Q.   How would it be under loan re
22 payments?

63 (Pages 246 to 249)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 250

1  A.  Well, loan re payments was for, I
2  think the loan repayment figure was actually for
3  the capital expenditure, it could be
4  miscellaneous.  Without actually reading into my
5  numbers, but I'm pretty sure that the auto other
6  included some of that number.
7  Q.  Do you have a line item for repair and
8  maintenance of equipment?
9  A.  On equipment?  No.
10  Q.  On equipment?
11  A.  No.
12  Q.  Do you have a line item for repair and
13  maintenance of any of the balance of the
14  facility?
15  A.  Yes, I do.  There is a line item,
16  there is no budgeted amount for that yet.
17  Q.  I see.  So that your pro forma of
18  income and expenses does not include an expense
19  for that item?
20  A.  No.  It does not.
21  Q.  Have you engaged any person to conduct
22  a market feasibility study in connection with

Page 251

1  your prospective business?
2  A.  Other than my own marketing, no.
3  Q.  What are the methods by which you
4  intend to promote your business?
5  A.  Mainly print advertising.
6  Q.  And is there a line item in your
7  projected expense budget for that item?
8  A.  Yes, there is.
9  Q.  And what is it called?
10  A.  Advertising.
11  Q.  And how much money is allocated to it?
12  A.  In year one, $334 a month.
13  Q.  Do you have --
14  A.  Roughly.
15  Q.  Do you have a preopening budget?
16  A.  Yes.
17  Q.  And is there any money in that budget
18  allocated to promotion or advertising?
19  A.  Yes.
20  Q.  How much is that?
21  A.  4,000.
22  Q.  And how did you intend to use that?

Page 252

1  A.  Let me consult.
2  Q.  Why don't you not -- why don't you not
3  consult that right now?
4  A.  It's in here.
5  Q.  Okay.  Go ahead.
6  A.  Here it is.  I'm sorry.  I take that
7  back, the only numbers I have here currently are
8  with regard to the monthly costs.
9  Q.  But do you have a preopening budget?
10  A.  Yes.
11  Q.  What was the total amount of that?
12  A.  $4,000 for advertising.
13  Q.  Is there a preopening budget for
14  including any other line items before you open
15  for business?
16  A.  Yes.
17  Q.  And are those limited to capital
18  costs?
19  A.  I'm sorry.  I don't understand that.
20  Q.  Do you have a preopening budget that
21  reflects operating expenses that you will incur
22  before you open for business, meaning generating

Page 253

1  revenue?
2  A.  Yes.  Yes.  The total of which is
3  $35,000.
4  Q.  And those are solely operating
5  expenses?
6  A.  Those are preopening expenses, yes.
7  Q.  Are there any capital costs included
8  in that $35,000?
9  A.  Capital?
10  Q.  As distinguished from operating?
11  A.  It's all inclusive to me.  Capital, I
12  don't understand what you're asking for as
13  differentiating from capital.
14  MR. NEEDLE:  Let him rephrase it.
15  MR. WINSTON:  I'll let the business
16  plan speak for itself on that point then.
17  THE WITNESS:  Okay.
18  BY MR. WINSTON:
19  Q.  I believe your business plan talks
20  about a number of services that you will perform?
21  A.  Yes.
22  Q.  Or provide?

64 (Pages 250 to 253)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 254

1    A.   Yes.
2    Q.   And one of them I think is
3  after-school learning?
4    A.   Yes.
5    Q.   Have you had experience in providing
6  that service prior to this time?
7    A.   Yes.
8    Q.   And what kind of experience have you
9  had in providing -- let me step back, what is
10  meant by after-school learning?
11    A.   After-school learning includes a daily
12  lesson, an unmounted lesson on horse care, basic
13  first aid of horses, I'm not talking about a
14  daycare situation, that's not what that's
15  intended to be, it's intended to be a program to
16  teach kids about serious horse ownership. Not
17  just riding lessons.
18    Q.   Are you qualified to perform those
19  services?
20    A.   Yes.
21    Q.   Yourself?
22    A.   Yes.

Page 255

1    Q.   Is there a certification that you
2  obtain from some professional organization in
3  order to be able to do that?
4    A.   There's no certifying organization
5  other than my own personal experience and the
6  certification I hold from the American Riding
7  Instructors Association.
8    Q.   That certification of you?
9    A.   For teaching.
10    Q.   And your right to teach people how to
11  ride?
12    A.   Yes.
13    Q.   In your business, in the prospective
14  business, do you intend to train not only riders
15  but horses?
16    A.   No. I did not. I take that back.
17  Yes, I do, but my own horses. I don't plan on
18  training as a mainstay of my business.
19    Q.   What licenses will your business
20  require?
21    A.   From the state of Maryland it just
22  requires a riding stable license.

Page 256

1    Q.   That's the -- other than a business,
2  general business license, which is no different
3  than what any business might be required to have,
4  are there any other licenses?
5    A.   When we open the camp program, we
6  would need a license from the board of health.
7    Q.   But no such license would be required
8  simply to have a riding stable and give lessons,
9  other than the riding stable license?
10    A.   Right.
11    Q.   Any other licenses?
12    A.   No.
13    Q.   We're in the home stretch.
14    During the period from March of 2001
15  forward through today, describe please, your
16  mental state.
17    A.   Well, I've been on edge, for obvious
18  reasons. I'm a busy person, I have a lot of
19  responsibilities, and I don't have time to get
20  sick. What do you want me to say?
21    Q.   I've asked you a question.
22    A.   Mental state, I have a lot of

Page 257

1  responsibilities and I have been trying my best
2  to hold it together. Now, I have lost -- I have
3  been stressed out much more than I realize,
4  because my family is more the one to tell me to
5  chill out. You know, I don't have time to take
6  care of myself, I have four children, five
7  ponies, a business to run, my grandparents are
8  invalids, I don't have time. And it irks me to
9  have to take medication to keep it together.
10    Q.   Do you have any physical conditions
11  like diabetes?
12    A.   Nothing. Absolutely nothing. In
13  fact, my doctor just did an overall health check
14  in November, and I'm fine. On all fronts.
15    Q.   Great.
16    How has this set of circumstances
17  affected your family relations?
18    A.   When I'm stressed out so bad I can't
19  sleep, that's -- my family gets the brunt of me
20  losing it every now and again, because I'm
21  stressed out over this lawsuit, and I -- I
22  expected this to be over and done with a long

65 (Pages 254 to 257)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 258

1 time ago. I didn't expect to have to go through
2 all of this.
3    Q.   Did you suffer from stress and being
4 stressed out also as a result of the other
5 responsibilities that you have?
6    A.   Not that I couldn't handle it. It
7 doesn't give me anxiety attacks that I can't
8 breathe.
9    Q.   How has your husband's mental state
10 been affected, that you've observed? How has his
11 behavior been affected?
12    A.   It's quiet and reserved, tells me he's
13 more worried about me than he is about himself.
14    Q.   Any other effect that --
15    A.   Occasionally a blow off.
16    Q.   I beg your pardon?
17    A.   Occasionally he'll blow off his head
18 of steam, but he's not a -- he's not a
19 raise-his-voice type of person.
20    Q.   Any other effects that this has had on
21 you and your family relations than the ones
22 you've described?

Page 259

1    A.   When my child says to me, gee mom,
2 you're laughing, I know that I've -- I haven't
3 been really pleasant to be around.
4    Q.   In your answers to interrogatories,
5 you have said that you have suffered $200,000 in
6 damages as a result of emotional distress. And I
7 would appreciate it if you can describe how you
8 arrive at that number.
9    A.   That's chump change in comparison to
10 the way I've felt about this. You know, the
11 emotional impact this has had has had
12 repercussions all the way through my family. My
13 kids have seen me break down and cry, because
14 I've been so stressed out over this. It doesn't
15 help my family's situation for their mom to be
16 worried about having to go to Court and for me to
17 have to leave them. This is a job for you, this
18 is not a job for me. I have to take time away
19 from my family, to be with Howard, to be with
20 you, to be stressed out over this. This is not a
21 job for me.
22    Q.   The first attorney, Mr. Azrael, is

Page 260

1 that his name?
2    A.   Yes.
3    Q.   What are your attorney's fees to
4 Mr. Azrael in connection with this matter, do you
5 know?
6    A.   There's a receipt for 700 plus
7 dollars.
8    Q.   And any other amounts owed to him?
9    A.   No.
10    Q.   What are your attorney's fees to date
11 to Mr. Needle?
12    A.   I don't know. I know what I've paid
13 him to date, but what I have, what we've racked
14 up since, I have no idea. We have an estimate,
15 but he doesn't give me a running balance.
16    MR. WINSTON: I will take that up with
17 Mr. Needle separately.
18    (Whereupon there was a discussion held
19 off the record between Mr. Winston and
20 Mr. Vogel).
21    BY MR. WINSTON:
22    Q.   In your answer to 9G in your

Page 261

1 interrogatories.
2    MR. NEEDLE: 9G?
3    MR. WINSTON: Oh, I think that's
4 right. I think it's 9, isn't it?
5    MR. VOGEL: Page 17.
6    MR. WINSTON: Page 17.
7    BY MR. WINSTON:
8    Q.   Excuse me, 12G, I'm very sorry.
9    You have asserted damage of at least
10 $100,000 and --
11    MR. NEEDLE: For loss of consortium.
12    MR. WINSTON: Yes, under G, loss of
13 consortium.
14    BY MR. WINSTON:
15    Q.   How have you arrived at that value?
16    A.   How would you arrive at it? It's not
17 exactly a number that you can -- other than
18 what -- that's nothing in comparison to what it's
19 worth to me. You know, I can't -- I've had to
20 just lean on my husband to just have a good cry
21 every now and again, let alone have a loving
22 relationship. It's personal. My husband will

66 (Pages 258 to 261)

c575b5c0-5458-11d7-b797-0003b3005cf9

Page 262

1  tell you that it's worth a hell of a lot more to
2  him.
3       MR. WINSTON:  I think we're complete.
4  Mr. Needle can advise you about any procedure.
5       MR. NEEDLE:  I have no questions.
6       You can read the transcript of this
7  deposition.  You can't change any of your
8  answers, you can correct any typographical
9  mistakes, misspellings, errors that the reporter
10 made in understanding what was said.  Do you have
11 a preference as to whether you want to read and
12 make such corrections or waive your right to do
13 so?
14      THE WITNESS:  I trust him to get it
15 right.
16      MR. NEEDLE:  We waive.
17      (Whereupon the deposition concluded at
18 5:25 p.m.)
19
20
21
22

Page 263

1       CERTIFICATE OF NOTARY PUBLIC
2       I, Curtis R. Cloward, a Notary Public in
3  and for the District of Columbia, before whom the
4  foregoing deposition was taken, do hereby certify
5  that the witness whose testimony appears in the
6  foregoing pages was duly sworn by me; that the
7  testimony of said witness was taken by me in
8  shorthand at the time and place mentioned in the
9  caption hereof and thereafter reduced to
10 typewriting under my supervision; that said
11 deposition is a true record of the testimony
12 given by said witness; that I am neither counsel
13 for, related to, nor employed by any of the
14 parties to the action in which this deposition is
15 taken; and, further, that I am not a relative or
16 employee of any attorney or counsel employed by
17 the parties thereto, nor financially or otherwise
18 interested in the outcome of the action.
19
20       _____
         Curtis R. Cloward, CSR
21       Notary Public in and for
         the District of Columbia
22 My commission expires: September 30, 2007

67 (Pages 262 to 263)

c575b5c0-5458-11d7-b797-0003b3005cf9

# EXHIBIT

# B

# EXHIBIT

# C

Page 1

1                  IN THE UNITED STATES DISTRICT COURT

                      FOR THE DISTRICT OF MARYLAND

2

MONICA JORDAN AND                    CONDENSED

3   LOUIS JORDAN

4            Plaintiffs

        vs.                      CASE NO. H-02-CV-1465

5

WASHINGTON MUTUAL BANK, F.A.

6

            Defendant

7   _____/

8            The deposition of BONNIE L. KAHLER was

9   held on Tuesday, March 11, 2003, commencing at 9:10

10  A.M., at the Offices of Coldwell Banker Residential

11  Brokerage, 7920 McDonough Road, Suite 101, Owings

12  Mills, Maryland, 21117, before Chuck Peppler, Notary

13  Public.

14

15  APPEARANCES:

16            HOWARD J. NEEDLE, ESQUIRE
                 On behalf of Plaintiffs

17

            KENNETH A. VOGEL, ESQUIRE
18               On behalf of Defendant

19

   ALSO PRESENT:  MONICA JORDAN

20

21  REPORTED BY:  Chuck Peppler

Page 58

1    A    Right, or if Monica calls, I'll send.
2  She'll say what's going on in Baltimore County and
3  I'll send one of these basic listing things. That's
4  all.
5    Q    Now, the stack of MRIS printouts seem to
6  begin January 29th of 2001 and they continue through,
7  the last one is January 22nd of 2003. So, that's
8  practically two years; is that correct?
9    A    That's correct, hm-hm.
10    Q    So, you're still continuing to keep in
11  contact and inform Mrs. Jordan as to properties that
12  have come on the market?
13    A    Well, like I explained before, those type,
14  any of my customers can pull off themselves. But,
15  what Monica would do, as you can see, it will just say
16  at the top like Dover or Havre de Grace,
17  Jarrettsville. She will call me and say Bonnie what's
18  the address of such and such? She'll give me the
19  multiple list number.
20    Q    I see. Then you just go ahead and give
21  her additional information when she does that?

Page 59

1    A    Yes. Our professional listings are
2  usually a little more meaty than this basic short
3  listing. So, you sometimes have information about the
4  farm property or barn specifications that the
5  layperson doesn't have access to.
6    Q    Has Mrs. Jordan been in contact with you
7  within the last couple of months inquiring about
8  properties?
9    A    Maybe one address. Certainly not
10  frequently.
11    Q    Do you recall when the last time that
12  might have been?
13    A    No, I don't. We do a lot. I do a lot as
14  an agent on e-mail and I don't keep -- you know,
15  unless it's something that I think we're going to have
16  to meet for contract information or something, I will
17  keep e-mails. I get hundreds of them a day.
18    Q    You're not actively searching with the
19  Jordans for property then?
20    A    No.
21    Q    Did Mrs. Jordan tell you that she was

Page 60

1  suing Washington Mutual?
2    A    Yes.
3    Q    What did she tell you about the lawsuit?
4    A    Just that she was going to sue. I
5  honestly didn't even know the name of the bank until I
6  got the subpoena. Just that she was going to move
7  forward with that case because it had hurt her life
8  and her credit.
9    Q    Do you recall when she may have said that?
10    A    No.
11    Q    She hasn't kept you up-to-date on the
12  lawsuit?
13    A    No, just that she calls more as an
14  acquaintance and as a customer thing. That she's
15  really sorry she couldn't move forward with her
16  business and it's been disappointing. More of those
17  conversations than a search for property for me.
18    Q    Did she say if she was expecting
19  Washington Mutual to pay her any money?
20    A    No, not to me she didn't. Like I said, I
21  didn't even know the name of the bank until I got the

Page 61

1  subpoena.
2    Q    So, as far as you know, she wasn't relying
3  on any judgment or settlement in order to get money to
4  buy a property?
5    A    No, not by my knowledge, because we had
6  been looking for a long time before the bank ever came
7  into the picture.
8    Q    Did you get the sense that Mrs. Jordan was
9  seriously shopping for property?
10    A    Oh, yes, very much so.
11    Q    At no time did you feel that she was just
12  simply going through the motions?
13    A    No, because searching for property and
14  with all the research Monica would do, it's hard work.
15  It takes a lot of time to find a unique piece of
16  property that someone needs for a specific purpose.
17    Q    She never asked you for any help with
18  respect to getting her credit repaired; is that
19  correct?
20    A    No, she did not.
21    Q    Did there come a time when you showed the

16 (Pages 58 to 61)

d4bf7ca0-5886-11d7-8e90-004854671c98

Page 62

1   Jordans the house located at 800 Bacon Hall Road in
2   Sparks, Maryland?
3       A   Yes.
4       Q   Tell me about that.
5       A   I couldn't tell you the year, the date.
6   We went out, probably at least two, maybe three times
7   with Monica and her family to look at the property.
8       Q   Did you present an offer?  Did you ever
9   write an offer?
10      A   I don't remember.
11      Q   So, as far as you can recall, she looked
12  at a property, but you have no recollection as to --
13      A   I have no recollection.  I don't think we
14  wrote a contract because the pricing.  He was very
15  pricey.  I don't remember.  I honestly don't.
16      Q   It is your practice to just throw away
17  offers which are not accepted at a point?
18      A   Right, I tear them up.  My files, really
19  they're not mine.  These kind of things I keep because
20  there is nothing confidential.  I mean, these are
21  Maryland kind of forms that we have to have and

Page 63

1   update.  But, our real files don't belong to me.  Our
2   real files belong to the brokers at Coldwell Banker.
3   So, if we go to contract, the office has an official
4   file here that remains on the premises during the
5   transaction period, then they go to storage somewhere.
6   I don't even know where because they're not my files.
7           MR. VOGEL:  I would like to have these
8   documents marked as Deposition Exhibit 5.
9           (Ms. Kahler's Deposition Exhibit Number 5
10  was marked for purposes of identification.)
11      Q   Calling your attention to Deposition
12  Exhibit Number 5, the first page is a printout from
13  the MRIS and it says Public Record at the top.  Do you
14  recognize the program MRIS?
15      A   Oh, yes.
16      Q   Does the MRIS have access to public
17  records?
18      A   Yes.
19      Q   What do the public records generally
20  reflect as appearing in the MRIS?
21      A   Taxes, purchase price, who owns the

Page 64

1   property.  It's a public record.
2       Q   The year is cut off.  This is February
3   27th of '03.
4       A   Hm-hm.
5       Q   You'll have to take my word for this since
6   '03 is missing.  Do you see where it says the transfer
7   date?
8       A   1985.
9       Q   1985.  That would be the year that, as far
10  as know, the current owner purchased the property?
11      A   Correct.
12      Q   The next page is a printout from MRIS
13  listing BC3214748.  Do you see that?
14      A   Hm-hm.
15      Q   BC is Baltimore County?
16      A   Correct.
17      Q   What is the status of this listing?
18      A   Mr. Sieverts withdrew his property.
19      Q   Can you tell me what the list price was?
20      A   Five hundred and twenty-nine thousand
21  dollars.

Page 65

1       Q   Now, I would like you to turn your
2   attention to the third page of this printout.  At the
3   top where it says listing date, page 3 of listing
4   3214748, page 3 of the listing.
5       A   This is my third page.
6       Q   That is the third page.  You're on it
7   right now.  This reflects that the property was listed
8   on the 11th of May, 2000.
9       A   Correct.
10      Q   Then the update was the 15th of November,
11  2000.
12      A   Correct.
13      Q   The update mean that there was some change
14  in the status or price or something; is that right?
15      A   Hm-hm, correct.
16      Q   The property was on the market for 441
17  days?
18      A   No, not at that time.  The days on
19  multiple list were 188.
20      Q   Then where it says days on
21  market-property.

17 (Pages 62 to 65)

d4bf7ca0-5886-11d7-8e90-004854671c98

Page 142

1  passed, I got the farm.
2      Q    Are you operating a riding stable on the
3  farm?
4      A    No, no commercial.  It's his own horses,
5  but he has a lot of them.
6      Q    Did either Mr. or Mrs. Jordan ever appear
7  unusually stressed out?
8      A    No.  But, like I said, the only time I
9  ever saw the family and the couple was when we were
10  out looking at properties.  I didn't visit the home at
11  all.
12      Q    Did you ever get the sense that she was
13  unable to function?
14      A    Not during the time I knew her.  But, like
15  I said, I haven't seen her for, not actively pursuing
16  property, quite a while.
17      Q    Are you aware of any issues with drugs or
18  alcohol?
19      A    No, not at all.
20      Q    Did they tell you about any anxiety?
21          MR. NEEDLE:  What about anxiety?

Page 143

1      Q    Have you observed anything about Mrs.
2  Jordan or Mr. Jordan that indicates that they're
3  unusually anxious?
4      A    No, I didn't spend that amount of time
5  with them.  When you look at properties, it doesn't
6  take that long.
7      Q    Neither of them appeared to be depressed?
8      A    Not during the time I was with them in the
9  brief periods looking at property.
10          MR. VOGEL:  I'm going to take one moment
11  to look through notes and we may be done, then Mr.
12  Needle has the opportunity to ask you questions.
13          (A discussion was held off the record.)
14          MR. VOGEL:  I'm done.
15          MR. NEEDLE:  I have no questions.  Bonnie,
16  you have the option of reading the transcript and
17  making any typographical corrections.  You cannot
18  change any of your answers.  If you find that anything
19  has been recorded incorrectly, you can make a note of
20  that.  However, you can waive your right to read.  Do
21  you have a preference?

Page 144

1          THE WITNESS:  I'll waive the right.
2          MR. NEEDLE:  That's what usually happens.
3  (Deposition concluded at 1:00 p.m.)

Page 145

1  State of Maryland
2  County of Baltimore, to wit:
3          I, CHUCK PEPPLER, a Notary Public of the
4  State of Maryland, County of Baltimore, do hereby
5  certify that the within-named witness personally
6  appeared before me at the time and place herein set
7  out, and after having been duly sworn by me, according
8  to law, was examined by counsel.
9          I further certify that the examination was
10  recorded stenographically by me and this transcript is
11  a true record of the proceedings.
12          I further certify that I am not of counsel
13  to any of the parties, nor in any way interested in
14  the outcome of this action.
15          As witness my hand and notarial seal this
16  17th day of March, 2003.
17
18          _____
19          CHUCK PEPPLER,
                Notary Public
20  My Commission Expires:
21  April 1st, 2006

37 (Pages 142 to 145)

d4bf7ca0-5886-11d7-8e90-004854671c98

# EXHIBIT

# D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

MONICA JORDAN                          *
LOUIS JORDAN

   Plaintiffs,                     *

 v.                                                    Case No. **H-02-CV-1475**
          *

WASHINGTON MUTUAL BANK, F.A.
           *
   Defendant.

 *  *  *  *  *  *  *  *  *  *  *  *  *

### Affidavit of Edward Naworol

1. I am Edward J. Naworol, an adult person, and I subscribe to this Affidavit in connection with the above-captioned litigation. I have been served with a Notice of Deposition Upon Oral Examination and Subpoena Duces Tecum in connection with the above-captioned case.

2. I am employed as a Financial Specialist with SunTrust Mortgage, Inc. in Bel Air, Maryland. In that capacity I accept residential mortgage loan applications for prospective borrowers and process them through the loan underwriting process to the point when a loan closes.

3. In accordance with the Subpoena Duces Tecum referred to above, I have checked my files and have determined that I am not in possession of any files or documents referring or relating to Monica and Louis Jordan.

4. Counsel for Defendant, Washington Mutual Bank, F.A., has presented me with copies of two letters addressed to Mr. and Mrs. Jordan from my office. The first letter is dated June 9, 2001, and is from my then assistant, Ms. Susan Lenahan. This is the typical form of letter that is sent to prospective mortgage loan applicants after I have received an information sheet from them for a prequalification which authorizes me to "pull" a credit report on the prospective loan applicant. The second letter is dated June 29, 2001. This letter is also a typical form I send to prospective borrowers after a conversation with them in which I inform the prospective borrower of a potential issue with their credit and offer to work with them to clean up their credit and raise their scores. It is my practice to work with clients in this way because, obviously, I am in the business of making loans.

5.    While, based on the foregoing correspondence, I have no doubt that I was contacted by the Jordans, I have no independent recollection of being contacted by them.  Likewise, I have no recollection of having taken a complete loan application from them either in general or for any particular property, and I have no recollection of ever having sent the Jordans a rejection of any loan application.  I also have no recollection of the Jordans ever having requested that I work with them to "clean up" any credit issues.

6.    Except to the extent otherwise expressly stated, I subscribe to this Affidavit on personal knowledge and have no further knowledge regarding this matter.

_____
Edward J. Naworol

SWORN AND SUBSCRIBED to before me, a Notary Public for the State of Maryland, this __6th__ day of March, 2003.

_____
Notary Public

My commission expires: __9/1/03__