# EXHIBIT

# B

Report, produced with plaintiffs' exhibits. for when, to whom, and in what amounts).  Having never experienced a problem with NetBank's electronic bill payment option, we never expected to have a problem with their mortgage payment either.  Washington Mutual Home Loans is clearly listed as a payee and as can be seen from the Payee Setup Report (provided) the Account Number is correct.  Also, as can be verified by the "Change a Payee Help" page (provided) the only options available to us to change are: an optional description, and the account number.  The only options available to us to ensure the transfer had been made was to check their bank statement, verify the payee detail (provided by NetBank, included in Plaintiffs Exhibits), and check their loan statement monthly (or online via the internet).

**Interrogatory No. 12:**  List each item of damage which you claim, state its dollar value, how it is calculated, the date it was incurred or is expected to be incurred, and identify all documents referring or relating to each such item or calculation.

**Answer No. 12:**

   A. Emotional Distress:

    We had to endure false notices from WaMu for many months that a payment has not been made, after being shown its' error, receiving many false monthly notices that we face foreclosure, many months of frustrating effort to clear our credit ratings, the humiliation of being denied consumer credit and mortgages to purchase the property we need, and resultant repeated devastating setbacks in our efforts to build Mrs. Jordan's business. Our severe emotional distress is evaluated conservatively at at least $200,000. If our doctors feel that this stress has had an

adverse permanent impact on our emotional health for the foreseeable future or rest of our lives, this element of damages will easily be a multiple of that amount.

B.  Medical Expenses:

The medical expenses incurred to date, at least $2,850, include office visits, prescription drugs, and hospital emergency room visit.

C.  Lost Profits:

The first year net loss is $92,788, and the second year net loss is $119,960, for a total net lost profits at this time of $212,748. The pro forma statements which have been produced develop these figures. We are entitled to recover comparable, though increasing, losses into the future.

D.  Lost Credit Opportunities:

Credit denials, frozen lines of credit and reductions in the amount of credit lines amount to $32,600. ($20,000 for business loan denial by Bank of America, $10,500 for big screen TV denial, $2,000 for frozen credit line by Bank of America, $100 for reduction in credit line on U.S. National Bank VISA, and denial of credit from Capital One for new credit card.)

E.  Lost Opportunities to Purchase Real Property:

We were first made aware of a "late" payment being reflected on our credit report by Suntrust Bank when we attempted to get pre-approval for a mortgage on a house & property in the amount of $525,000. We were denied that approval until we could prove that the information contained in our report was false. By that time, the property had been placed under contract to another buyer. We are not typical home buyers. We have a unique need for a home large enough to accommodate not

only our family, but it must also contain an "in-law apartment." The cost to build the home we could have bought for $525,000 is now approximately $650,000.

Mrs. Jordan operates a business that is very location and land available driven. It took her more than a year to locate the house and property, for which financing was rejected as aforesaid, and we have not found another suitable house with land available since, including homes in the million dollar plus range. This is the reason we turned to trying to locate just land available and build the house & barn(s) thereon to satisfy our needs. Since this process has occurred we have found several suitable land sites available, including 25 acres in Westminster for $129,900, 36 acres in Westminster for $225,000, 25 acres in Reisterstown for $325,000, 47 acres in Upperco for $499,000, and 131 acres in Westminster for $600,000. We had no intention of owning more than 100 acres when we started this process, but since the availability of land is limited and location is paramount to Mrs. Jordan's business success we have had to be very selective when choosing from what is available to us. We have recently had to submit contracts contingent upon the resolution of this case, because the increasing cost of properties would not allow for us to carry mortgages on two properties consecutively. However, Mrs. Jordan's business plan does allow for us to be able to support such a property in the future. The measure of damages for this item is the difference between the cost of building the $525,000 home today for about $650,000, plus the cost of purchasing comparable land for about $200,000, for a total of $850,000, less the cost of the $525,000 and property. That amount is $325,000.

F. Increased Cost to Purchase Real Property.

If we had been able to purchase the house and property for $525,000, our annual mortgage payments would have been negligibly higher than what we are paying now. That must be compared to paying $470,000 more for the latest viable parcel of land only, not including the increased cost to erect a house and barn for Mrs. Jordan's business. This is the difference between the lowest priced and first piece of property we were seeking ($129,900) and the most recent viable piece of property we are seeking ($600,000).  The cost to build a home and barn thereon would be $1,150,000. We are working with two builders now to get exact estimates of this construction. The interest on $1,225,000 ($600,000 for land, plus $1,150,000 to construct the house & barn, minus the $525,000 for the original house we tried to purchase, being the actual increased cost to us to purchase and build today) at 6.25% for 30 years amounts to $1,490,314.40. Therefore, the total increased cost to purchase the land and construct the house and barn, plus the cost of financing, amounts to $2,715.314.40.  If interest rates increase between now and the time we are able to obtain a mortgage on our construction project, that increase in interest payable will be part of our damages. We would like to be able to take advantage of mortgage rates that are now at 40 year lows. But we haven't even been able to consider refinancing our current mortgage because Washington Mutual still doesn't have the correct balance owed on our mortgage reflected on their statements. As time goes on, it will continue to cost us more to construct our house and barn(s) because of the increased cost of materials and labor, which increased costs will also be part of our damages. Taking into consideration that we need to construct a 6500 square foot home and an

8300 square foot barn, these increased costs would amount to more than $50,000.

G. Loss of Consortium:

It is very difficult for us to have a loving relationship in a marriage when we have been faced with monthly foreclosure notices, the inability to purchase consumer items on credit and the daily rigors of dealing with the stress of not being able to achieve our life goals because of Washington Mutual's errors. The stress each of us has experienced, and the frustration of having to constantly put our plans on hold because of a ridiculous but serious problem over which we have no control, has strained our marital relationship. That damage is serious and is certainly worth at least $100,000.

H. Punitive Damages:

Punitive damages are usually a multiple of the compensatory damages. The Electronic Funds Transfer Act calls for treble damages if the Act is violated, as in this case.

I. Reasonable Attorney's Fees:

The Fair Credit Reporting Act and the Electronic Funds Transfer Act are both fee-shifting statutes that provide for the recovery of costs and reasonable attorney's fees. In addition to the fees paid to Matthew Azrael, Esq., Mr. Needle's fees, which will be calculated prior to trial, will be sought.

J. Cost and Fees:

Actual costs and fees will be calculated prior to trial.

**Interrogatory No. 13:** Identify all persons who have investigated the occurrence or its consequences.

17